# EXHIBIT "A"

e-Filed in Office
Tammie Mosley
Clerk of Superior Court
Chatham County
Date: 6/9/2025 11:10 AM
Reviewer: KW

## IN THE SUPERIOR COURT OF CHATHAM COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| STEPHEN COWART,<br>JOSEPH HURST, and<br>KENNETH RAHN JR., | |
| Plaintiffs, | CASE NO.:  SPCV25-00849-WA |
| v. | |
| ILA LOCAL 1475 CLERKS AND<br>CHECKERS UNION, INC., GEORGIA<br>STEVEDORE ASSOCIATION, BENNY<br>HOLLAND JR., RICKY DELOACH,<br>FRANK RYAN JR., STEVE SIMS,<br>NORMAN MASSEY, TRACY<br>O'CONNELL, MICHAEL PARSONS,<br>DENNIS DAGGETT, ALAN ROBB,<br>HAROLD DAGGETT, and John Doe(s)<br>1-10; | |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Stephen Cowart, Joseph Hurst, and Kenneth Rahn ("Plaintiffs"), by and through the undersigned counsel, and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff Stephen Cowart ("Cowart") is a Georgia resident. He resides at 403 Old Augusta Road South, Rincon, GA 31326, in Effingham County, Georgia, and may be served with process there or, wherever he may be found.

2.  Plaintiff Joseph Hurst ("Hurst") is a Georgia resident. He resides at 7 Broken Bit Rd, Ellabell, GA 31308, in Bryan County, Georgia, and may be served there, or wherever he may be found.

3.  Plaintiff Kenneth Rahn Jr. ("Rahn") is a Georgia resident. He resides at 11561 Hwy. 301, Glennville, GA, 30427, in Tattnall County, Georgia, and may be served there, or wherever he may be found.

4.  Defendant ILA Local 1475 Clerks and Checkers Union, Inc. is a Georgia domestic nonprofit corporation, registered in Chatham County, Georgia. ILA Local 1475 can be served at 3 Stockbridge Ct., Savannah, GA 31419 through its registered agent Teri Williams, or wherever it may be found.

5.  Defendant Georgia Stevedore Association, Inc. is a Georgia domestic nonprofit corporation, registered in Chatham County, Georgia. Georgia Stevedore Association can be served at 7 East Congress Street, 2nd Floor, Savannah, GA 31401 through its registered agent, Tracy O'Connell, and may be served there, or wherever it may be found.

6.  Defendant Benny Holland Jr. is the Executive Vice President Emeritus of the International Longshoremen's Association ("ILA") and was actively

involved in integrating Deck and Dock workers into ILA Local 1475. He may be served at the ILA headquarters, or wherever he may be found.

7. Defendant Ricky Deloach, the past and current President of ILA Local 1475, was involved in key decisions during the 2013-2014 contract year that affected the seniority and working conditions of Deck and Dock workers. He currently serves as President of ILA Local 1475 at the filing of suit. He may be served in Chatham County, Georgia, or wherever he may be found.

8. Defendant Frank Ryan Jr., former President of ILA Local 1475, was involved in decisions affecting the seniority classifications and job assignments for Deck and Dock workers. He may be served in Chatham County, Georgia, or wherever he may be found.

9. Defendant Steve Sims is the former President of ILA Local 1475, who has continued the discriminatory practices against Deck and Dock workers. He may be served at ILA Local 1475, 3 Stockbridge Ct., Savannah, GA 31419, or wherever he may be found.

10. Defendant Norman Massey is a representative of the Georgia Stevedore Association who participated in creating and implementing the MOUs that disadvantaged Deck and Dock workers. He may be served at the Georgia Stevedore Association, 7 East Congress Street, 2nd Floor, Savannah, GA 31401, or wherever he may be found.

11. Defendant Tracy O'Connell is an attorney for the Georgia Stevedore Association who drafted and promoted the viewpoint that Deck and Dock work does not belong in the Clerks and Checkers union. She may be served at 7 East Congress Street, 2nd Floor, Savannah, GA 31401, or wherever she may be found.

12. Defendant Michael Parsons, Vice President-Deck and Dock of ILA Local 1475, received numerous complaints from Deck and Dock workers but ultimately union leadership ignored these complaints. He may be served at ILA Local 1475, 3 Stockbridge Ct., Savannah, GA 31419, or wherever he may be found.

13. Defendant Dennis Daggett is the Executive Vice President of the ILA, who received multiple communications regarding the discrimination against Deck and Dock workers, but failed to take appropriate action. He may be served at the ILA headquarters, or wherever he may be found.

14. Defendant Alan Robb, President of the ILA's South Atlantic and Gulf Coast District, was directly involved in decisions regarding the seniority system that disadvantaged Deck and Dock workers. He may be served at the district office of the South Atlantic and Gulf Coast District, or wherever he may be found.

15. Defendant Harold Daggett is the President of the ILA, who received formal requests for intervention and the placement of Local 1475 into emergency trusteeship, but failed to take appropriate action. He may be served at the ILA headquarters, or wherever he may be found.

16. Defendants John Doe 1 through John Doe 5 are currently unknown individuals in union leadership positions who participated in the conspiracy to defraud Deck and Dock workers. Their identities will be added by amendment when discovered.

17. Defendants John Doe 6 through John Doe 10 are currently unknown individuals representing shipping companies who participated in the conspiracy to circumvent the seniority system for job selection. Their identities will be added by amendment when discovered.

18. Jurisdiction and venue are proper in this Court.

### FACTUAL BACKGROUND

19. Plaintiffs are all rank-and-file members of the International Longshoremen's Association (ILA) Local 1475 Clerks and Checkers Union, Inc. ("the Local").

20. Plaintiffs are not just "Clerks and Checkers", whose sole job is to track and document cargo going on and off ships at port; rather, they are "Deck and Dock" workers, whose job is of a dual nature: to physically load and unload cargo coming on and off ships at port, while also performing related clerical duties.

21.Plaintiffs are trained and skilled in every job offered through the 1475 hiring hall, and equipped to perform every function of the work offered by the Stevedore companies.

22.The events that brought on this lawsuit date back to 2011. At that time, a group of non-union Deck and Dock workers directly employed by the Port of Savannah's stevedoring companies filed a grievance with the National Labor Relations Board, alleging that their work should be represented by and performed under the protection of the ILA Union.

23. The Deck and Dock workers won their grievance, and from 2011 to 2013, they worked with ILA Vice President Benny Holland to integrate their work into the operations of ILA Local 1475, Clerks and Checkers Union. Before this integration, the Local had only represented the Clerks and Checkers, whose work did not involve dock work, (despite the Local hiring hall previously performing Deck and Dock work prior to entering into a "Gentleman's agreement" with stevedoring companies to allow them to train and hire their own non-union labor for deck and dock work to the benefit of the Local's clerks and checkers).

24. The Deck and Dock workers thought they would be welcomed by the union with open arms and treated as equals in brotherhood, but have been treated as second-class citizens from the moment they joined the Local. Despite

being dues-paying union members, the Local has systematically used its organizational structure and procedures to discriminate against the Plaintiffs, solely for the crime of not being dyed-in-the-wool Clerks and Checkers.

25. In 2013, the Local passed a "Memorandum of Understanding" (the "*2013 MOU*"), formalizing the Plaintiffs' membership in the Local. Attached as **Exhibit A**. The Memorandum of Understanding was created on August 8, 2013, and the first ILA Deck and Dock workers were dispatched to jobs from the ILA Local 1475 Hiring Hall on August 19, 2013.

26. The *2013 MOU* created a two-tiered caste system that put the Clerks and Checkers on the higher tier, and the Deck and Dock workers on the lower tier, by implementing changes such as:

a) A separate seniority classification system that denied the Deck and Dock workers the ability to advance in seniority in the Local at the same pace as their Clerks and Checkers brothers;

b) A restriction on jobs offered to the Deck and Dock workers that impaired their ability to accumulate qualifying hours in the Local and achieve seniority; and

c) Quality of life issues, including Deck and Dock workers being specifically singled out as not allowed to request relief at the first meal break of a shift. When Deck and Dock workers requested relief, they were written up by

management and faced grievances and punishment, while Clerks and Checkers were granted this right.

27. Seniority has long been a key pillar of how union members access premier job opportunities and benefits of membership. The *2013 MOU* robbed Plaintiffs of many of the benefits of union membership. Under the *2013 MOU*, all Deck and Dock workers were considered "new hires" regardless of prior experience, with a base pay of $20.00/hour following the Master Contract Tiered Wage progression. Benefits contribution rates (MILA, Pension, Welfare, Vacation) were set at breakbulk rates until September 30, 2016, further disadvantaging Deck and Dock workers.

28. After years of subjugation under the *2013 MOU*, the Local portended to end the seniority debate with a 2019 Seniority Agreement (the "*2019 MOU*"). The *2019 MOU* was the Local's (specifically, the Clerks and Checkers') attempt to make the second-class citizenship of the Deck and Dock workers permanent. However, this was hidden in dense bureaucratic language and not immediately evident to the rank-and-file union members. A copy of the *2019 MOU* has been attached as **Exhibit B**.

29. The *2019 MOU* was written and proposed by the leadership of the Local and the leadership of the Georgia Stevedore Association. It required support from a majority of the rank-and-file Local members to ratify it.

30. The leadership of the Local were all longtime Clerks & Checkers, and never actually wanted to bring Deck and Dock workers into the Local, seeing them as competition for resources. A letter from a senior Clerk and Checker expressing this viewpoint is attached as **Exhibit C**.

31. The Georgia Stevedore Association, having already lost at the National Labor Relations Board, longed for the days of hiring Deck and Dock workers directly on their own payrolls without having to pay the salary and benefits associated with hiring union labor. A letter from  Defendant GSA attorney Tracy O'Connell expressing the viewpoint that Deck and Dock work does not belong in the Clerks and Checkers union is attached as **Exhibit D**.

32. This confluence of interests created an unholy alliance between two organizations determined to drive the Deck and Dock workers back out of the Local and back into the employment of stevedoring companies.

33. The Local and the GSA promoted their corrupt scheme in tandem with one another. They fraudulently influenced the rank-and-file vote on the *2019 MOU*, by engaging in malicious whisper campaigns and electronic communications against the Deck and Dock workers.

34. The campaign worked, and the *2019 MOU* passed by a comfortable margin and was so successful that multiple Deck and Dock workers supported the measure, not recognizing the dangers hidden within the document.

35. Despite being branded as a good-faith attempt to resolve the fundamental conflicts within the Local, the *2019 MOU* simply calcified the existing inequities between members. The Deck and Dock workers recognized the rot at the heart of the local organization and appealed the *2013 MOU* to the ILA South Atlantic and Gulf Coast District ("the District") leadership and the leadership of the international organization ("the International").

36. By 2021, the Deck and Dock workers had petitioned the District and the International to place the Local into an emergency trusteeship in order to reach an unbiased solution to the seniority problems facing the Deck and Dock workers. Michael Parsons, the Vice President-Deck and Dock of ILA Local 1475, sent letters to President Harold Daggett on May 5-6, 2021, formally requesting intervention and temporary trusteeship. Despite having the power to fix the seniority system unilaterally, Mr. Daggett formed the "Holland Committee" which advocated for only partial integration.

37. The ILA's Executive Council issued a report on June 4, 2021, finding that there was sufficient basis to impose an emergency trusteeship but instead appointed a committee to investigate the seniority issues and propose a solution directly to ILA President Harold Daggett, who held the power to unilaterally alter the system per the ILA Constitution. A copy of the Executive Council's report is attached as **Exhibit E**.

38. By not imposing an emergency trusteeship, the Executive Council and each member voting not to institute the trusteeship, despite overwhelming evidence it was necessary, condemned the Deck and Dock workers to another corrupt investigation rife with deceptive use of electronic communications designed to achieve a rigged outcome.

39. As a direct result of Defendants' conduct, the Local again subverted their duty to look after their members and reinforced the existing regime under which Deck and Dock workers' seniority goes unrecognized and those members continue to be passed over for jobs in favor of clerks with casual status.

40. Throughout this period, Deck and Dock workers were paid a base pay rate and "breakbulk" for jobs that were previously paid at the highest available rate, creating significant financial disparities. Management paid lower contribution rates to ILA Pension and Welfare Benefit for the first three years, further financially disadvantaging Deck and Dock workers and the greater collective.

41. Despite paying the same dues and fees as other union members, Deck and Dock workers had access to only two types of jobs, while Clerks and Checkers had access to the full range of clerical positions. Deck and Dock workers were systematically excluded from higher-paying jobs such as gate jobs, company clerk and checker jobs, plan jobs, and timekeeper jobs.

42. Deck and Dock workers received harsher punishments for the same offenses committed by Clerks and Checkers. Finally, while Extra List clerk workers were given options to train for Deck and Dock work, Deck and Dock workers were never offered training for Clerk and Checker jobs, further preventing their advancement.

## SUMMARY OF THE SCHEME

43. At its core, the scheme perpetrated by the Defendants was designed to extract maximum value from the Deck and Dock workers while providing them minimal benefits. The Local and the GSA conspired to create a system where Deck and Dock workers would pay full union dues, contribute valuable work hours to the union's overall tally, and increase the union's bargaining power, while systematically denying them the full benefits and protections that should accompany union membership.

44. The financial aspects of this scheme were particularly exploitative. Deck and Dock workers were required to pay the same dues and fees as Clerks and Checkers but received substantially less in return. Their contribution rates to pension and welfare benefits were set at lower rates than their Clerk and Checker counterparts, and they were paid at base rates for jobs that previously commanded premium pay. Meanwhile, union leadership used the additional revenue from these dues to enhance the position of traditional Clerks and Checkers members.

45. Central to this scheme was the manipulation of the seniority system. By creating a separate seniority classification for Deck and Dock workers and imposing unreasonable barriers to advancement (such as the 15,000-hour requirement to transition to conventional clerk work), the Defendants effectively created a permanent underclass within the union. This dual seniority system ensured that even experienced Deck and Dock workers would remain subordinate to more recently hired Clerks and Checkers.

45. The Defendants deliberately restricted Deck and Dock workers' access to better-paying and more desirable jobs. By limiting them to only two job types despite their qualifications for a broader range of positions, the Defendants ensured that premium assignments remained available exclusively to Clerks and Checkers. This restriction had the dual effect of limiting Deck and Dock workers' earning potential and their ability to accumulate the hours necessary for seniority advancement.

46. The conspiracy between the union leadership and the GSA was particularly insidious, as it leveraged the union's supposed duty of fair representation to actually undermine the interests of a specific group of members. Union officials who should have advocated for equal treatment of all members instead colluded with management to preserve a discriminatory system that benefited traditional Clerks and Checkers at the expense of Deck and Dock

workers. This betrayal of fiduciary duty formed the backbone of the scheme that has persisted from 2013 to the present day.

47. In 2019, during the NLRB proceedings related to the seniority system, representatives of the Local and the GSA made false statements to the NLRB regarding the fairness and non-discriminatory nature of the separate seniority system for Deck and Dock workers. These statements were made within the jurisdiction of the NLRB, a government agency, and were material to the NLRB's determination regarding the lawfulness of the union's practices.

48. Subsequently, in 2022, during NLRB Case No. 10-CB-288927, representatives of Local 1475 submitted false statements regarding the implementation of the MOU and the fairness of the hiring hall seniority rules for Deck and Dock workers. The NLRB Regional Director's letter of July 13, 2022, addressed these claims, which were material to the NLRB's investigation of alleged unfair labor practices.

49. The Local also submitted false statements to the NLRB in Case No. 10-CB-288719, filed January 2022, misrepresenting the nature and implementation of the waiver provision signed to be placed on the emergency personnel list, and falsely characterizing the merger of the Deck/Dock list with the Clerk/Checker list as non-discriminatory and in compliance with union obligations.

## COUNT I

## <u>VIOLATIONS OF GEORGIA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT</u>

50. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

51. Defendants ILA Local 1475 Clerks and Checkers Union., Inc., and Georgia Stevedore Association (collectively, the "RICO Defendants") have engaged in a pattern of racketeering activity in violation of the Georgia RICO Act, O.C.G.A. §16-14-1 et seq.

52. The RICO Defendants formed an "enterprise" as defined in O.C.G.A. §16-14-3(3), in that they are a group of individuals and legal entities associated in fact.

53. The RICO Defendants worked together to protect union benefits for existing Clerks and Checkers and, by not giving equal protection to Deck and Dock workers with valid membership, attempting to drive the Deck and Dock workers from the Local.

54. This association had sufficient structure and organization to qualify as a RICO enterprise. There were established roles and relationships among the RICO Defendants. The enterprise exhibited a common unlawful purpose and a consistent pattern and practice of fraudulent behavior. This enterprise was distinct from the pattern of racketeering itself, and it existed separately and apart from two predicate acts of wire fraud in 2019 and 2021.

55. The RICO Defendants, through this enterprise, engaged in a pattern of racketeering activity as defined by O.C.G.A. §16-14-3(4), by engaging in at least two incidents of racketeering activity (predicate crimes) that have the same or similar intents, results, accomplices, victims, and methods of commission.

56. Specifically, the RICO Defendants engaged in the crime of **Wire Fraud** in violation of 18 U.S.C. §1343, in the 2021 dispute about Deck and Dock seniority:

a)    The RICO Defendants devised a scheme to defraud the Deck and Dock workers by means of false and fraudulent pretenses;

b)    In furtherance of this scheme, the RICO Defendants transmitted or caused to be transmitted using wire communication in interstate commerce (such as email or electronic funds transfer) writings, signs, signals, pictures, or sounds;

c)    The use of interstate wire communications was for the purpose of executing the scheme to defraud the Deck and Dock workers;    By engaging in this conduct, the RICO Defendants violated 18 U.S.C. §1343, the federal wire fraud statute;  and

d)    This conduct took place less than five years ago.

57. Furthermore, the RICO Defendants engaged in the crime of **Wire Fraud** in violation of 18 U.S.C. §1343, in the 2019 dispute about Deck and Dock seniority:

a)    The RICO Defendants devised a scheme to defraud the Deck and

Dock workers by means of false and fraudulent pretenses;

b)    In furtherance of this scheme, the RICO Defendants transmitted or

caused to be transmitted by means of wire communication in interstate commerce

(such as email or electronic funds transfer) writings, signs, signals, pictures, or

sounds;

c)    The use of interstate wire communications was for the purpose of

executing the scheme to defraud the Deck and Dock workers;

d)    By engaging in this conduct, the RICO Defendants violated 18 U.S.C.

§1343, the federal wire fraud statute; and

e)    This conduct took place less than five years from the time of the

conduct cited in paragraph 56.

58. Upon information and belief, the RICO Defendants engaged in the crime

of **Embezzlement of Union Assets** in violation of 29 U.S.C. §501(c):

a)    The RICO Defendants, as officers and representatives of the Local,

embezzled, stole, and unlawfully and willfully abstracted and converted to their

own use, and the use of favored Clerks and Checkers, the moneys, funds, property,

and assets of the Local;

b)      Specifically, the RICO Defendants manipulated the seniority system to allocate premium job opportunities, higher pay rates, and enhanced benefits to Clerks and Checkers at the expense of eligible Deck and Dock workers;

c)      The RICO Defendants diverted union resources, including training opportunities, relief positions, and higher-paying assignments away from qualified Deck and Dock workers to Clerks and Checkers with less seniority or qualifications, as documented in the testimony to the ILA Trusteeship Committee;

d)      By denying Deck and Dock workers equal access to the benefits of union membership while requiring them to pay the same dues, the RICO Defendants effectively embezzled the financial contributions of the Deck and Dock workers; and

e)      This conduct has been ongoing since 2013 and continued through 2021 and beyond.

59. The RICO Defendants engaged in the crime of making **False Statements** in violation of O.C.G.A. §16-10-20:

a)      During the NLRB proceedings in Case No. 10-CB-288927 in 2022, representatives of Local 1475 knowingly and willfully made false, fictitious, or fraudulent statements regarding the implementation of the hiring hall seniority rules for Deck and Dock workers;

b)      These statements were made within the jurisdiction of the NLRB, which operates in cooperation with the Georgia Department of Labor on matters of labor practices affecting Georgia residents;

c)      The statements were material to the NLRB's determination regarding whether the union had engaged in unfair labor practices;

d)      The RICO Defendants made similar false statements in NLRB Case No. 10-CB-288719 regarding the waiver provision and merger of seniority lists; and

e)      These false statements were intended to conceal the discriminatory practices targeting the Deck and Dock workers and to protect the existing seniority system that favored the Clerks and Checkers.

60. The RICO Defendants' acts of **Wire Fraud**, **Embezzlement of Union Assets**, and **False Statements** in 2021, 2019, and throughout the relevant period had the same or similar intent: to defraud the Deck and Dock workers and unlawfully deprive them of the benefits of union membership by stifling their earned seniority.

61. The RICO Defendants' acts had the same or similar results, in that they succeeded in thwarting reasonable attempts to change the 2013 Memorandum of Understanding in a way fair to the Deck and Dock workers.

62. The RICO Defendants' racketeering activities had the same or similar methods of commission, including use of social media posts, anonymous flyers, letters, and other channels to spread misinformation about Deck and Dock workers and how their seniority would affect the seniority of rank-and-file Clerks & Checkers.

63. The RICO Defendants' prohibited activities were not isolated incidents. Rather, they were related acts in furtherance of their overarching scheme to defraud the Deck and Dock workers out of seniority and benefits to which they should be entitled.

64. The RICO Defendants' acts of racketeering activity had the same or similar victims, namely the Deck and Dock workers.

65. The RICO Defendants' acts of racketeering activity used the same or similar methods of commission.

66. The RICO Defendants' acts of racketeering activity are interrelated by distinguishing characteristics and are not isolated incidents.

67. Through this pattern of racketeering activity, the RICO Defendants gained control of seniority status and benefits rightfully belonging to the Deck and Dock workers, violating O.C.G.A. §16-14-4(a).

68. As a direct and proximate result of the RICO Defendants' pattern of racketeering activity, including **Wire Fraud**, **Embezzlement of Union Assets**, and **False Statements**, Plaintiffs have been injured in an amount to be proven at trial.

69. Under O.C.G.A. §16-14-6(c), Plaintiffs are entitled to recover three times their actual damages sustained, punitive damages, and their attorneys' fees and costs incurred in this action.

70. Due to the RICO Defendants' violations discussed above, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs of investigation and litigation pursuant to O.C.G.A. §16-14-6(c).

## COUNT II

### CIVIL CONSPIRACY
**(Unfair Practices)**

71. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

72. Defendants ILA Local 1475, Georgia Stevedore Association, Benny Holland Jr., Ricky Deloach, Frank Ryan Jr., Steve Sims, Norman Massey, Tracy O'Connell, and John Does 1-5 entered into a civil conspiracy to defraud the Plaintiffs and other Deck and Dock workers of the full benefits of union membership.

73. This conspiracy involved an agreement between the named Defendants to act in concert to accomplish the unlawful purpose of discriminating against

Deck and Dock workers and depriving them of fair representation, equal benefits, and equal employment opportunities within the union.

74. The conspiracy had the same aims as the RICO scheme detailed above, namely, to extract maximum value from Deck and Dock workers while providing them minimal benefits in return, and to protect and enhance the benefits and opportunities available to traditional Clerks and Checkers at the expense of Deck and Dock workers.

75. In furtherance of this conspiracy, the Defendants committed numerous overt acts, including but not limited to:

a)      Creating and implementing the discriminatory *2013 MOU* that established a separate and unequal seniority system;

b)      Spreading misinformation to influence the vote on the *2019 MOU*, which further entrenched the discriminatory system;

c)      Making false statements to the NLRB regarding the fairness and non-discriminatory nature of the seniority system;

d)      Implementing disproportionate disciplinary actions against Deck and Dock workers;

e)      Systematically denying Deck and Dock workers access to training opportunities for higher-paying jobs; and

f)      Manipulating the 700-hour requirement in ways that specifically

disadvantaged Deck and Dock workers.

76. As a direct and proximate result of this conspiracy, the Plaintiffs have

suffered the damages detailed in the preceding counts, in an amount to be proven at

trial.

## COUNT III

### BREACH OF FIDUCIARY DUTY
**(Creation of Unfair Practices)**

77. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

78. The Defendants ILA Local 1475, Georgia Stevedore Association, and

the individual union leaders named herein owed a fiduciary duty to the Plaintiffs

and other Deck and Dock workers as union members. This fiduciary duty is

established under the principles of union representation and Georgia case law

regarding fiduciary relationships.

79. This fiduciary duty required the Defendants to act in the best interests of

all union members, including the Plaintiffs, to represent them fairly and without

discrimination, and to ensure that union resources, benefits, and opportunities were

distributed equitably among all members.

80. The Defendants breached their fiduciary duty to the Plaintiffs in

numerous ways, including but not limited to:

a)      Failing to abide by the proper implementation of the MOUs in a fair and non-discriminatory manner;

b)      Misusing and misappropriating Deck and Dock workers' dues for the benefit of Clerks and Checkers rather than for the equal benefit of all members;

c)      Imposing disproportionate and inappropriate disciplinary actions against Deck and Dock workers compared to similarly situated Clerks and Checkers;

d)      Failing to provide equal representation, training opportunities, and access to preferred job assignments; and

e)      Creating and maintaining a discriminatory dual seniority system that specifically disadvantaged Deck and Dock workers.

81. As a direct and proximate result of the Defendants' breach of fiduciary duty, the Plaintiffs have suffered damages, including but not limited to:

a)      Lost wages and benefits that would have been earned had they been treated fairly under the union's seniority system;

b)      Lost career advancement opportunities due to restricted job access and discriminatory training practices;

c)      Economic damages resulting from the misappropriation and misuse of their union dues;

d)     Out-of-pocket expenses incurred as a result of discriminatory treatment;

e)     Lost retirement benefits resulting from reduced contributions to pension and welfare funds; and

f)     Mental anguish and emotional distress caused by the discriminatory treatment and hostile environment.

82. The amount of these damages will be proven at trial.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
### (Failure to Address Complaints)

83. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

84. Defendants ILA Local 1475, Michael Parsons, Dennis Daggett, Alan Robb, Harold Daggett, and John Does 1-5 owed a fiduciary duty to Plaintiffs to fairly and effectively address complaints regarding inequitable treatment of Deck and Dock workers.

85. These Defendants breached their fiduciary duty by consistently failing to take appropriate action when presented with complaints and evidence of discriminatory treatment against Deck and Dock workers. Specific instances of this breach include, but are not limited to:

a)    Failure to meaningfully respond to the May 5-6, 2021, letters sent by Michael Parsons to President Harold Daggett requesting intervention and temporary trusteeship;

b)    Ignoring appeals to the ILA South Atlantic and Gulf Coast District regarding the unfair treatment of Deck and Dock workers;

c)    Dismissing or minimizing the significant findings in the Executive Council's report of June 4, 2021, which acknowledged that there was sufficient basis to impose an emergency trusteeship; and

d)    Failing to properly address grievances filed with the local seniority board regarding discriminatory practices.

86. Each time Deck and Dock workers complained about inequities in their treatment, and these complaints were not acted upon to remedy the situation, a separate breach of fiduciary duty occurred. These breaches have been continuous from 2013 to the present day.

87. The Defendants' failure to address these complaints effectively promoted and perpetuated the discriminatory system that disadvantaged Deck and Dock workers. It constituted a fundamental betrayal of the union's duty to represent all its members fairly.

88. As a direct and proximate result of these breaches of fiduciary duty, the Plaintiffs have suffered damages, including but not limited to:

a)      Continued economic losses from perpetuated discriminatory practices;

b)      Loss of fair representation within the union;

c)      Denial of equal employment opportunities;

d)      Mental anguish and emotional distress caused by being ignored and dismissed when seeking redress; and

e)      Costs and expenses incurred in attempting to secure fair treatment through internal union channels.

89. The amount of these damages will be proven at trial.

## COUNT V

### CIVIL CONSPIRACY
**(The Shipping Companies)**

90. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

91. Upon information and belief, Defendants ILA Local 1475, Georgia Stevedore Association, Benny Holland Jr., Ricky Deloach, Frank Ryan Jr., Steve Sims, Norman Massey, and John Does 6-10 (representing shipping companies including Ports America, SSA/Cooper, and Ceres Marine Terminals) entered into a specific civil conspiracy to circumvent the seniority system for job selection.

92. This conspiracy involved an agreement between union leadership and shipping company representatives to allow companies to select Deck and Dock workers by name according to previous employer preference rather than following

the alphabetical rotation system used for other Extra Lists and the seniority-based selection system mandated by union principles.

93. This conspiracy aimed to undermine the seniority rights of Deck and Dock workers, give shipping companies unprecedented control over the union hiring process, and further the goal of treating Deck and Dock workers as second-class union members.

94. In furtherance of this conspiracy, the Defendants committed numerous overt acts, including but not limited to:

a)      Implementing special provisions in the *2013 MOU* that allowed for name selection rather than seniority-based job assignments;

b)      Creating a separate dispatch system for Deck and Dock workers that deviated from the standard procedures used for Clerks and Checkers;

c)      Bypassing the alphabetical rotation system that was standard practice for other Extra Lists;

d)      Denying qualified Deck and Dock workers access to jobs for which they should have been eligible based on seniority; and

e)      Manipulating the hiring hall procedures to favor certain workers over others based on company preferences rather than union principles.

95. As a direct and proximate result of this specific conspiracy, the Plaintiffs have suffered damages including but not limited to:

a)      Loss of higher-paying job opportunities that would have been available through proper seniority-based selection;

b)      Reduction in total working hours and corresponding compensation due to favoritism in job assignments;

c)      Economic impact on earnings, benefits, and pension contributions; and

d)      Loss of seniority advancement opportunities due to reduced hours.

96. The amount of these damages will be proven at trial.

## COUNT VI

### PUNITIVE DAMAGES

97. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

98. By engaging in the bad faith and willful conduct complained of herein, the Defendants acted with the specific intent to cause harm. Their actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences, thereby entitling Plaintiffs to recover punitive damages in an amount to be determined at trial to deter such wrongful conduct in the future.

99. Alternatively, the Defendants' willful acts complained of herein constitute RICO violations, thus entitling Plaintiffs to recover treble or punitive damages pursuant to O.C.G.A. §16-14-6(c).

## COUNT VII

### ATTORNEYS' FEES

100. Plaintiffs reassert the preceding paragraphs as if fully set forth herein.

101. Defendants' willful acts complained of herein constitute RICO violations, thus entitling Plaintiffs to recover reasonable attorneys' fees, costs of investigation, and litigation costs, under O.C.G.A. §16-14-6(c).

**WHEREFORE,** Plaintiffs respectfully pray this Court:

a)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs;

b)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, for the Defendants' RICO violations;

c)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, for breach of fiduciary duty;

d)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, for civil conspiracy;

e)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, for civil conspiracy to circumvent the seniority system for job selection;

f)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, for breach of fiduciary duty related to failure to address complaints;

g)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, and award punitive damages, uncapped, for the Defendants' intentional and willful conduct and to deter such conduct in the future;

h)      Enter judgment against the Defendants, jointly and severally, and in favor of Plaintiffs, and award Plaintiffs their attorneys' fees and expenses of this litigation, pursuant to O.C.G.A. §16-14-6(c).

i)      Grant Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of June, 2025.

GUILMETTE PULVER, LLC

/s/ *Bryan J. Henderson*
Bryan J. Henderson
Georgia Bar No. 821624
1355 Peachtree St NE
Suite 1125
Atlanta, GA 30309

*Attorney for Plaintiffs*

**Exhibit Index**

1.      Exhibit A – 2013 Memorandum of Understanding bringing the Deck and Dock workers into the Local. *See* Paragraphs 13, 14.

2.      Exhibit B – 2019 Memorandum of Understanding attempting to create a seniority system within the Local. *See* Paragraphs 16, 17.

3.      Exhibit C – Letter from Local Clerks and Checkers Skip Sheffield. *See* Paragraph 18.

4.      Exhibit D – Letter from Georgia Stevedore Association attorney Tracy O'Connell. *See* Paragraph 19.

5.      Exhibit E – Report of the Executive Committee of the International Longshoremen's Association, as to seniority issues in the Local. *See* Paragraphs 24-26.

# EXHIBIT A

**Memorandum of Understanding With Respect to
Work of "ILA Deck and Dockmen"**

**August 8, 2013**

On July 18, 2013, the Jurisdiction Committee determined that certain work being performed by management on fully automated container ships calling the GPA Garden City Terminals in the Port of Savannah should be performed by ILA members.  More specifically, Deck and Dock personnel were:  (1) recording stowage changes on plan documents; (2) documenting the move count by checking the containers off the bay plan; and (3) writing buck slips/trucker tickets.

The Jurisdiction Committee has directed the parties to arrive at a mutually acceptable procedure for having these clerical duties performed by ILA-represented employees.  This agreement is also being executed in order to settle long-standing issues among management, the ILA and personnel who have historically performed deck and dock work.

To this end, the Parties agree to the following:

(1)     The direct employer members of the Georgia Stevedore Association recognize ILA Local #1475 as the collective bargaining representative for the ILA Container Deck and Dock Personnel covered by this agreement as hereinafter provided;

(2)     The parties agree to incorporate by reference the Local Agreement (when finalized) between ILA Local #1475 and the GSA representing its direct Employer members, except as modified herein;



1056899v3

(the "ILA Container Deck and Dockmen") to perform the duties described below and in the Master Contract on the fully automated container ships described above. The Parties agree that this agreement in no way impacts Supervisors, as defined below, working for GSA members in the Port of Savannah and does not apply to other Savannah terminals or operations or to other commodities, cargo groups, vessel types or warehouses, except fully automated container vessels at Garden City and Ocean Terminals. The Union specifically acknowledges that it fully understands and agrees that the definition of Superintendent as stated on Page 137 of the ILA Local #1475 Local Agreement dated November 6, 1996, excludes ILA Deck and Dockmen in the Port of Savannah from said definition, but specifically includes Superintendents, the Assistant Superintendents, the Head Superintendents, and Company Vessel Planners employed by GSA members in the Port of Savannah (the "Supervisors") and the Union further agrees that they are supervisory employees as that term is defined in Section 2(11) of the National Labor Relations Act and will not seek to organize or represent any Supervisor. It is agreed that no Supervisors will perform any ILA clerical work as defined in the Master Contract;

(4) The ILA Deck and Dockmen shall be responsible for directing the gang, hatch clerk, field clerk and crane operators to complete all tasks associated with completing the "game" plan, bay plan and similar or related documents and determine when, where, and which containers are to be loaded and unloaded within the parameters of these plans. ILA Deck and Dockmen will also be responsible for ensuring compliance with safety standards and reporting misconduct and poor job performance to the Head Superintendent. The ILA Deck and Dockmen will be responsible for all clerical duties associated with these jobs. Assignment of these duties to the ILA Deck and Dockmen



2



will not deprive supervisory or management employees of the right to perform any of their current duties, including the right of Supervisors to direct the ILA Deck and Dockmen and to duplicate entries made by the ILA Deck and Dockmen. The ILA Deck and Dockmen shall have no power or authority to hire or discharge employees. The ILA Deck and Dockmen will work under the supervision of the CWC, subject to direction by management;

(5)    Parties agree the Master Contract will apply to the ILA Deck and Dockmen. All ILA Deck and Dockmen shall be considered as "new hires" (base $20.00/hour) and "shall receive all increases under the Master Contract Tiered Wage progression for new hires". The total contribution rate for all benefits (MILA, Pension, Welfare, Vacation) shall be the current breakbulk rate ($9.815) per hour worked for these personnel through September 30, 2016, of which $5.00 per hour will go to MILA. The contribution rate will change to the fully automated rate on October 1, 2016;

(6)    The Parties agree to jointly establish a list for each company's ILA Deck and Dockmen (hereinafter referred to as "List A"). The companies agree to equally order by name among those on their lists based on qualification to be dispatched through ILA Local #1475's Hiring Hall. The Union agrees to send those ILA Deck and Dockmen who are asked for by name whenever they are marked up and available for that shift. A port-wide list of ILA Deck and Dockmen will be established to be dispatched on a rotating basis (hereinafter referred to as "List B"). ILA Deck and Dockmen asked for by name from List A will be dispatched first before sending any personnel from List B. The ILA Deck and Dockmen will follow the longshore gang. Once said List B is exhausted, then Deck and Dockmen will be dispatched from the existing ILA Local #1475 seniority list;

3



(7)    By August 16, 2013, current employees must decide whether to remain employed with his current company or to accept assignment through ILA Local 1475 as an ILA Deck or Dockmen;

(8)    All of said ILA Deck and Dockmen shall work under the Clerk's and Checker's Agreement of Local 1475 with special conditions as set out herein;

(9)    Under the direction of his Supervisors, the ILA Deck and Dockmen will be responsible for the conduct of the gang to which they are assigned, including meeting the requirements of the stowage plans, the requirements of the shipping lines, and the provisions of the collective bargaining agreement;

(10)   ILA Deck and Dockmen will not be allowed to mark off until the 2nd meal break; the process of "handing off" a Deck or Dockman's paperwork to the relief Deck or Dockman will be established;

(11)   Any company will have the authority, in its discretion, to refuse to use any ILA Deck or Dockman for just cause on a temporary or permanent basis and/or to request a different ILA Deck or Dockman in his or her place;

(12)   Nothing in this agreement shall affect the rights of management-designated Supervisors or other supervisory employees to direct the labor force, including the ILA Deck and Dockmen, in the performance of their designated tasks. These duties include responsibility for the safety of all personnel assigned to his control, proper stowage and handling of cargo and coordination of the assignment of labor;

4



(13) This will include an interim agreement to assure uninterrupted operations while transitioning to this new agreement;

(14) During the term of this Agreement, the Union will exercise its best efforts, internally and through regular meetings with the Georgia Ports Authority and the stevedoring companies, to increase vessel productivity; and

(15) Unless mutually agreed upon in writing by the Parties there will be no modification of this agreement. The employers will not be required to negotiate on any further matters affecting these or other subjects not specifically set forth in this agreement. Anything not contained in this Agreement shall not be construed as being a part of this agreement.

(16) This Agreement shall not be effective until signed by all of the Parties through their officers designated below.

ILA LOCAL 1475                          GEORGIA STEVEDORE ASSOCIATION

By: _____ 8/15/13          By: _____ 08/15/13
Ricky C. DeLoach, President            Norman L. Massey, President

APPROVED:

_____
Benny H. Holland, Jr.
Executive Vice President
International Longshoremen's Association

5

Memorandum of Understanding With Respect to
Work of "ILA Deck and Dockmen"

August 8, 2013

On July 18, 2013, the Jurisdiction Committee determined that certain work being performed by management on fully automated container ships calling the GPA Garden City Terminals in the Port of Savannah should be performed by ILA members.  More specifically, Deck and Dock personnel were:  (1) recording stowage changes on plan documents; (2) documenting the move count by checking the containers off the bay plan; and (3) writing buck slips/trucker tickets.

The Jurisdiction Committee has directed the parties to arrive at a mutually acceptable procedure for having these clerical duties performed by ILA-represented employees.  This agreement is also being executed in order to settle long-standing issues among management, the ILA and personnel who have historically performed deck and dock work.

To this end, the Parties agree to the following:

(1)     The direct employer members of the Georgia Stevedore Association recognize ILA Local #1475 as the collective bargaining representative for the ILA Container Deck and Dock Personnel covered by this agreement as hereinafter provided;

(2)     The parties agree to incorporate by reference the Local Agreement (when finalized) between ILA Local #1475 and the GSA representing its direct Employer members, except as modified herein;



1056890v3



(3)     The Parties agree that the stevedoring company will hire

(the "ILA Container Deck and Dockmen") to perform the duties described below and in

the Master Contract on the fully automated container ships described above.   The

Parties agree that this agreement in no way impacts Supervisors, as defined below,

working for GSA members in the Port of Savannah and does not apply to other

Savannah terminals or operations or to other commodities, cargo groups, vessel types

or warehouses, except fully automated container vessels at Garden City and Ocean

Terminals.  The Union specifically acknowledges that it fully understands and agrees

that the definition of Superintendent as stated on Page 137 of the ILA Local #1475 Local

Agreement dated November 6, 1996, excludes ILA Deck and Dockmen in the Port of

Savannah from said definition, but specifically includes Superintendents, the Assistant

Superintendents, the Head Superintendents, and Company Vessel Planners employed

by GSA members in the Port of Savannah (the "Supervisors") and the Union further

agrees that they are supervisory employees as that term is defined in Section 2(11) of

the National Labor Relations Act and will not seek to organize or represent any

Supervisor. It is agreed that no Supervisors will perform any ILA clerical work as defined

in the Master Contract;

(4)     The ILA Deck and Dockmen shall be responsible for directing the gang, hatch clerk, field

clerk and crane operators to complete all tasks associated with completing the "game"

plan, bay plan and similar or related documents and determine when, where, and which

containers are to be loaded and unloaded within the parameters of these plans.  ILA

Deck and Dockmen will also be responsible for ensuring compliance with safety

standards and reporting misconduct and poor job performance to the Head

Superintendent.  The ILA Deck and Dockmen will be responsible for all clerical duties

associated with these jobs. Assignment of these duties to the ILA Deck and Dockmen



2



will not deprive supervisory or management employees of the right to perform any of their current duties, including the right of Supervisors to direct the ILA Deck and Dockmen and to duplicate entries made by the ILA Deck and Dockmen. The ILA Deck and Dockmen shall have no power or authority to hire or discharge employees. The ILA Deck and Dockmen will work under the supervision of the CWC, subject to direction by management;

(5)    Parties agree the Master Contract will apply to the ILA Deck and Dockmen. All ILA Deck and Dockmen shall be considered as "new hires" (base $20.00/hour) and "shall receive all increases under the Master Contract Tiered Wage progression for new hires". The total contribution rate for all benefits (MILA, Pension, Welfare, Vacation) shall be the current breakbulk rate ($9.815) per hour worked for these personnel through September 30, 2016, of which $5.00 per hour will go to MILA. The contribution rate will change to the fully automated rate on October 1, 2016;

(6)    The Parties agree to jointly establish a list for each company's ILA Deck and Dockmen (hereinafter referred to as "List A"). The companies agree to equally order by name among those on their lists based on qualification to be dispatched through ILA Local #1475's Hiring Hall. The Union agrees to send those ILA Deck and Dockmen who are asked for by name whenever they are marked up and available for that shift. A port-wide list of ILA Deck and Dockmen will be established to be dispatched on a rotating basis (hereinafter referred to as "List B"). ILA Deck and Dockmen asked for by name from List A will be dispatched first before sending any personnel from List B. The ILA Deck and Dockmen will follow the longshore gang. Once said List B is exhausted, then Deck and Dockmen will be dispatched from the existing ILA Local #1475 seniority list;



3



(7)   By August 16, 2013, current employees must decide whether to remain employed with his current company or to accept assignment through ILA Local 1475 as an ILA Deck or Dockmen;

(8)   All of said ILA Deck and Dockmen shall work under the Clerk's and Checker's Agreement of Local 1475 with special conditions as set out herein;

(9)   Under the direction of his Supervisors, the ILA Deck and Dockmen will be responsible for the conduct of the gang to which they are assigned, including meeting the requirements of the stowage plans, the requirements of the shipping lines, and the provisions of the collective bargaining agreement;

(10)  ILA Deck and Dockmen will not be allowed to mark off until the 2nd meal break; the process of "handing off" a Deck or Dockman's paperwork to the relief Deck or Dockman will be established;

(11)  Any company will have the authority, in its discretion, to refuse to use any ILA Deck or Dockman for just cause on a temporary or permanent basis and/or to request a different ILA Deck or Dockman in his or her place;

(12)  Nothing in this agreement shall affect the rights of management-designated Supervisors or other supervisory employees to direct the labor force, including the ILA Deck and Dockmen, in the performance of their designated tasks. These duties include responsibility for the safety of all personnel assigned to his control, proper stowage and handling of cargo and coordination of the assignment of labor;

4




(13)    This will include an interim agreement to assure uninterrupted operations while transitioning to this new agreement;

(14)    During the term of this Agreement, the Union will exercise its best efforts, internally and through regular meetings with the Georgia Ports Authority and the stevedoring companies, to increase vessel productivity; and

(15)    Unless mutually agreed upon in writing by the Parties there will be no modification of this agreement. The employers will not be required to negotiate on any further matters affecting these or other subjects not specifically set forth in this agreement. Anything not contained in this Agreement shall not be construed as being a part of this agreement.

(16)    This Agreement shall not be effective until signed by all of the Parties through their officers designated below.

ILA LOCAL 1475                                    GEORGIA STEVEDORE ASSOCIATION

By: _____    By: _____
    Ricky C. DeLoach, President            Norman L. Massey, President

APPROVED:

_____
Benny H. Holland, Jr.
Executive Vice President
International Longshoremen's Association



# EXHIBIT B

## ILA LOCAL 1475
## SAVANNAH DECK AND DOCKMEN SENIORITY PLAN
### April 1, 2019

To implement the employment of Deck and Dockmen in the Port of Savannah, Georgia, as provided by Clause 14 of the present Collective Bargaining Agreement of I.L.A. Local 1475 and the Memorandum of Understanding with Respect to ILA Deck and Dockmen, (MOU), dated August 8, 2013, the parties thereto hereby agree to the following:

1.  The operation of the Plan shall be governed by a Seniority Board composed of the President and one (1) rank and file member of I.L.A. Local 1475, and two (2) members of the Georgia Stevedore Association.

2.  Any dispute concerning or arising out of the terms and conditions of this Agreement shall be referred to the Seniority Board.

    A.  This Seniority Board shall act by majority vote, and should they reach a determination in a particular dispute, such determination shall be final and binding.
    B.  The Board shall hold meetings as necessary.
    C.  The Seniority Board shall be the sole judge of the sufficiency of the evidence to be considered in the resolution of any dispute brought before them.
    D.  If the Seniority Board shall be unable to reach a determination in a particular dispute, the dispute shall be resolved under the procedure established under Clause 15(B) of the Collective Bargaining Agreement.
    E.  The Board shall have authority to determine whether any seniority rules listed herein have been violated, and shall have power to invoke the penalties provided under Paragraph 6 herein.
    F.  Any dispute or grievance by an individual employee or employer must be submitted to the Board in writing at least 48 hours prior to a meeting. The complaint must be signed by the plaintiff.

3.  As used in this Agreement, "continuous service" means that an employee must work a minimum of 700 hours as a Deck or Dockman in the port of Savannah beginning October 1, 2018 and each successive contract year following the seniority classification. An employee must continue to maintain 700 hours or more of service as a Deck or Dockman during future contract years to maintain seniority.

    A.  An individual must work a minimum of 700 hours in a contract year to attain a number/letter seniority classification.
    B.  All years of stevedoring services and all hours of service as a Deck or Dockman must have been earned in the Port of Savannah.



C.  Deck and Dockmen shall be dispatched in accordance with their Seniority Classification as set forth below:

**CLASS A:** (DD1) Class A seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 42 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS B:** (DD2) Class B seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 30 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS C:** (DD3) Class C seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 23 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS D:** (DD4) Class D seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 22 years of stevedoring service and who earned or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS E:** (DD5) Class E seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 21 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS F:** (DD6) Class F seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 20 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS G:** (DD7) Class G seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 19 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS H:** (DD8) Class H seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 18 years of stevedoring service and who earned 700

or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS I:** (DD9) Class I seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 17 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS J:** (DD10) Class J seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 16 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS K:** (DD11) Class K seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 15 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS L:** (DD12) Class L seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 14 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS M:** (DD13) Class M seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 12 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS N:** (DD14) Class N seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 11 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS O:** (DD15) Class O seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 10 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.



**CLASS P:** (DD16) Class P seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 9 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS Q:** (DD17) Class Q seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 8 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS R:** (DD18) Class R seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 7 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS S:** (DD19) Class S seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 6 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS T:** (DD20) Class T seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 5 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS U:** (DD21) Class U seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 4 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS V:** (DD22) Class V seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 3 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS W:** (DD23) Class W seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 2 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS X:** (DD24) Class X seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 1 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS Y:** (DD25) Class Y seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2015 to September 30, 2016 and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2016.

**CLASS Z17:** (DD26) Class Z17 seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2016 to September 30, 2017 and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2017

**FUTURE CLASSIFICATIONS:** The Seniority Board shall meet on or about September 30, 2019 to determine whether and how to classify personnel who have earned 700 or more hours of service as a deck or dockman in either or both contract years ending September 30, 2018 or September 30, 2019.

D. A seniority Deck or Dockman who fails to earn 700 hours during any contract year will drop to the next classified seniority category He will serve a two-year probation period the following two contract years. He may regain his original seniority category by earning at least 700 hours during each of these two years of probation. Failure to earn 700 hours during this probationary period will result in a loss of seniority and he will drop to Casual status.

**CASUAL:** Casual seniority shall be enjoyed by those personnel who do not fall within the above classes, were employed as Deck and Dockmen 700 or more hours during any contract year and who remain ready and willing to work at all times.

E. Additional qualified Deck and Dockmen will be added in the following order as needed from the groups listed below:

1. Those who hold Seniority status under Savannah Clerks and Checkers Seniority plan.

2. Those individuals who have been approved jointly by Georgia Stevedore Association and ILA Local 1475.

4. In determining the above qualification, the following rules shall apply:

A. As used in this Agreement "Contract Year" shall be defined as any annual period between October 1 and September 30 of the following year.

B. Employees may receive credit for allowable breaks in service which are due to:

    1. Injury or illness (other than through alcohol or drugs) to the extent of becoming eligible for Worker's Compensation or for benefits under the Industry's Welfare Plan.

    2. Absence due to military service provided the individual is reinstated in the Industry in compliance with the requirements of law as to re-employment.

    3. Absence due to service as an officer of the I.L.A. or its subdivision.

    4. Absence for a period not to exceed one year upon advance approval of the Seniority Board when the Board determines a temporary leave to be necessary and not for the purposes of accepting other employment.

C. Credit for allowable breaks in service shall be granted for the purpose of seniority on the basis of four (4) hours for each day of the week in each contract year, with a maximum of 700 hours per contract year.

D. The seniority of an individual shall cease with respect to priority of employment in the event he/she:

    1. Voluntarily quits, resigns or retires.

    2. Fails to work at least 700 hours unless such failure is allowable within 4(B). Time credited for paid vacations and holidays is not to be credited toward this requirement.

E. The records of the Pension and Welfare Fund shall be the official source of years of service and hours worked and where such records are questioned, the Seniority Board shall have the authority to determine the figures to be used for classification under the Seniority Plan.

F. All new deck and dock men, regardless of years of service in any craft in the industry will have NO SENIORITY or standing until they work a minimum of 700 hours as a deck and/or dock man in a single contract year.

5. In selecting personnel for work covered by the Collective Bargaining Agreement and the MOU, the following rules must be observed:

A. The Local 1475 Hiring Center will dispatch personnel in accordance with the provisions of this Seniority Agreement.

B. Providing they are able to perform the essential functions of an available position with or without a reasonable accommodation, all available personnel in group "A" must be offered employment before the other groups can be considered. Should further personnel be required after all available group "A" personnel have been offered employment, the employment will be offered to personnel in group "B" in the same fashion. Employment will continue to be offered through successive groups until all available personnel have been offered employment before personnel without seniority status are employed, except current practice will be followed through September 30, 2019.

C. Personnel working during the day and having completed eight (8) hours, shall have no seniority or new status at 7:00 P.M. Personnel working during the night and having completed eight (8) hours shall have no seniority status at 8:00 A.M. Notwithstanding, personnel referred to in the above provisions, may be hired after all employees with seniority status have been offered employment. Once an individual has been offered employment by any employer for work at any starting time, and he/she refuses employment at that time, he/she therefore, waives his/her seniority status for that particular hiring period; but may be offered employment at the next hiring period. Persons who cancel or reject employment after having accepted it, shall lose their seniority for 24 hours.

D. Employers must make every reasonable effort to train personnel for deck and dock jobs.

E. Selection of individuals for jobs shall be without discrimination against any applicant by reason of race, creed, sex, membership or non-membership in I.L.A. Local 1475. Such selection shall be strictly in accord with the above rules and procedures as set forth in this Agreement and shall not be affected by Union rules, by-laws, regulations, constitutional provisions, or any other aspect of Union membership, policies, or requirements. If any provision herein is found to be in violation of any local, state or federal laws, then those portions in violation shall be declared null and void.

6.

A. The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

  1. Collusion by an individual with an employer to violate hiring rules.
  2. Leaving a job prior to 2nd meal period (unless injured).
  3. Persistently failing to accept employment which he/she is capable of performing or regularly fails to make themselves available for employment.
  4. ILA Deck and Dockmen who secure a relief prior to the second meal break shall not be eligible for employment for 24 hours from the time they knock off.



5. Any other violation of this Seniority Agreement.

B. Before taking disciplinary action for violation of rules herein specified, the party will be given written notice of the conduct claimed to be in violation of the rules and warranting disciplinary action, which notice shall fix a time and place at which the employee may appear and present his/her defenses.

C. The Seniority Board must assess the following penalties against an employee who is found to violate the above rules and regulations during each contract year:

**FIRST OFFENSE:** Fourteen (14) days suspension of all Seniority through ILA Local 1475 Hiring Center.

**SECOND OFFENSE:** Thirty (30) days suspension of all Seniority through ILA Local 1475 Hiring Center.

**THIRD OFFENSE:** Sixty (60) days suspension of all Seniority through ILA Local 1475 Hiring Center plus such additional suspension of seniority preference as the Seniority Board deems necessary.

D. The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

a. Use of false seniority card or use of a card belonging to another individual.

b. Allowing another to use the seniority card entrusted to the owner.

**FIRST OFFENSE:** Permanent dismissal from the industry.

7. The Seniority Board will meet to determine whether the penalties listed in paragraph 6 are adequate, and if they find an undue number of violations, the Seniority Board shall recommend to the parties that the penalties be substantially increased.

8. The Seniority Plan will remain effective until the expiration of the present Collective Bargaining Agreement, but may be amended by mutual agreement between the parties. All provisions of the Plan including criteria for grouping employees are subject to change upon agreement by both parties, to the extent the change does not violate the terms of the MOU.

9. Both parties agree that the charging party shall have the right to file a complaint under the terms and conditions of the contractual agreement of their choice.



Signed and agreed to by the International Longshoremen's Association, Local 1475 and the Georgia Stevedore Association on the 1st day of April, 2019.

For the International Longshoremen's
Association, I.L.A. Local 1475:

For the Georgia Stevedore
Association:

_____
Frank C. Ryan, Jr., President

_____
Norman L. Massey, President

## ILA LOCAL 1475
### SAVANNAH DECK AND DOCKMEN SENIORITY PLAN
### April 1, 2019

To implement the employment of Deck and Dockmen in the Port of Savannah, Georgia, as provided by Clause 14 of the present Collective Bargaining Agreement of I.L.A. Local 1475 and the Memorandum of Understanding with Respect to ILA Deck and Dockmen, (MOU), dated August 8, 2013, the parties thereto hereby agree to the following:

1. The operation of the Plan shall be governed by a Seniority Board composed of the President and one (1) rank and file member of I.L.A. Local 1475, and two (2) members of the Georgia Stevedore Association.

2. Any dispute concerning or arising out of the terms and conditions of this Agreement shall be referred to the Seniority Board.

    A. This Seniority Board shall act by majority vote, and should they reach a determination in a particular dispute, such determination shall be final and binding.
    B. The Board shall hold meetings as necessary.
    C. The Seniority Board shall be the sole judge of the sufficiency of the evidence to be considered in the resolution of any dispute brought before them.
    D. If the Seniority Board shall be unable to reach a determination in a particular dispute, the dispute shall be resolved under the procedure established under Clause 15(B) of the Collective Bargaining Agreement.
    E. The Board shall have authority to determine whether any seniority rules listed herein have been violated, and shall have power to invoke the penalties provided under Paragraph 6 herein.
    F. Any dispute or grievance by an individual employee or employer must be submitted to the Board in writing at least 48 hours prior to a meeting. The complaint must be signed by the plaintiff.

3. As used in this Agreement, "continuous service" means that an employee must work a minimum of 700 hours as a Deck or Dockman in the port of Savannah beginning October 1, 2018 and each successive contract year following the seniority classification. An employee must continue to maintain 700 hours or more of service as a Deck or Dockman during future contract years to maintain seniority.

    A. An individual must work a minimum of 700 hours in a contract year to attain a number/letter seniority classification.
    B. All years of stevedoring services and all hours of service as a Deck or Dockman must have been earned in the Port of Savannah.



C. Deck and Dockmen shall be dispatched in accordance with their Seniority Classification as set forth below:

**CLASS A:** (DD1) Class A seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 42 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASSB:** (DD2) Class B seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 30 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS C:** (DD3) Class C seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 23 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS D:** (DD4) Class D seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 22 years of stevedoring service and who earned or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS E:** (DD5) Class E seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 21 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS F:** (DD6) Class F seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 20 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS G:** (DD7) Class G seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 19 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS H:** (DD8) Class H seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 18 years of stevedoring service and who earned 700



or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS I:** (DD9) Class I seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 17 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS J:** (DD10) Class J seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 16 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS K:** (DD11) Class K seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 15 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS L:** (DD12) Class L seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 14 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS M:** (DD13) Class M seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 12 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS N:** (DD14) Class N seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 11 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS O:** (DD15) Class O seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 10 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.



**CLASS P:** (DD16) Class P seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 9 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS Q:** (DD17) Class Q seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 8 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS R:** (DD18) Class R seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 7 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS S:** (DD19) Class S seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 6 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS T:** (DD20) Class T seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 5 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS U:** (DD21) Class U seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 4 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS V:** (DD22) Class V seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 3 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS W:** (DD23) Class W seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 2 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS X:** (DD24) Class X seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen with 1 years of stevedoring service and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2013 to September 30, 2014, and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2014.

**CLASS Y:** (DD25) Class Y seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2015 to September 30, 2016 and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2016.

**CLASS Z17:** (DD26) Class Z17 seniority shall be enjoyed by those personnel who were employed as Deck or Dockmen and who earned 700 or more hours of service as a deck or dockman during the contract year October 1, 2016 to September 30, 2017 and who have maintained at least 700 hours of continuous service at such occupation since October 1, 2017

**FUTURE CLASSIFICATIONS:** The Seniority Board shall meet on or about September 30, 2019 to determine whether and how to classify personnel who have earned 700 or more hours of service as a deck or dockman in either or both contract years ending September 30, 2018 or September 30, 2019.

    D. A seniority Deck or Dockman who fails to earn 700 hours during any contract year will drop to the next classified seniority category He will serve a two-year probation period the following two contract years. He may regain his original seniority category by earning at least 700 hours during each of these two years of probation. Failure to earn 700 hours during this probationary period will result in a loss of seniority and he will drop to Casual status.

**CASUAL:** Casual seniority shall be enjoyed by those personnel who do not fall within the above classes, were employed as Deck and Dockmen 700 or more hours during any contract year and who remain ready and willing to work at all times.

    E. Additional qualified Deck and Dockmen will be added in the following order as needed from the groups listed below:

        1. Those who hold Seniority status under Savannah Clerks and Checkers Seniority plan.

        2. Those individuals who have been approved jointly by Georgia Stevedore Association and ILA Local 1475.

4. In determining the above qualification, the following rules shall apply:



A. As used in this Agreement "Contract Year" shall be defined as any annual period between October 1 and September 30 of the following year.

B. Employees may receive credit for allowable breaks in service which are due to:

    1. Injury or illness (other than through alcohol or drugs) to the extent of becoming eligible for Worker's Compensation or for benefits under the Industry's Welfare Plan.

    2. Absence due to military service provided the individual is reinstated in the Industry in compliance with the requirements of law as to re-employment.

    3. Absence due to service as an officer of the I.L.A. or its subdivision.

    4. Absence for a period not to exceed one year upon advance approval of the Seniority Board when the Board determines a temporary leave to be necessary and not for the purposes of accepting other employment.

C. Credit for allowable breaks in service shall be granted for the purpose of seniority on the basis of four (4) hours for each day of the week in each contract year, with a maximum of 700 hours per contract year.

D. The seniority of an individual shall cease with respect to priority of employment in the event he/she:

    1. Voluntarily quits, resigns or retires.

    2. Fails to work at least 700 hours unless such failure is allowable within 4(B). Time credited for paid vacations and holidays is not to be credited toward this requirement.

E. The records of the Pension and Welfare Fund shall be the official source of years of service and hours worked and where such records are questioned, the Seniority Board shall have the authority to determine the figures to be used for classification under the Seniority Plan.

F. All new deck and dock men, regardless of years of service in any craft in the industry will have NO SENIORITY or standing until they work a minimum of 700 hours as a deck and/or dock man in a single contract year.

5. In selecting personnel for work covered by the Collective Bargaining Agreement and the MOU, the following rules must be observed:

A. The Local 1475 Hiring Center will dispatch personnel in accordance with the provisions of this Seniority Agreement.

B. Providing they are able to perform the essential functions of an available position with or without a reasonable accommodation, all available personnel in group "A" must be offered employment before the other groups can be considered. Should further personnel be required after all available group "A" personnel have been offered employment, the employment will be offered to personnel in group "B" in the same fashion. Employment will continue to be offered through successive groups until all available personnel have been offered employment before personnel without seniority status are employed, except current practice will be followed through September 30, 2019.

C. Personnel working during the day and having completed eight (8) hours, shall have no seniority or new status at 7:00 P.M. Personnel working during the night and having completed eight (8) hours shall have no seniority status at 8:00 A.M. Notwithstanding, personnel referred to in the above provisions, may be hired after all employees with seniority status have been offered employment. Once an individual has been offered employment by any employer for work at any starting time, and he/she refuses employment at that time, he/she therefore, waives his/her seniority status for that particular hiring period; but may be offered employment at the next hiring period. Persons who cancel or reject employment after having accepted it, shall lose their seniority for 24 hours.

D. Employers must make every reasonable effort to train personnel for deck and dock jobs.

E. Selection of individuals for jobs shall be without discrimination against any applicant by reason of race, creed, sex, membership or non-membership in I.L.A. Local 1475. Such selection shall be strictly in accord with the above rules and procedures as set forth in this Agreement and shall not be affected by Union rules, by-laws, regulations, constitutional provisions, or any other aspect of Union membership, policies, or requirements. If any provision herein is found to be in violation of any local, state or federal laws, then those portions in violation shall be declared null and void.

6.

A. The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

   1. Collusion by an individual with an employer to violate hiring rules.
   2. Leaving a job prior to 2nd meal period (unless injured).
   3. Persistently failing to accept employment which he/she is capable of performing or regularly fails to make themselves available for employment.
   4. ILA Deck and Dockmen who secure a relief prior to the second meal break shall not be eligible for employment for 24 hours from the time they knock off.



5. Any other violation of this Seniority Agreement.

B. Before taking disciplinary action for violation of rules herein specified, the party will be given written notice of the conduct claimed to be in violation of the rules and warranting disciplinary action, which notice shall fix a time and place at which the employee may appear and present his/her defenses.

C. The Seniority Board must assess the following penalties against an employee who is found to violate the above rules and regulations during each contract year:

**FIRST OFFENSE:** Fourteen (14) days suspension of all Seniority through ILA Local 1475 Hiring Center.

**SECOND OFFENSE:** Thirty (30) days suspension of all Seniority through ILA Local 1475 Hiring Center.

**THIRD OFFENSE:** Sixty (60) days suspension of all Seniority through ILA Local 1475 Hiring Center plus such additional suspension of seniority preference as the Seniority Board deems necessary.

D. The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

a. Use of false seniority card or use of a card belonging to another individual.

b. Allowing another to use the seniority card entrusted to the owner.

**FIRST OFFENSE:** Permanent dismissal from the industry.

7.   The Seniority Board will meet to determine whether the penalties listed in paragraph 6 are adequate, and if they find an undue number of violations, the Seniority Board shall recommend to the parties that the penalties be substantially increased.

8.   The Seniority Plan will remain effective until the expiration of the present Collective Bargaining Agreement, but may be amended by mutual agreement between the parties. All provisions of the Plan including criteria for grouping employees are subject to change upon agreement by both parties, to the extent the change does not violate the terms of the MOU.

9.   Both parties agree that the charging party shall have the right to file a complaint under the terms and conditions of the contractual agreement of their choice.

Signed and agreed to by the International Longshoremen's Association, Local 1475 and the Georgia Stevedore Association on the 1st day of April, 2019.

For the International Longshoremen's
Association, I.L.A. Local 1475:

Frank C. Ryan, Jr., President

For the Georgia Stevedore
Association:

Norman L. Massey, President

April 18, 2021.

EXHIBIT C

*Skip's Letter Against DND*

ARTHUR (SKIP) SHEFFIELD

37 PENROSE DRIVE
SAVANNAH, GA
31410-1222.  912-663-7320.

In late 1971, I followed my Uncle (a former Business Agent of the Local) and my Dad ( a former Secretary of the Local) and started working as a clerk for Local1475. In contract year 1972-1973, myself and 21 other white males made our hours and joined local 1475 as H cards (now B -Cards). In 1975 I ran and was elected as a Dispatcher of local 1475. I was re-elected as Dispatcher in 1976,1977 and 1978. During my time as dispatcher, 3 groups made their hours: I cards 1973-76 (now C -Cards, 8 white males), J cards 1976-77 (now D Cards, 25 White males), K cards 1977-78 (now E – Cards 7 White males and 1 black male.

In 1978, local 1475 was sued in the United States District Court for the Southern District of Georgia for racial discrimination. The Local assured the Court of their intentions to continue to comply in all respects with Title VII and Section 1981 and all other applicable laws concerning equal employment. When new applications are to be accepted, notice of that fact shall be made prior to the acceptance of such applications through local news organizations. All such notices shall contain language that Local 1475 is an equal opportunity employer, and such notice is in accordance with the spirit and terms of the settlement.

The next group to make their hours were L cards ( now F - Cards 1982-1983, 42 white males and 3 Black males). In 1984, Local 1475 held the List 1 sign up, and if my memory is correct, about 600 applications were received. Within 15 to 18 months of the List 1 sign-up, the largest container line in the port (United States Line) filed for bankruptcy and went out of business. It was not until contract year 1990-1991 ( 7 years later), that the first group from List 1 made their hours, 14 - N Cards (now G -Cards) including the first woman. The next year, 1991-1992 12 O-Cards (now H – Cards) made their hours including women and minorities. It took another 5 years (until 1996-1997) for the next category to make their hours.  All you have to do is look at our membership, since the **List 1 and List 4 sign-ups,** to see the obvious diversity and opportunities these sign-ups have brought, not only to these members but also to our  Local. Every clerk has started on a *Clerk's List,* at the bottom and with no seniority, sometimes taking as long as 7 years to make their hours. Not one clerk started their career on the docks with seniority.

I was on the Executive Board the entire time the deck and dock were trying to organize. I was not involved in the organizing efforts but was kept up to date, as were the other Executive Board members as to what was happening with this effort. At just about every meeting, it was brought up and stated for the record that deck and dock hours would *not* count towards clerk hours and seniority. ***Everyone knew this or should have known it.*** Now we are being fed misinformation and not so veiled threats as to receivership and possible direct action by the District. The District proposal is nothing short of insulting, putting our local in direct conflict with the 1978 United

States District Court settlement, by basically putting 75-100 white men ahead of everyone after this year, including potentially seniority personnel. The District held no forum, and never consulted with us until after their plan was formulated. We have contributed nothing to this plan, and have not been given an opportunity to negotiate changes of any kind. We have the resources of our local (money), and the protection of government agencies and the courts to do what is right. We need to vote *no, no, no.* I cannot think of single reason (besides *self interest*) for a clerk to vote in favor of this proposal. I think this vote is the most crucial one in my 50 years on the docks. I also think that those who are playing Local politics are doing so for purely selfish reasons. They should be ashamed of themselves and we should never forget who they are. The solution to the deck and dock personnel who want who want to be clerks is quite simple. With the upcoming List 5 sign-up, if someone wants to be a clerk, all they have to do is sign-up like anyone else who wants to be a clerk.

However the vote goes, *yes or no*, I do not think our Local can survive much longer with us combined with deck and dock. We have already spent tens, maybe even hundreds of thousands of dollars and thousands of hours on many frivolous threats, law suits and NLRB charges. I think we need our own Local (just as it has been for over 80 years) just for clerks, and the deck and dock need their own Local for deck and dock men (and or women). In the early 1980's, M&R (maintenance & repair) were part of Local 1414 and separated to become Local 1423. We (clerks) and (deck / dock) could, with the District's and International's help, by September 30, 2021 have *TWO LOCALS.* Local 1475 could help financially by returning the deck and dock men's initiation fee ( I'm guessing $50,000 to $70,000, maybe more) and in any other way possible. It can be and has been done, separating one Local into two.

I felt strongly enough about my views and opinions, that I had to share them with anyone who would listen. All the dates and numbers are from my memory so might be a little off. Thank you for taking the time to read this letter.


IN BROTHERHOOD


SKIP SHEFFIELD

EXHIBIT D



EPRA
ELLIS, PAINTER, RATTERREE & ADAMS LLP

TRACY C. O'CONNELL (GA & TX)

WWW.EPRA-LAW.COM

August 27, 2020

**VIA EMAIL and U.S. MAIL**
Frank Ryan, Jr.
ILA 1475
24 Drayton Street
Suite 610
Savannah, Georgia 31402

Re:    Clerk and Checkers and Deck and Dock Workers

Dear Frank:

On behalf of Georgia Stevedore Association, Inc. ("GSA"), and its members ("Employers")(collectively "Management"), I am writing to set forth our position on the International Longshoremen's Association Clerks and Checkers Union #1475 ("Union") proposed hiring methods for new Clerks and Checkers including the creation of a new Extra List #5. Our understanding is the Union intends to allow current Clerks and Checkers to sponsor a new hire into the Clerks and Checkers Extra List #5 as well as allow ILA Deck and Dock members to sponsor someone, including themselves, to be included in the Clerks and Checkers Extra List #5. Basically, the Union is proposing to allow Deck and Dock members to self-sponsor for a Clerk and Checker Position. GSA and Employers absolutely oppose any such action by the Union.

Deck and Dock members, while part of the International Longshoremen's Association, are not members of the Clerks and Checkers. They are a separate entity and as such do not have standing to sponsor for new hires into the Clerks and Checkers. A Deck and Dock member stands equally with a member of the general public when it comes to Clerk and Checker hiring. While Management disagrees with this hiring proposal, if the Union proceeds, it should allow members of other Savannah ILA Locals (1414 and 2046) the same right to self-sponsor for these new positions on the Clerks and Checkers Extra List #5.

Please be advised that if there is any adverse consequence to Management from the Union's actions we will look to the Union to indemnify and defend Management in any litigation as well as seek any additional damages. If you have any questions regarding Management's position, please do not hesitate to contact myself or Norman Massey.

Very truly yours,

Tracy O'Connell

Cc:    Georgia Stevedore Association, Inc. (via email)
       Larry Goodman (via email)

EXHIBIT E

May 5, 2021

Dear President Daggett:

I am the Local 1475 vice president-deck and dock, Savannah, Georgia. I am writing to advise you that the deck and dock situation has deteriorated to the extent the viability of Local 1475 is at stake. You will recall the deck and dock workers became part of Local 1475 as a result of a decision of the Jurisdiction Committee in 2013 determining the work done by the deck and dock workers was clerks' jurisdiction work. Since then there has been litigation and numerous unfair labor practices regarding the integration of the deck and dock workers into the Local. The District, including Bennie Holland, Clyde Fitzgerald, Alan Robb, Bill Williams have tried to find a satisfactory solution to establish a merged seniority system. Most recently Dennis Daggett and Alan Robb presented a proposal which was overwhelmingly defeated by the membership. The antagonism and hostility among the members is tearing the Local apart. The deck and dock workers have been contributing their fair share of service charges to the International and Local, but have not been treated as equals within the Local. If the situation is not timely resolved, the objectives and purposes of the ILA will be at risk in the Port of Savannah. The issue carries over to the other crafts and contributes to disruption in Port operations. The deck and dock workers have a right to full, fair and proper representation at Local 1475. There are plans to hire several hundred additional clerks in the near future. The planned hiring imposes an even greater emergency to our dilemma. We look forward to your assistance. If you have any questions, please feel free to call me. Thank you very much for your attention to our problem.

Respectfully,

Michael Parsons
912-441-1327

cc:    Mr. Dennis Daggett

Mr. Alan Robb

Mr. Steve Simms

May 6, 2021


Dear President Daggett:


In addition to the letter that I sent you yesterday regarding the deck and dock situation in ILA Local 1475, I am officially requesting the intervention of the International to take whatever steps necessary to include a temporary trusteeship.


Respectfully,

Michael Parsons

912-441-1327


cc:   Mr. Dennis Daggett

Mr. Alan Robb