# EXHIBIT 1

<u>UNITED STATES DISTRICT COURT</u>
<u>SOUTHERN DISTRICT OF GEORGIA</u>
<u>SAVANNAH DIVISION</u>

STEPHEN COWART, JOSEPH HURST,              )
and KENNETH RAHN, JR.,                     )
                                           )
   Plaintiffs,                         )
                                           )          Case No. 4:25-cv-00199-RSB-CLR
v.                                         )
                                           )
ILA LOCAL 1475 CLERKS AND                  )
CHECKERS UNION, INC., GEORGIA              )
STEVEDORE ASSOCIATION, BENNY               )
HOLLAND, JR., RICKY DELOACH,               )
FRANK RYAN, JR., STEVE SIMS,               )
NORMAN MASSEY, TRACY O'CONNELL,            )
MICHAEL PARSONS, DENNIS DAGGETT,           )
ALAN ROBB, HAROLD DAGGETT, and             )
JOHN DOE(S) 1-10,                          )
                                           )
   Defendants.                         )

<u>DECLARATION OF RICKY DELOACH</u>

**COMES NOW** Ricky C. DeLoach and under penalty of perjury makes the following declaration pursuant to 28 U.S.C. §1746 that the following is true and correct:

1.

My name is Ricky C. DeLoach. I am the incumbent President of Defendant ILA Local 1475 Clerks and Checkers Union, Inc. ("Local 1475"). Local 1475 is an affiliate of the International Longshoremen's Association ("ILA").

2.

I submit this declaration in support of the Motion to Dismiss filed in this matter on behalf of Local 1475, as well as myself and Defendants Frank Ryan, Jr., Steve Sims and Michael Parsons.

3.

I have personal knowledge of the facts contained in this declaration by virtue of my position as President of Local 1475, as well as my involvement in the negotiation of the Memorandum of

Understanding identified in ¶25 of the Complaint (Doc. 1-1, Complaint, P. 8, ¶25) and referred to therein as the "2013 MOU." The 2013 MOU is attached to the Complaint as Exhibit A. (Doc. 1-1, Complaint, Ex. A, P. 34-38).

4.

The 2013 MOU incorporates "by reference the Local Agreement" between Defendant Georgia Stevedore Association ("GSA") and Local 1475, except as modified in the 2013 MOU. (Doc. 1-1, Complaint, Ex. A, P. 34, ¶2). A true and accurate copy of the Local Agreement, which is the GSA-Local 1475 Collective Bargaining Agreement, is incorporated into the 2013 MOU and is attached hereto as Exhibit A. The Local Agreement is publicly available for download at: https://ila1475.com/wp-content/uploads/2017/03/2004-Savannah-1475-Local-Contract.pdf.

5.

Plaintiffs' Complaint references separate seniority systems for the Clerks and Checkers ("CNC") and the Deck and Dock ("DND") workers. (Doc. 1-1, Complaint, P 8, ¶26.a); P.14, ¶45; P. 15, ¶47; and P. 23, ¶75.a)). The referenced separate seniority system for CNC workers is found in the ILA Local 1475 Savannah Clerks and Checkers Seniority Plan ("CNC Seniority Plan"). A true and accurate copy of the CNC Seniority Plan is attached hereto as Exhibit B, and is publicly available for download at: https://ila1475.com/wp-content/uploads/2024/01/SAVANNAH-CLERKS-AND-CHECKERS-SENIORITY-PLAN-ammended-10-1-2021-1.pdf.

6.

In ¶45 of the Complaint, Plaintiffs assert that the Defendants "create[ed] a separate seniority classification for Deck and Dock workers and impos[ed] unreasonable barriers to advancement (such as the 15,000-hour requirement to transition to convention clerk work) …" The "15,000-hour requirement" referenced in the Complaint is contained in the October 1, 2021 Memorandum of Understanding between Defendant Georgia Stevedore Association and the South Atlantic and Gulf Coast District, ILA ("2021 MOU"). A true and accurate copy of the 2021 MOU is attached hereto as Exhibit C and is publicly available for download at: https://ila1475.com/wp-

content/uploads/2024/02/Memoradum-of-Understanding-for-Local-1475-Clerks-and-Checkers-Seniority-2021-10-01.pdf. The 2021 MOU, by its terms, was intended to amend both the CNC Seniority Plan and the DND Seniority Plan and states that "[T]o the extent there is any conflict between those documents and this MOU, the terms of this MOU supersede any inconsistent provisions in these Seniority Plans."

7.

The 2013 MOU further provides that "the Master Contract will apply to the ILA Deck and Dockmen." (Doc. 1-1, Complaint, Ex. A, P. 36, ¶5). The Master Contract referenced in the 2013 MOU is a collective bargaining agreement between ILA and United States Maritime Alliance, Ltd. ("USMX"). A true and accurate copy of the 2012-2018 Master Contract incorporated into the 2013 MOU is attached hereto as Exhibit D. The Master Contract is available for download at: https://ila1475.com/wp-content/uploads/2017/01/2012-2018_ILA-USMX_MASTER_CONTRACT_BLUE_BOOK-FINAL.pdf.

8.

In ¶22 of the Complaint, the Plaintiffs allege that "a group of non-union Deck and Dock workers directly employed by the Port of Savannah's stevedoring companies filed a grievance with the National Labor Relations Board." (Doc. 1-1, Complaint, P. 7, ¶22). I was a witness in the National Labor Relations Board ("NLRB") representation proceeding referenced in ¶22 of the Complaint, which is docketed in the NLRB's filing system as NLRB Case No. 10-RC-080061.

9.

The NLRB's electronic docket setting forth the chronology of the processing of that matter (NLRB Case No. 10-RC-080061) as well as the Decision and Direction of Election dated June 20, 2012 are both available on the NLRB's website, https://www.nlrb.gov/case/10-RC-080061. A true and correct copy of the Electronic Docket and the Decision and Direction of Election ("DDE"), in NLRB Case No. 10-RC-80061, June 20, 2012, are attached hereto as Exhibits E and F,

respectively. The DDE is publicly available for viewing and download at: https://apps.nlrb.gov/link/document.aspx/09031d4580aa27fb

10.

On July 16, 2012, the NLRB denied the Request for Review of the DDE. A true and correct copy of the Order denying the Request for Review is attached hereto as Exhibit G, and is publicly available for viewing at: https://apps.nlrb.gov/link/document.aspx/09031d4580b1be1b.

11.

I have read the foregoing declaration and declare under penalty of perjury that it is true and correct.

This 16th day of September, 2025.

/s/ Ricky C. DeLoach_____ (L.S.)

**Ricky C. DeLoach**

Page 4 of 4

# EXHIBIT A

# CLERKS AND CHECKERS AGREEMENT
## BETWEEN THE
## GEORGIA STEVEDORE ASSOCIATION
## AND THE
## INTERNATIONAL LONGSHOREMEN'S ASSOCIATION
## LOCAL #1475

**1.**     This Agreement was made and entered into on the 11th day of May, 2004, between the Georgia Stevedore Association representing its direct employer members, hereinafter known as the party of the first part and the South Atlantic & Gulf Coast District of the International Longshoremen's Association representing its subordinate Local #1475, hereinafter known as the party of the second part.

Wages to become effective October 1, 2004.

**2.**     This Agreement and all Memorandums of Understanding shall be in effect until midnight September 30, 2010, and covers all work as designated herein at the port of Savannah, Georgia.

**2.(A)**   The Union agrees that there shall be no strikes, slow downs or work stoppages of any kind whatsoever with respect to handling perishable fruit cargoes on or off vessels, or in and out of marine terminals. This agreement includes the handling of empty pallets, containers, reefer trailers, or other devices used in transport of perishable fruit cargoes.

This Perishable Fruit Agreement shall remain in full force and effect until midnight, September 30, 2010, or until one day beyond the date that the contract between the employers and the South Atlantic and Gulf Coast District of the International Longshoremen's Association, covering container and general cargo longshore work is ratified, whichever is later, and may not be reopened for any reason prior to that time. Any increase in wages or benefits in subsequent contracts to be retro-active to effective date of said contract.

**3.(A)**   Wages per hour, according to job classifications, shall be in accordance with the provisions of Clause A-1, B-1 and C-1 (with the provision that the contract will be reopened after the third year for wages only on general cargo, breakbulk and bulk cargo):

**3.(A)(1)**      It is mutually agreed that if any adjustments are made in the basic hourly wage of longshoremen in accordance with the provisions of Clauses A-1, B-1 and C-1 of the Longshore Agreement, the same adjustments in cents per hour in basic hourly wage for all job classifications covered by this agreement shall be made effective at the same times as provided in the Longshore Agreement.

**3.(B)(1)**      It is mutually agreed that during the life of this Agreement, the Employers will contribute into a fund for pension and welfare benefits the same amounts in cents per man hour as the Employers for those purposes contribute in accordance with provision of Clause 3 (B)(1)(A) of the Agreement with Local 1414 and any changes in the amount of such man-hour Employer contribution for hours worked under this agreement shall become effective on the same dates as the corresponding changes in Employer contributions for hours worked under the Agreement with Local 1414 become effective.

**3.(B)(1)(A)**     The Employers agree to contribute into the fund for Welfare and Pension benefits for all hours for which employees receive pay the following amounts per hour effective as indicated:

|  |  |
|---|---|
| Effective 10/01/04 | $12.15 Container Hours |
|  | $ 9.20 Car Carrier Hours |
|  | $ 9.20 All Other Hours |
| Effective 10/01/05 | $12.15 Container Hours |
|  | $10.20 Car Carrier Hours |
|  | $ 9.20 All Other Hours |
| Effective 10/01/06 | $12.65 Container Hours |
|  | $10.20 Car Carrier Hours |
|  | $ 9.20 All Other Hours |
| Effective 10/01/08 | $13.15 Container Hours |
|  | $10.20 Car Carrier Hours |
|  | $ 9.20 All Other Hours |

The amounts above may be allocated, not only to pension and welfare, but also to any other fringe benefits, as agreed to by the local ILA and port associations in each of the ports or districts covered by this agreement, except that beginning October 1, 1999, $4.00 per hour worked in each port or district shall be allocated to the Managed Health Care Plan or Plans.

The  MILA man hour contribution shall be $5.00 effective October 1,2004.

No other man-hour contributions shall be increased by any port or district other than the above except for (i) vacation or holiday contributions and (ii) the one dollar per hour benefit increase of October 1, 1993 (subject to paragraphs 14 and 20 of the Master Contract).  No tonnage assessment (not in effect on the effective date of this Agreement) shall be imposed on Containerization or Ro-Ro operations by any parties to this Agreement during the life of this Agreement.

These funds shall continue to be administered on a local basis by a Board of Six (6) Trustees.

It is agreed that either party of the funds established under this agreement may increase the number of Trustees by mutual consent of the Trustees of the Board involved. It is further agreed that regardless of the number of Trustees on either side being unequal, the voting rights of each side shall remain equal.

**3.(B)(1)(B)    Container Royalty.** The Employers also agree to pay into a fund for supplemental cash benefits the amounts set forth below as a royalty when loading or discharging containers which are twenty (20) feet or more in length and which have not been stuffed or will not be stripped by personnel employed under this agreement.

(a)    On conventional ships, thirty-five cents (35¢) per gross ton;

(b)    On partially automated ships (conventional ships converted for handling vans and containers) where not more than two hatches have been converted for the handling of containers, seventy cents (70¢) per gross ton;

(c)    On partially automated ships (conventional ships converted for handling vans and containers) where not more than forty percent (40%) of the ship's bale cube has been fitted for containers, seventy cents (70¢) per gross ton;

(d)    On ships where more than two hatches have been converted or fitted for the handling of containers, or where more than forty percent (40%) of the ship's bale cube has been fitted for containers, one dollar ($1.00) per gross ton;

The above fund shall continue to be administered on a local basis by a Board of Six (6) Trustees.

It is agreed that either party of the funds established under this agreement may increase the number of Trustees by mutual consent of the Trustees of the Board involved. It is further agreed that regardless of the number of Trustees on either side being unequal, the voting rights of each side shall remain equal.

All three (3) dollars per ton container royalties paid pursuant to the terms of this Agreement shall continue to be paid to the various local port and district container royalty funds for the first (3) years of the 1996 Agreement. Effective on October 1, 1999, the second Container Royalty dollar shall be paid to the Managed Health Care Trust Fund created by paragraph 20 hereof to be used exclusively for the purpose of funding the uniform managed health care program therein described.

The Container Royalty Cap shall be raised to the following levels:

| EFFECTIVE DATE | | CAP LEVEL |
|---|---|---|
| October 1, 2004 | - | 58 million tons |
| October 1, 2006 | - | 63 million tons |
| October 1, 2008 | - | 68 million tons |
| October 1, 2009 | - | 73 million tons |

During the term of this Agreement for each contract year in which the CAP level changes the port benchmarks for the ports of New York/New Jersey, Hampton roads, Charleston, Savannah, Miami/Port Everglades and the West Gulf will be recalculated using the tons reported to the local container royalty funds in the "Base Contract Year." The "Base Contract Year' is the year which commences two prior to the contract year in which the CAP changes (eg., the port benchmarks for the contract year commencing October 1, 2004, will be calculated based on the container royalty tons reported in the Base Contract Year beginning October 1, 2002 and ending September 30, 2003). Individual port benchmarks for the ports of New York/New Jersey, Hampton Roads, Charleston, Savannah, Miami/Port Everglades and the West Gulf will be calculated using the following formula:

$$\frac{\text{Base Year Local CR Tons}}{\text{Base Year Coastwide CR Tons In All Master Contract Ports}} \quad x \quad \text{Applicable CR CAP Level}$$

During the term of the Agreement with respect to the Ports of Boston, Philadelphia, Baltimore, Wilmington, NC, Jacksonville and New Orleans, the benchmark for each of these ports shall be the lesser of (a) the port's benchmark as of September 30, 2004 or (b) the tons reported in the port for container royalty purposes in the Contract Year ending September 30, 2003.

The payment of container royalty assessments shall cease in every port when the number of tons reported to the local Container Royalty Fund in the port exceed the benchmark determined using the formula set forth in paragraph 9(a) of the Master Agreement, as if that formula were applicable to all Master Contract ports, and container royalty assessments in excess of such benchmarks shall be paid to CCC Service Corporation for distribution as follows:

Forty (40%) percent shall be refunded to the Carriers;
Twenty (20%) percent shall be paid to MILA; and
Forty (40%) percent shall be paid to an escrow fund established by a single local port or by a group of ports ("Local Escrow Fund") to pay local benefits.

In the event the application of the provision in Paragraph 9 (b) of the Master Contract results in an obligation to pay Container Royalty Dollars Nos. 1 and 3 on tons in excess of the agreed upon CAP Level set forth in Paragraph 8 of the Master Contract, such obligation shall be satisfied solely from that portion of the container royalties in excess of the benchmarks collected and set aside for distribution to the Local Escrow Funds pursuant to Paragraph 10 of the Master Contract without any allocation of the amount of that obligation to any particular port.

During the term of this Agreement, a port's existing benchmark may be reviewed and adjusted prospectively at the beginning of a contract year by the parties to this agreement if such port experiences a dramatic annual decrease in the tons reported for container royalty purposes.

The portion of the CAP refund paid to a Local Escrow Fund pursuant to Paragraph 10 of the Master Contract shall not be used for supplemental cash benefits (except as provided in Paragraph 11 of the Master Agreement, nor shall the use of this portion of the CAP refund result in any carrier being considered an employer in relation to any local port employee pension benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), except in any port where the carrier already is an employer under ERISA.

Effective October 1, 1999 the use of the Second Container Royalty dollar which shall be continued in the South Atlantic and in the West Gulf for the first three (3) years of the 1996 contract shall be discontinued for such purposes as of October 1, 1999. The 1993 dollar, which is now being used for welfare purposes, as well as other fringe benefit amounts, shall be transferred for use as a substitute for the Second Container Royalty dollar in such port areas. The effect thereof shall be that on and after October 1, 1999, the Second Container Royalty dollar shall be used exclusively for health care purposes in all ports and districts covered by this Agreement. Either the South Atlantic or the West Gulf may determine to continue to use the Second Container Royalty dollar for present purposes. In the event that either or both such areas make such a determination, each must pay the equivalent of said second Container Royalty amount, in total dollars, out of its hourly assessments to the Trustees of the Managed Health Care Plan. In the event that there is a deficit in any such plan created by unforeseen events, application may be made to the Trustees of Container Royalty Fund #4 to make up any such deficit from funds collected from cargo that had moved in the affected ports or districts. The Trustees of such fund shall act only if there is a need for such funding.

The total royalty contributions to be made to the fund provided shall be $1.00 per weight ton of containerized cargo (with lesser amounts from cargo described in the Stein Award as not being fully containerized) plus the hourly contribution  which shall be used for the purposes of the managed health care systems and $2.00 per weight ton to be used for supplementary cash payments to employees (all of which is subject to the  provisions of the Stein Award and to accommodations elsewhere provided herein.)

The benefits provided by the above funds shall be limited to persons and entities who have subscribed to and agree to be bound by this agreement with the joint consent of Management and the ILA. No container benefit shall be paid to an employee during any year which shall exceed a maximum payout of $16,500 per employee per year. Employees who enter the industry after October 1, 1996, may be entitled to container royalty benefits if they have at least three qualifying years. Such employees shall not receive more than $7,500 in any year in which they receive a benefit, as such benefits are determined to be payable by the local parties. Any excess over the $16,500 or $7,500 generated in each year shall be paid as determined by local container fund Trustees with appropriate trust amendments as may be required, to employees other than those who have been paid the maximum benefits.

The third container royalty, equal to the first container royalty listed above shall be paid into the same fund as the first container royalty, and administered by the same Board of six Trustees as previously detailed. These two container royalties must be used only and exclusively for cash disbursements to the men. Terms and conditions of the disbursement to be determined by the Trustees.

The first and third container royalty dollar shall be paid to the local container royalty fund in each port. Normal and reasonable expenses will be determined by each port for administrative expenses and container inspectors and will be paid from the container royalty fund.

Each party shall appoint three of the Trustees to administer the local funds described hereinbefore in Paragraph 3(B)(1)(A) and the first and third container royalty funds established in this Paragraph 3(B)(1)(B), to serve until they resign or are replaced by the party they represent. The local port employer and I.L.A. representatives and the Trustees of each local container fund shall be bound by this agreement and shall have no authority to provide otherwise except that the parties agree that each port shall have the right to administer and establish by rule and regulations each container royalty fund.

Members of U.S.M.X. and carriers bound to the Master Contract are responsible for paying Container Royalty as per the Master Contract.

For Non U.S.M.X. members, the Contracting Stevedore is obligated to obtain a signed agreement from the party ordering the work to be bound by this contract. Should the Contracting Stevedore fail to obtain the signed agreement, then the Contracting Stevedore shall be held responsible for the Container Royalty and District Escrow Fund assessments.

Should the party ordering the Contracting Stevedore to perform the work fail to pay the established assessments, and not withstanding the provisions of Clause 15(A)(1), the employees shall not be required to work for the defaulting party ordering work by any Contracting Stevedore until the debt is paid in full. Should the Contracting Stevedore fail to obtain the signed agreement, then the Contracting Stevedore shall be held responsible for the assessments.

**3.(B)(2)**        Each employer will submit to the Local Union and the Fund Trustees quarterly reports of hours worked, individually by employee, for all work covered under this Agreement. The Trustees shall institute whatever auditing procedures they deem necessary to verify these reports.

The eligibility requirements for benefits and the provisions under which these funds are to be held and administered will be the same as agreed to pursuant to the Agreement with Local 1414 and personnel covered by this Agreement shall participate in the benefits of the container royalty payments established under the Agreement with Local 1414.

**3.(B)(2)(A)**     A District Escrow Fund is established for the purpose of collecting and supplying funds for the District Vacation and Holiday Fund. The District Escrow Fund and District Vacation and Holiday Fund shall be administered by a board of 12 Trustees. Six Trustees shall be appointed by the Unions who are party to this Agreement, one of whom shall represent the Clerks and Checkers. Six Trustees shall be appointed by Management, who are party to this Agreement.

It is agreed that either party of the funds established under this agreement may increase the number of Trustees by mutual consent of the Trustees of the Board involved. It is further agreed that regardless of the number of Trustees on either side being unequal, the voting rights of each side shall remain equal.

The Trustees of the District Escrow Fund shall also be the Trustees of the Vacation and Holiday Fund.

**3.(B)(2)(A)(1)**    Funding of the District Escrow Fund shall be accomplished as follows:

(a)    All employers of I.L.A. personnel working under the terms and conditions of the Deep-Sea Longshore Agreement or the Deep-Sea Clerks and Checkers Agreement, or those personnel shown in Paragraph 3(B)(4), shall pay an assessment of 61½ cents per man hour to the District Escrow Fund.

(b)    Beginning October 1, 1997, the Employers shall pay the tonnage and man hour assessments presently in effect for non United States Maritime Alliance Members.

$.25 per long ton on breakbulk and Rule 1 containerized cargo

$.60 per long ton on Rule 2 containerized cargo

$.0025 per long ton on bulk cargo

$.40 per unit on passenger autos and light trucks under 4000 pounds

(c)    During the life of this contract, the Employers shall not be obligated to pay any additional tonnage, man hour or other assessments to the District Escrow Fund.

(d)    The collection of the assessments shall be the responsibility of the Trustees and Administrator of the District Escrow Fund and the provisions of Clause 15(A)(2) shall be followed in the collection of delinquent assessments.

(e)    For Non U.S.M.X. members, the Contracting Stevedore is obligated to obtain a signed agreement from the party ordering the work to be bound by this contract. Should the Contracting Stevedore fail to obtain the signed agreement, then the Contracting Stevedore shall be held responsible for the Container Royalty and District Escrow Fund assessments.

Should the party ordering the Contracting Stevedore to perform the work fail to pay the established assessments, and not withstanding the provisions of Clause 15(A)(1), the employees shall not be required to work for the defaulting party ordering work by any Contracting Stevedore until the debt is paid in full. Should the Contracting Stevedore fail to obtain the signed agreement, then the Contracting Stevedore shall be held responsible for the assessments.

**3.(B)(2)(A)(2)**          A District Trust Fund to administer the Vacation and Holiday Fund disbursements shall also be established.  It shall receive its funding from the District Escrow Fund.

(a)      6 paid holidays to clerks and checkers or those personnel shown in Paragraph 3(B)(4), only who have worked 700 hours or more in the current contract year.

          (For the purpose of paying the 16 holidays provided for in this paragraph, the holidays will be those as shown in Paragraph A-3 and B-3 and February 12, Abraham Lincoln's Birthday;  3rd Monday in February, George Washington's Birthday;  March 17, Thomas Gleason's Birthday;  2nd Monday in October, Columbus Day;  November 11, Armistice Day; National Election Day, one annually.)

(b)      Vacations of from 1 week to 6 weeks based on the following criteria:  All longshoremen and clerks and checkers who have worked:

> 700 hours or more in the current
> contract year ..................1 week vacation
>
> 700 hours or more in the 2 consecutive previous
> contract years .................2 weeks vacation
>
> 700 hours or more in the 6 consecutive previous
> contract years ................ 3 weeks vacation
>
> 700 hours or more in the 12 consecutive previous
> contract years ................ 4 weeks vacation
>
> 700 hours or more in the 15 consecutive previous
> contract years ................ 5 weeks vacation
>
> 700 hours or more in the 20 consecutive previous
> contract years ................ 6 weeks vacation

(c)      Trustees are authorized to set such requirements as are needed to be furnished validated records from each local Pension and Welfare office within the District.

(d)      The vacation and holiday benefits (which cannot exceed $21 per hour) shall be funded as follows:

> a.      All funds presently used for vacation and holiday benefits, including the tonnage assessment, man hour assessment, and all of the 1993 Dollars paid in the Ports of Wilmington, NC, Charleston, Savannah, Jacksonville and Tampa shall continue to be paid to the South Atlantic District Escrow Fund ("SADEF") to fund vacation and holiday benefits.

  b.  In addition to the funding described in subparagraph a. above, an amount equal to one-half (½) of the forty (40%) percent of the Container Royalties in excess of the benchmarks designated for local fund use for the Ports of Wilmington, NC, Charleston, Savannah, Jacksonville, and Tampa, as defined in paragraph 10 of the Master Contract Memorandum of Settlement, dated June 28, 2004 (Section E: Container Royalty Cap) will be used to pay vacation and holiday benefits.

  c.  After making all of the payments described in subparagraphs a. and b. above, the balance required to fund the vacation and holiday benefits (which cannot exceed $21 per hour) shall be paid by the carriers who are signatories to the Master Contract and operate in the ports described in subparagraphs above, in whatever fashion they deem appropriate.

(e)  Any deficit caused by a work interruption or work stoppage engaged in by the ILA shall not be made up by the carriers described in subparagraph c. above.

(f)  The SADEF shall keep an annual reserve of no more than $500,000, which shall be used to pay the SADEF's annual operating expenses.

**3.(B)(3)**  In the event the I.L.A. shall consider supplying labor to an Employer not a party to this Agreement at conditions which would depart from the provisions of this contract, the I.L.A. shall first give advance notice of such intent to the Employers parties to this Agreement. Further, that such conditions for the particular work to be performed for an Employer not bound by the provisions of this Agreement shall also be made applicable to the employers parties to this Agreement for the same type of work. The employer likewise agrees to give the I.L.A. advance notice of any potential new business proposed to them which would or could result in a departure from this Agreement. In the event the employers should enter into an agreement with any other local of the I.L.A. containing terms more favorable than those set forth herein for the performance of work covered by this contract, such terms shall automatically apply to employees covered under this Agreement.

No employer shall engage in a double breasted operation.

Management personnel, or other non-bargaining unit personnel of an employer shall not be permitted to perform any of the work traditionally performed by employees covered by this agreement.

All Port Associations and the local unions of the ILA operating in the South Atlantic District may negotiate among themselves for an agreement, on a case by case basis, to compete with non-union companies on cargoes and for any new cargoes or service which is not in competition with any other South Atlantic port. (This paragraph to be re-written as agreed to by ILA and Management.) Each port in the South Atlantic District will be notified.

**3.(B)(4)**       Personnel working under I.L.A. Contracts other than the I.L.A./SAENC Deep-Sea Longshore and the Deep-Sea Clerks and Checkers Agreements and who are presently participating in the Pension and Welfare Funds, the Container Royalty Funds and Vacation and Holiday Funds of the District Escrow Fund, as well as new personnel in the same job classifications as those presently participating who may subsequently be working under an I.L.A. Contract may participate in such funds, provided the Employers of such personnel have signed Agreements with the Trustees of such funds agreeing to make the contributions specified in the I.L.A./SAENC Agreements and abide by the terms and conditions of the Trust Agreements covering such Funds.  No Employees shall receive benefits from the Funds that exceed the benefits set forth in the I.L.A./SAENC Deep-Sea Longshore and Deep-Sea Clerks and Checkers Agreements.

**4.(A)**       The work week will begin at 7:00 A.M. on Monday and will end at 7:00 A.M. on the following Monday.  A day is defined as the 24-hour period commencing at 12:01 A.M. and ending at 12:00 midnight.

**5.(A)**       Differentials in accordance with Clauses 5(A)(1)(2)(3) of Longshore Agreement and the same rates shall be paid weighers, samplers, tallymen and checkers covered by this Agreement.

**5.(B)(1)**       A differential of 25 cents per hour in straight time and 37½ cents per hour in overtime will be added to the rates specified in Clauses A-1, B-1 and C-1 (whichever is applicable) for work performed in refrigerator compartments, refrigerator holds, refrigerator containers, refrigerator trucks or refrigerator cars whenever cargo is being handled that has been or will be carried at temperatures below 32 degrees Fahrenheit.  When handling refrigerated cargo in conjunction with ice, the same differential will apply while handling such cargo and while handling the ice.  These differentials will be paid to employees assigned to checking the hatch involved.

**5.(B)(2)**       Personnel ordered for work on refrigerated cargo will be notified in advance in order that they may secure sufficient clothing.  In the event employees are not so notified prior to reporting for work that they will be handling cargo that has been or will be carried below 32 degrees Fahrenheit, they shall not be required to handle such cargo.

**5.(C)(1)**       All personnel assigned to ships loading or discharging explosives or radioactive material of a type requiring a U.S. Coast Guard Permit handled over or at explosive facilities, including linehandlers when they are required to stand by, will be paid double the straight time or overtime rate (whichever is applicable) as specified in Clauses A-1, B-1and C-1 (whichever is applicable).  Small arms ammunition and firecrackers shall not be construed as explosives.

**5.(C)(2)**       When personnel at other than explosive facilities such as Sunny Point or St. Mary's are working a vessel which contains explosives, other than commodities such as small arms ammunition or firecrackers, all employees, including dockmen, and linehandlers working the vessel will be paid at double the straight time or overtime rate (whichever is applicable) as specified in Clauses A-1, B-1 and C-1 (whichever is applicable).

       Explosive pay only applies to personnel working the vessel which contains explosives in all ports other than Sunny Point and St. Marys.  All other port practices remain the same.

**A-1.**  Wages for container and Ro-Ro vessels are as follows:

## CONTAINER WAGES:

| **Effective:** 10/01/04 | | **Effective:** 10/01/06 | | **Effective:** 10/01/08 | | **Effective:** 10/01/09 | |
|------|------|------|------|------|------|------|------|
| **S/T** | **O/T** | **S/T** | **O/T** | **S/T** | **O/T** | **S/T** | **O/T** |

**(a)    Chief Shipside Clerks:  (Head Checker)**

| $29.60 | $44.40 | $30.60 | $45.90 | $31.60 | $47.40 | $32.60 | $48.90 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 1996 to September 30, 2001:

| $20.60 | $30.90 | $22.60 | $33.90 | $24.10 | $36.15 | $25.60 | $38.40 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2001 to September 30, 2004:

| $19.60 | $29.90 | $21.60 | $32.40 | $23.10 | $34.65 | $24.60 | $36.90 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2004 to September 30, 2006:

| $17.60 | $26.40 | $19.60 | $29.40 | $21.10 | $31.65 | $22.60 | $33.90 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2006 to September 30, 2008:

| | | $17.60 | $26.40 | $19.10 | $21.35 | $20.60 | $23.60 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2008 to September 30, 2009:

| | | | | $17.60 | $26.40 | $19.10 | $21.35 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2009 and after:

| | | | | | | $17.60 | $26.40 |
|------|------|------|------|------|------|------|------|

**(b)    Timekeepers, Plan Clerks:**

| $29.35 | $44.025 | $30.35 | $45.525 | $31.35 | $47.025 | $32.35 | $48.525 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 1996 to September 30, 2001:

| $20.35 | $30.525 | $22.35 | $33.525 | $23.85 | $35.775 | $25.35 | $38.025 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2001 to September 30, 2004:

| $19.35 | $29.025 | $21.35 | $32.025 | $22.85 | $34.275 | $24.35 | $36.525 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2004 to September 30, 2006:

| $17.35 | $26.025 | $19.35 | $29.025 | $20.85 | $31.275 | $22.35 | $33.525 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2006 to September 30, 2008:

| | | $17.35 | $26.025 | $18.85 | $28.275 | $20.35 | $30.625 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2008 to September 30, 2009:

| | | | | $17.35 | $26.025 | $18.85 | $28.275 |
|------|------|------|------|------|------|------|------|

New personnel entering the industry October 1, 2009 and after:

| | | | | | | $17.35 | $26.025 |
|------|------|------|------|------|------|------|------|

**(c)    T.I.R. Clerks, Bookmen, Cargo Spotters - Sunnypoint only:**

| $29.10 | $43.65 | $30.10 | $45.15 | $31.10 | $46.65 | $32.10 | $48.15 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 1996 to September 30, 2001:

| $20.10 | $30.15 | $22.10 | $33.15 | $23.60 | $35.40 | $25.10 | $37.65 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2001 to September 30, 2004:

| $19.10 | $28.65 | $21.10 | $31.65 | $22.60 | $33.90 | $24.10 | $36.15 |
|------|------|------|------|------|------|------|------|

Personnel entering the industry October 1, 2004 to September 30, 2006:
$17.10     $25.65     $19.10     $28.65     $20.60   $30.90          $22.10     $33.15
New personnel entering the industry October 1, 2006 to September 30, 2008:
                          $17.10     $25.65     $18.60   $27.90          $20.10     $30.15
New personnel entering the industry October 1, 2008 to September 30, 2009:
                                                $17.10   $25.65          $18.60     $27.90
New personnel entering the industry October 1, 2009 and after:
                                                                         $17.10     $25.65

**(d)     Receiving and Delivery Clerks:**
$28.30     $42.45     $29.30     $43.95     $30.30   $45.45          $31.30     $46.95
Personnel entering the industry October 1, 1996 to September 30, 2001:
$19.30     $28.95     $21.30     $31.95     $22.80   $34.20          $24.30     $36.45
Personnel entering the industry October 1, 2001 to September 30, 2004:
$18.30     $27.45     $20.30     $30.45     $21.80   $32.70          $23.30     $34.95
Personnel entering the industry October 1, 2004 to September 30, 2006:
$16.30     $24.45     $18.30     $27.45     $19.80   $29.70          $21.30     $31.95
New personnel entering the industry October 1, 2006 to September 30, 2008:
                          $16.30     $24.45     $17.80   $26.50          $19.30     $28.75
New personnel entering the industry October 1, 2008 to September 30, 2009:
                                                $16.30   $24.45          $17.80     $26.50
New personnel entering the industry October 1, 2009 and after:
                                                                         $16.30     $24.25

**(e)     Weighers, Tallymen, Checkers and Samplers:**
$28.10     $42.15     $29.10     $43.65     $30.10   $45.15          $31.10     $46.65
Personnel entering the industry October 1, 1996 to September 30, 2001:
$19.10     $28.65     $21.10     $31.65     $22.60   $33.90          $24.10     $36.15
Personnel entering the industry October 1, 2001 to September 30, 2004:
$18.10     $27.15     $20.10     $27.15     $21.60   $32.40          $23.10     $34.65
Personnel entering the industry October 1, 2004 to September 30, 2006:
$16.10     $24.15     $18.10     $27.15     $19.60   $29.40          $21.10     $31.65
New personnel entering the industry October 1, 2006 to September 30, 2008:
                          $16.10     $24.15     $17.60   $26.40          $19.10     $28.65
New personnel entering the industry October 1, 2008 to September 30, 2009:
                                                $16.10   $24.15          $17.60     $26.40
New personnel entering the industry October 1, 2009 and after:
                                                                         $16.10     $24.15


**A-2.**     On container and Ro-Ro vessels the basic working day shall consist of 8 hours and the basic working week shall consist of 40 hours.  Personnel shall work any night in the week, or on Saturdays, Sundays, or holidays when required (except as provided in Clause A-3, for work on New Year's Day, Independence Day, Labor Day and Christmas Day).  Except for holidays specified in Clause  A-3, straight time rate shall be paid for any work performed from 8:00 A.M. to 12:00 Noon and from 1:00

P.M. to 5:00 P.M. Monday through Friday, inclusive. Work at all other times, including specified holidays will be paid for at overtime rates, except as provided in Clause A-3 for work on New Year's Day, Independence Day, Labor Day and Christmas Day and as provided in Clause A-5(A) for work during meal hours.

**A-3.**    The following holidays will be observed on container and Ro-Ro vessels:

| | |
|---|---|
| January 1................................. | New Year's Day |
| January, 3rd Monday................ | Martin Luther King's Birthday |
| February, 3rd Monday.............. | Washington's Birthday |
| Good Friday............................ | Good Friday |
| May, Last Monday................... | National Memorial Day |
| July 4....................................... | Independence Day |
| September, 1st Monday............ | Labor Day |
| November 11............................ | Armistice Day |
| November, 4th Thursday.......... | Thanksgiving Day |
| December 24............................ | Christmas Eve |
| December 25............................ | Christmas Day |
| December 31............................ | New Year's Eve |

When any of these holidays fall on Sunday, the following Monday shall be observed to the extent of paying overtime rates and applying the 8-hour minimum period. No work will be performed on New Year's Day, Independence Day, Labor Day and Christmas Day, nor before 7:00 A.M. on the days following these holidays, nor after 3:00 P.M. on Christmas Eve or New Year's Eve, except on ships which can be finished by 5:00 P.M. and except in case of fire or where property is in danger. On Christmas Eve or New Year's Eve personnel working will be guaranteed eight hours overtime pay.

**A-4.(A)**    On container and Ro-Ro vessels regular starting times shall be 7:00 A.M., 8:00 A.M., 1:00 P.M. and 7:00 P.M.

**A-4.(B)**    Flex-time may be negotiated on a local port basis, but shall be in accordance with the Master Contract.

In an effort to better utilize facilities and improve service to the shipping public a flex-time may be instituted using the following guidelines. The normal work day shall consist of eight (8) hours from 8:00 A.M. - 5:00 P.M.

Longshore employees, who are employed in support of the expanded hours of gate operations provided for in the Flex-time Agreement in the Master Contract, shall be employed as follows:

(a) Eight (8) hours of work starting at 6:00 A.M.,7:00 A.M., 8:00 A.M., 9:00 A.M., 10:00 A.M., and 1:00 P.M.

(b) Meal periods shall be provided for in accordance with local regulations;

(c) Hours worked prior to 0800 hours and after 1700 hours will be paid at 1.25 of the straight time rate;

(d) All hours worked in excess of eight (8) consecutive hours within any 24 hour period, excluding meal hours, will be paid at 1.5 of the straight time rate;

(e) Implementation of the above is subject to similar agreements of other crafts on a local basis.

**A-4.(C)**    An additional starting time of 12:00 Midnight is established for "Fully Automated" vessel operations.  Gang(s) and/or individual(s) ordered for the 12:00 Midnight starting time shall receive six (6) hours time at overtime rate plus two (2) hours at double overtime rate.  Gang(s) and/or individual(s) ordered for 12:00 Midnight starts will not be worked past 7:00 A.M.

**A-4.(D)**    All personnel for 7:00 A.M. through 1:00 P.M. starts must be ordered by 5:00 P.M. the previous day.  All personnel for 7:00 P.M. and 12:00 Midnight starts must be ordered by 1:00 P.M. the same day.  In the event weather or mechanical failure after 7:00 P.M. makes it impossible for night personnel to finish a ship scheduled to complete before 8:00 A.M., the night personnel may be released and ordered back from shipside for a subsequent daytime start for work on that ship only.  Personnel ordered for 7:00 A.M. through 8:00 A.M. starts may be cancelled or modified by 5:00 P.M. the previous day.

On container and Ro-Ro vessels personnel ordered for 1:00 P.M. starts may be cancelled or modified no later than 7:00 A.M.  Personnel ordered for 7:00 P.M. or 12:00 Midnight starts may be cancelled no later than 4:00 P.M.  Personnel ordered to work for 7:00 A.M. or 8:00 A.M. starts may be cancelled or modified no later than one hour before the start when it appears there shall be weather conditions that will prevent commencement of work as planned.  If employees are ordered for a new starting time for that day, such order shall be a firm and noncancelable order.  In the event the employer cancels 7:00 A.M. or 8:00 A.M. calls one hour before the start due to weather conditions the employees are to receive 4 hours call time at the applicable rate.

**A-4.(E)**    Personnel ordered to work shall be paid at straight time or overtime rates, whichever is applicable as specified in Paragraph A-1 provided they report and remain subject to the call of their Employer.  Personnel ordered to work shall be paid the following applicable minimum:

| | |
|---|---|
| Container Ships | - 8 hours |
| Container Vessels | |
| (with 80 moves or less) | - 4 hours |
| Stuffing/Stripping of containers | - 4 hours |

In the event employees are ordered for 7:00 A.M. they shall be paid one hour overtime from 7:00 A.M. to 8:00 A.M.  Guarantee begins at 8:00 A.M.

Personnel ordered back for work after a meal hour shall be paid the following applicable minimum with running time thereafter:

| | |
|---|---|
| Container Ships | - 4 hours |
| Stuffing/Stripping of Containers | - 2 hours |

On container and Ro-Ro vessels personnel who work on Saturdays, Sundays and holidays will be paid a minimum of eight (8) hours overtime.

**A-4.(F)**    Personnel ordered for 7:00 A.M. starts on container and Ro-Ro vessels and car carriers shall be paid one hour overtime from 7:00 A.M. to 8:00 A.M. and the minimum shall be computed from 8:00 A.M.  The minimum for an 8:00 A.M. start shall be computed from 8:00 A.M.; for 1:00 P.M. starts, 1:00 P.M.; for night starts, 7:00 P.M.

**A-4.(G)**    Inasmuch as the work of chief clerks, timekeepers, plan clerks and R/D clerks is not necessarily completed at the time loading and/or discharging gangs are released, then such clerks shall remain until their work is completed.

**A-5.(A)**    When working on container and Ro-Ro vessels all meal hours when worked shall be paid for at double the overtime rates specified in Clause A-1 except for the Mid-Day Dinner hours on Monday through Fridays, holidays excepted; and for such Mid-Day Dinner hours double the straight time rates specified in Clause  A-1 shall be paid.  Meal hour pay is to be continued until employees are released or meal hour is given.

**A-5.(B)**    On container and Ro-Ro vessels, when personnel ordered for 7:00 A.M. , 8:00 A.M. or 1:00 P.M. are to work after 7:00 P.M. they must be notified by 4:00 P.M. and such notification constitutes a firm order.  In the event weather or mechanical failure occurs after 4:00 P.M. delaying the finish the employees will observe the normal supper hour if so ordered and return to complete the vessel.

Weather conditions are defined as including in addition to weather which prevents the working of cargo, weather within the channel at any point between the Sea Buoy and the pier which prevents the docking or shifting of vessels in time to start working as intended, but do not apply to vessels which have not reached the Sea Buoy in time to arrive at the dock for the intended starting time.

If the employees do not wish to remain after  7:00 P.M. the Union must provide new employees for a 7:00 P.M. start if notified prior to 6:00 P.M. to fulfill the guarantee of the original personnel.

**A-6.(A)**    The work covered by this Agreement is understood to include the tallying, clerking, checking, weighing, booking (cargo spotting at Sunny Point only), sampling of cargo, assorting of cargo discharged from a vessel, stripping and stuffing of Containers, checking Containers and Barges when being loaded or discharged from the vessel; handled at the time of or in connection with performing Longshore work as defined in Clause 13 of the current Longshore Labor Agreement. It shall also include time keeping duties, directions of clerks and checkers by the Chief Clerk as directed by management, clerking on passenger ships, and field clerks on automated container vessels.

Checkers and clerks shall perform all clerical work on container waterfront facilities which traditionally and regularly has been performed by them including work related to the receipt and delivery of cargo, hatch checking, prestow, (hatch sequence sheet) plan clerking, recording and receipt and delivery of containers received or delivered at waterfront facilities, timekeeping, location and yard work, and demurrage recording, which work shall not be removed from the waterfront facility.

**A-6.(B)**    There shall be no interference with Employer's right to designate the number of employees, if any, to be employed, nor the Employer's right to shift personnel from hatch to hatch, ship to ship, dock to ship or ship to dock. A Chief Clerk must be employed whenever two or more Clerks or Checkers are working a ship. An hourly timekeeper must be employed under the terms and conditions of this Agreement and the pay scale designated in Clauses A-1, B-1 or C-1(whichever is applicable) on fully automated container ships, and when using more than one gang on break bulk general cargo ships, lash ships and lash barges containing break bulk cargo, and one clerk shall be employed on passenger ships and utilized as needed, provided his/her pay is in accordance with paragraph A-1, B-1 or C-1 (whichever is applicable) and is based on the highest skill performed. A checker is to be assigned to each gang handling miscellaneous general cargo, woodpulp, discharging lumber or discharging automobiles from conventional vessels, and to each gang loading or unloading cargo to or from containers (stuffing or stripping) when required at container terminals. Two checkers are to be used when discharging autos from Roll-on/Roll-off vessels. Stowage plans when required by the Employer are to be prepared by the Chief Clerks unless the Employer decides the work load is too great on the Chief Clerk. In that event a Plan Clerk will be hired for the purpose of preparing the stowage plan.

When loading and/or unloading a Ro-Ro vessel with a maximum stowage capacity of more than seventy-five (75) forty foot (40') units, or the equivalent thereof, and the cargo is being handled by means of the ramp, the manning will be the same as for automated container carriers regardless of the type of cargo.

When a Container Gang is ordered for a ship under the Containerization Agreement, the Clerks and Checkers manning scale shall be the same as for a fully automated container vessel. Minimum manning scale for a fully automated container vessel is five Employees for one gang: Chief Clerk, Timekeeper, Plan Clerk (Except discharge only vessels), two Clerks (one to be used as Field Clerk on container vessels) and for each additional gang add two Clerks.

**A-6.(C)**    On barges loading or discharging containers, a minimum of two clerks (or checkers) consisting of one Chief Clerk and one Field Clerk will be used and they will do all the work required and they shall receive a guarantee of 8 hours; and when reporting back after a meal hour, they shall

receive an additional 4 hour guarantee.  There will be a two (2) hour guarantee when returning from the second meal hour.

**A-6.(D)    SMALL BOAT AGREEMENT**

(a)    For breakbulk vessels having a capacity of 500 gross registered tons or less (as listed in Lloyd's Registry), or for container vessels with a capacity of 500 TEU or less, a minimum of two clerks (or checkers) consisting of one Chief Clerk and one Field Clerk will be used and they will do all the work required.

Orders shall specify if the vessel is classified as a Small Boat pursuant to any Small Boat Agreement sanctioned by this Agreement.

If the employees do not wish to remain after 7:00 P.M. the Union must provide new personnel for a 7:00 P.M. start if notified prior to 6:00 P.M. to fulfill the guarantee of the original personnel. Personnel ordered for 1:00 P.M. starts need not be so notified.

(b)    For Ro-Ro vessels having a capacity of 500 TEU, or less, a minimum of two clerks (or checkers) consisting of one Chief Clerk and one Field Clerk will be used and they will do all the work required.

(c)    Clerks ordered under this Small Boat Agreement shall receive a guarantee of 4 hours; and when reporting back after a meal hour shall receive an additional 2 hours guarantee.

**A-7.**    The following general safety work rules shall be used as guidelines to set up each port safety program.

## CONTAINER OPERATIONS
## GENERAL SAFETY RULES

1.    Personnel working in the immediate area of container handling equipment or in traffic lanes shall wear high visibility equipment.

2.    The employer shall direct employees to stay clear of the area beneath a suspended container.

3.    No container shall be hoisted if it's actual gross weight exceeds the weight marked or if it exceeds the capacity of the crane.

4.    Containers shall not be hoisted unless all engaged chassis twist locks are released.

5.    Adequately illuminate all walking and working areas.

6.    A safe distance will be maintained between the first two trucks in a container vessel lead or behind any vehicle which personnel are required to work.

7.    Pre-plan and establish traffic patterns for working vessels.

Signed and agreed to by the International Longshoremen's Association, Local 1475 and the Georgia Stevedore Association on the    day of October, 2005.

For the International Longshoremen's
Association, I.L.A. Local 1475:

For the Georgia Stevedore
Association:

_____

Stephen C. Sims, President

_____

Stephen W. Zadach, President

# EXHIBIT B

## SAVANNAH CLERKS AND CHECKERS SENIORITY PLAN

To implement the employment of Checkers, Clerks, etc., in the Port of Savannah, Georgia, as provided by Clause 14 of the present Collective Bargaining Agreement of I.L.A. Local 1475, the parties thereto hereby agree to the following:

1.    The operation of the Plan shall be governed by a Seniority Board composed of the President and one (1) rank and file member of the I.L.A. Local 1475, and two (2) members of the Georgia Stevedore Association.

2.    Any dispute concerning or arising out of the terms and conditions of this Agreement shall be referred to the Seniority Board.

    A.    This Seniority Board shall act by majority vote, and should they reach a determination in a particular dispute, such determination shall be final and binding.

    B.    The Board shall hold meetings as necessary.

    C.    The Seniority Board shall be the sole judge of the sufficiency of the evidence to be considered in the resolution of any dispute brought before them.

    D.    If the Seniority Board shall be unable to reach a determination in a particular dispute, the dispute shall be resolved under the procedure established under Clause 15(B) of the Collective Bargaining Agreement.

    E.    The Board shall have authority to determine whether any rules listed herein have been violated, and shall have power to invoke the penalties provided under Paragraph 7 herein.

    F.    Any dispute or grievance by an individual employee or employer must be submitted to the Board in writing at least 48 hours prior to a meeting.  The complaint must be signed by the plaintiff.

3.    As used in this Agreement, "continuous service" means that an employee must work a minimum of 700 hours under the Checkers and Clerks Agreement in the port of Savannah each successive contract year following the seniority classification.  An employee must continue to maintain 700 hours or more of service under said agreement during future contract years to maintain seniority.

A.    Checkers and Clerks, etc., shall be classified by the Seniority Board on the following basis.

**CLASS A**:    Class A seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during contract year October 1, 1966 to September 30, 1967, and who have maintained continuous service at such occupation since October 1, 1967.

**CLASS B**:     Class B seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1969 to September 30, 1970, and who have maintained continuous service at such occupation since October 1, 1970.

**CLASS C**:     Class C seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during contract year October 1, 1970 to September 30, 1971, and who have maintained continuous service at such occupation since October 1, 1971.

**CLASS D**:     Class D seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1971 to September 30, 1972, and who have maintained continuous service at such occupation since October 1, 1972.

**CLASS E**:     Class E seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1972 to September 30, 1973, and who have maintained continuous service at such occupation since October 1, 1973.

**CLASS F**:     Class F seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1975 to September 30, 1976, and who have maintained continuous service at such occupation since October 1, 1976.

**CLASS G**:     Class G seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1976 to September 30, 1977, and who have maintained continuous service at such occupation since October 1, 1977.

**CLASS H**:     Class H seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1977 to September 30, 1978, and who have maintained continuous service at such occupation since October 1, 1978.

**CLASS I**:     Class I seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1982 to September 30, 1983, and who have maintained continuous service at such occupation since October 1, 1983.

**CLASS J**:     Class J seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1989 to September 30, 1990, and who have maintained continuous service at such occupation since October 1, 1990.

**CLASS K**:     Class K seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1990 to September 30, 1991, and who have maintained continuous service at such occupation since October 1, 1991.

**CLASS L**:     Class L seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours in any contract year during the period of October 1, 1991 to September 30, 1996, and who maintain continuous service at such occupation from October 1, 1996.

**CLASS M:**    Class M seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 1996 to September 30, 1997, and who maintain continuous service at such occupation from October 1, 1997.

**CLASS N:**    Class N seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours in any contract year during the period of October 1, 1997 to September 30, 1999, and who maintain continuous service at such occupation from October 1, 1999.

**CLASS O:**    Class O seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1,1999 to September 30, 2000, and who maintain continuous service at such occupation from October 1, 2000.

**CLASS P:**    Class P seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 2000 to September 30, 2002, and who maintain continuous service at such occupation from October 1, 2002.

**CLASS Q:**    Class Q seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract years October 1, 2002 to September 30, 2003, and who maintain continuous service at such occupation from October 1, 2003.

**CLASS R:**    Class R seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 2003 to September 30, 2004, and who maintain continuous service at such occupation from October 1, 2004.

**CLASS S:**    Class S seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 2004 to September 30, 2005, and who maintain continuous service at such occupation from October 1, 2005.

**CLASS T:**  Class T seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 2005 to September 30, 2006, and who maintain continuous service at such occupation from October 1, 2006.

**CLASS U:**  Class U seniority shall be enjoyed by those personnel who were employed as Checkers, Clerks, etc., 700 or more hours during the contract year October 1, 2006 to September 30, 2007, and who maintain continuous service at such occupation from October 1, 2007.

**CASUAL**:    Casual seniority shall be enjoyed by those personnel who do not fall within the above classes, were employed as Checkers, Clerks, etc., 700 or more hours during any contract year, and who remain ready and willing to work at all times.

4.A.    In determining the above qualification, the following rules shall apply:

      a.    As used in this Agreement "Contract Year" shall be defined as any annual period between October 1 and September 30 of the following year.

b.   Employees may receive credit for allowable breaks in service which are due to:

1.   Injury or illness (other than through alcohol or drugs) to the extent of becoming eligible for Worker's Compensation or for benefits under the Industry's Welfare Plan.

2.   Absence due to military service provided the individual is reinstated in the Industry in compliance with the requirements of law as to re-employment.

3.   Absence due to service as an officer of the I.L.A. or its subdivision.

4.   Absence due to service in a supervisory or managerial position with a concerned party to the Collective Bargaining Agreement.

5.   Absence for a period not to exceed one year upon advance approval of the Seniority Board when the Board determines a temporary leave to be necessary and not for the purposes of accepting other employment.

B.   Credit for allowable breaks in service shall be granted for the purpose of seniority on the basis of four (4) hours for each day of the week in each contract year, with a maximum of 700 hours per contract year.

C.   The seniority of an individual shall cease with respect to priority of employment in the event he/she:

1.   Voluntarily quits, resigns or retires.

2.   Fails to work at least 700 hours unless such failure is allowable within 4(A).  Time credited for paid vacations and holidays is not to be credited toward this requirement.

3.   Is receiving G.A.I. benefits and accepts employment out of the industry at anytime during the period Monday through Friday, between 8:00 a.m. and 5:00 p.m. or thereafter.

D.   The records of the Pension and Welfare Fund shall be the official source of years of service and hours worked and where such records are questioned, the Seniority Board shall have the authority to determine the figures to be used for classification under the Seniority Plan.

5.   Any individual reaching the age 70 and is eligible for pension benefits and who wishes to remain in the industry, the Seniority Board must annually agree whether or not he/she is capable of remaining in the industry.

6.   In selecting personnel for work covered by the Collective Bargaining Agreement, the following rules must be observed:

A.1.  The Local 1475 Hiring Center will dispatch personnel in accordance with the provisions of this Seniority Agreement.

A.2.  Providing they are physically qualified, and in the case of personnel, etc., requiring special skills providing they meet the necessary standards of skill, all available personnel in group "A" must be offered employment before the other groups can be considered.  Also, when employing personnel for less arduous work, preference will be given to all available older personnel within the group.  Should further personnel be required after all available group "A" personnel have been offered employment, the employment will be offered to personnel in group "B" in the same fashion.  Employment will continue to be offered through successive groups until all available personnel have been offered employment before personnel without seniority status are employed.

B.    To accomplish the above, all personnel shall report their availability as follows:  Personnel must report their availability for 7 A.M., 8 A.M. and 1 P.M. starts by 3 P.M the previous day, except Sundays, and remain available at a given phone number.  If not there, they will be assigned a job according to their seniority.  Personnel must report their availability for 7 P.M. starts by 12 Noon the same day, except Sundays and no-work days.  All persons working during the day will automatically be considered available for the next day.  Those persons who do not wish to work should notify the Hiring Center by 3:30 p.m.  All persons starting work at 7 P.M. will automatically be considered available for work at 7 P.M. the following night.  However, all persons who worked the night before and those persons who have made themselves available to work at 7 P.M. must be able to be contacted by 2:30 P.M. or it will be assumed that they do not wish to work.  Personnel who have accepted employment for 7:00 A.M. or 8:00 A.M. starts the next day and work eight (8) or more hours from 7:00 P.M. the previous night or are required to take Midnight Lunch must call the Dispatcher not later than 6:00 A.M.  They will be replaced by qualified fresh personnel, if available, except in cases of legitimate ship-side orders.

C.1. Personnel starting work are entitled to remain as long as they are continuously employed.  It is not a break in continuity when employment is interrupted by meal periods, payroll or voting periods, or when shifted between job classifications or locations.  When personnel are released for other than the above breaks and are ordered back for a subsequent starting time, their re-employment will follow procedures for new employment except that individuals working in the Chief Wharf Clerk, Timekeeper or Plan Clerk capacity shall not be replaced by those in higher groups but shall be retained until completion of the job.  This exemption also applies to any individual working as Assistant to the Chief Wharf Clerk and is in addition to the regular complement of personnel.  Their continuity shall last no longer than 24 hours or two continuous shifts for vessels starting at 7 A.M., 8 A.M. and 1 P.M.  However, they will be replaced sooner if so ordered by the employer.  At the end of the above period, they shall have no continuity and will be replaced by qualified fresh personnel, if available, except in cases of legitimate shipside orders.  The most hours a night person may

work are 13, from 7 P.M. - 12 x 1 A.M. - 9 A.M. unless qualified fresh personnel are not available. The Assembling Chief Clerk, working during the day, may be ordered that night to Chief Clerk that job at 7 P.M., if all work is to be completed that night and applicable minimum of hours is applied from 7 P.M.*

C.2. Persons accepting jobs of continuity will be required to complete those jobs. In the event they do not do so, then they shall not be eligible for employment for 24 hours after giving up the job of continuity. Persons holding continuity positions shall not "double over" on a new call if their continuity job is reordered for the next day or night, whichever applies.

C.3. If a previous continuity job is reordered by the employer at some later time and that person who was ordered to that job originally is not employed elsewhere on a job of continuity, that person will be ordered and required to accept the reordered job. If a person is shifted from one continuity job to another or from a non-continuity job to one of continuity during the same applicable guarantee period, he shall not possess continuity for the new job.*

*This language has been modified by the Georgia Stevedore Association to conform to the requirements of the Collective Bargaining Agreement.

D.      Personnel working during the day and having completed 8 hours, shall have no seniority or new status at 7:00 P.M. Personnel working during the night and having completed eight (8) hours shall have no seniority status at 8:00 A.M. Notwithstanding, personnel referred to in the above provisions, may be hired after all employees with seniority status who are present have been offered employment. Once an individual has been offered employment by any employer for work at any starting time, and he/she refuses employment at that time, he/she therefore, waives his/her seniority status for that particular hiring period; but may be offered employment at the next hiring period. Persons who cancel or reject employment after having accepted it, shall lose their seniority for 24 hours.

E.      Employers must make every effort to train personnel now in the industry for specialized jobs.

F.      Selection of individuals for jobs shall be without discrimination against any applicant by reason of race, creed, sex, membership or non-membership in I.L.A. Local 1475. Such selection shall be strictly in accord with the above rules and procedures as set forth in this Agreement and shall not be affected by Union rules, by-laws, regulations, constitutional provisions, or any other aspect of Union membership, policies, or requirements. If any provision herein is found to be in violation of any local, state or federal laws, then those portions in violation shall be declared null and void.


7.A.    The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

        a.      Collusion by an individual with an employer to violate hiring rules.

      b.     Leaving a job (unless injured) except supper reliefs at 7:00 P.M. for 7:00 A.M. or 8:00 A.M. starts or failure to arrive at a job.

      c.     Persistently failing to accept employment which he/she is capable of performing.

      d.     Any other violation of the Seniority Agreement.

B.     Before taking disciplinary action for violation of rules herein specified, the party will be given written notice of the conduct claimed to be in violation of the rules and warranting disciplinary action, which notice shall fix a time and place at which the employee may appear and present his/her defenses.

C.     The Seniority Board must assess the following penalties against an employee who is found to violate the above rules and regulations during each contract year:

     **FIRST OFFENSE**:     Fourteen (14) days suspension of Seniority Preference.

     **SECOND OFFENSE**:   Thirty (30) days suspension of Seniority Preference.

     **THIRD OFFENSE**:    Sixty (60) days suspension of Seniority Preference plus such additional suspension of seniority preference as the Seniority Board deems necessary.

D.     The Seniority Board, on written and signed complaint, shall hear and determine whether or not an employee has violated the following rules and regulations:

      a.     Use of false seniority card or use of a card belonging to another individual.

      b.     Allowing another to use the seniority card entrusted to the owner.

     **FIRST OFFENSE**:     Permanent dismissal from the industry.

8.     On October 1, 1983, or thereafter, the Seniority Board will meet to determine whether the penalties listed in paragraph 7 are adequate, and if they find an undue number of violations, the Seniority Board shall recommend to the parties that the penalties be substantially increased.

9.     The Seniority Plan will remain effective until the expiration of the present Collective Bargaining Agreement, but may be amended by mutual agreement between the parties thereto provided such amendment is approved by the District Negotiating Committee.  All provisions of the Plan including criteria for grouping employees are subject to change upon agreement by both parties.

Signed and agreed to by the International Longshoremen's Association, Local 1475 and the Georgia Stevedore Association on the    day of October, 2005.

For the International Longshoremen's                For the Georgia Stevedore
Association, I.L.A. Local 1475:                     Association:


_____          _____
Stephen C. Sims, President                         Stephen W. Zadach, President

# EXHIBIT C

# MEMORANDUM OF UNDERSTANDING FOR
# LOCAL 1475 CLERKS AND CHECKERS' SENIORITY

## Effective Date: October 1, 2021

The purpose of this proposed MOU is to establish a unified seniority system for ILA Local 1475. The following document outlines a solution to create a single list while ensuring that no seniority classifications are compromised and ensures that deck and dock jobs will be dispatched through a priority program.  The need to resolve this issue is in everyone's best interest, both clerks and deck and dock workers alike, as well as our employer partners and the Georgia Ports Authority.

This document is intended to amend both the ILA Local 1475 Savannah Clerks and Checkers Seniority Plan and the ILA Local 1475 Savannah Deck and Dockmen Seniority Plan. To the extent there is any conflict between those documents and this MOU, the terms of this MOU supersede any inconsistent provisions in these Seniority Plans.

For purposes of clarification the following definitions will apply:

a)  Clerks Dispatcher - any individual dispatching clerks in seniority classifications currently regarded to as groups A-Z.

b)  Clerks Seniority List - the Clerks Seniority List currently containing classification A-Z as modified by this document.

c)  Deck and Dock Dispatcher - any individual dispatching Deck and Dock clerks in seniority classifications currently regarded to as groups A-Z19.

d)  Deck and Dock Seniority List - the Deck and Dock Seniority List currently containing classification groups A-Z19.

e)  Conventional Clerks - work that was traditionally being performed by ILA Local 1475 clerks prior to 2013 and that is currently dispatched under the Local 1475 Savannah Clerks and Checkers Seniority Plan.

1. The current Clerks Seniority List containing groups A-Z remains as is.

2. New seniority classifications will be added to the Clerks Seniority List following the conclusion of the current contract year 2020-2021 starting with group AA, followed by group BB, CC, etc., as necessary.

3. All current Local 1475 "Extra List" workers (Extra Lists 1, 2, 3, and 4), Local 1475 Casuals, and/or any individuals dispatched by the Clerks Dispatcher who have earned a minimum of 700 hours or more in the 2020-2021 contract year will be

1

placed on the Clerks Seniority List into seniority classification group AA. This group **does not** include any Clerk and Checker personnel on the Clerks "Emergency List."

4. Current "Extra List" workers who did not work a minimum of 700 hours in contract year 2020-2021 may qualify for seniority on the Clerks Seniority List in the future if they meet all requirements for seniority set forth at the time. Extra List workers who qualify at a future date will be moved into the seniority class created in the year in which their qualification was attained.

5. All Deck and Dock personnel being dispatched by the Deck and Dock dispatcher will be placed on the Clerks Seniority List in the following order:

   Class Seniority BB:  D&D seniority groups A though X.

   Class Seniority CC: D&D seniority group Y.

   Class Seniority DD:  D&D seniority group Z17.

   Class Seniority EE: D&D seniority group Z18.

   Class Seniority FF: D&D seniority group Z19.

   Class Seniority GG: D&D seniority group Z20 (Casuals, Extra Lists 1-4, Deck and Dock Clerks who accumulate 700 hours during contract year 2020-2021).  This group **does not** include Deck and Dock personnel on the Deck and Dock "Emergency List."

6. All Deck and Dock clerks moved to the Clerks Seniority List will have an asterisk placed next to their name indicating that they will continue to be dispatched by the Deck and Dock dispatcher in the same manner that currently exists and per the Deck and Dock Seniority List. This is designed to ensure that Local 1475 provides our employers with qualified, productive workers on all Deck and Dock jobs without interruption.

7. A Deck and Dock clerk will be given the option to have the asterisk removed from their name, which will allow them to be dispatched going forward for Conventional Clerk work by the Clerks Dispatcher based on their seniority classification on the Clerks Seniority List, once they have accumulated 15,000 hours from contract year 2013-2014 forward **or** 10,000 hours from the contract year beginning in October

2021-2022 forward, **whichever occurs first**. All hours worked (both Deck and Dock AND Clerk and Checker hours) will count towards a Deck and Dock clerk's accumulated hours for these purposes.

An individual who chooses to remove the asterisk from their name will no longer keep their placement on the Deck and Dock Seniority List. However, the individual will be given permanent placement as a Deck and Dock Casual and may be dispatched for Deck and Dock work based on their classification as a Casual.

8. An individual will have 30 days prior to the end of the contract year in which they reach their required number of hours (15,000 hours from contract year 2013-2014 or 10,000 hours from the contract year beginning in 2021-2022, whichever occurs first) to exercise this option of removing the asterisk.

9. To ensure that the number of clerks with an asterisk by their name changing over to Conventional Clerk work is manageable, no more than twelve (12) clerks will be allowed to exercise the option to remove their asterisk to transition to Conventional Clerk work in a given contract year. If more than 12 clerks would be eligible to exercise this option of removing the asterisk in a given contract year, the 12 workers with the highest seniority on the Deck and Dock Seniority List will have the option to change over to Conventional Clerk work. To break a tie within a seniority group, the individual with the most cumulative total hours worked since contract year 2013-2014 will be given priority and be allowed to exercise the option. A waiting list will be created for those who have qualified to exercise this transition option but were unable to do so due to the 12 person limit having already been reached for that contract year by workers ahead of them. No more than 12 workers will be allowed to transition from Deck and Dock Work to Conventional Clerk work in a single contract year unless ILA 1475 and GSA both agree to allow more than 12 workers to transition in a single contract year.

10. Deck and Dock clerks who have met their required number of hours and exercised the option to transition to Conventional Clerk work and to be dispatched by the Clerks Dispatcher will be dispatched by their respective seniority positions on the Clerks Seniority List (Example: BB, CC, DD, etc.).

11. If a Deck and Dock worker with an asterisk meets the required number of hours but rejects the option to transition to Conventional Clerk work, he/she will continue to be dispatched by their current Deck and Dock seniority by the Deck and Dock Dispatcher for the following contract year.

3

12. Going forward, the transition option for an individual with an asterisk by their name will be available at the end of each contract year to an individual who has reached the required number of hours (15,000 hours from contract year 2013-2014 or 10,000 hours from the contract year beginning in 2021-2022, whichever occurs first), subject to the limit of only 12 Deck and Dock clerks being allowed to transition in a single contract year as set forth above. In that event, the individual would be moved to a waiting list as set forth above and would transition only when they are high enough to get one of the twelve spots in a contract year.

13. Individuals on the Deck and Dock Emergency List and the Clerks Emergency List who accumulate 700 hours during contract year 2020-21 will be placed on a new Extra List to be established called "Extra List 5." This "Extra List 5" shall consist of only those Deck and Dock and Clerks Emergency List personnel who accumulated 700 hours during contract year 2020-21. All hours worked (both Deck and Dock AND Clerk and Checker hours) will count towards an individual's accumulated hours for these purposes. Commencing with the 2021-22 contract year, these individuals will qualify for seniority classification once they earn 700 hours in a contract year. Any other future Extra List(s) created after the effective date of this MOU, including an "Extra List 6," shall be established by Local 1475 in a non-discriminatory and non-arbitrary manner.

14. Individuals on Extra List 5 who were on the Deck and Dock Emergency List will have an asterisk placed next to their name on the Clerks Seniority List indicating that they are mandated to take any Deck and Dock position before seeking a Conventional Clerk position. The individual performing Deck and Dock work will be dispatched by their Extra List classification on Extra List 5 or their Seniority classification on the Clerks Seniority List (starting in contract year 2021-22 with Group HH, II, JJ, etc.) after the existing Deck and Dock Seniority List has been dispatched. Failure to accept the Deck and Dock job will result in a penalty as set forth in Paragraphs 24 and 25 of this MOU. If a Deck and Dock job is not available, the individual may take a Clerk and Checker job.

15. The asterisk placed next to the names of those individuals on Extra List 5 maybe removed once they have accumulated 10,000 hours from the contract year beginning in 2021-2022 (counting both Deck and Dock hours and Clerk and Checker hours) and if they are eligible as one of the 12 who can transition in a single contract year pursuant to Paragraph 9 above. If they have the hours but there is no available

4

slot given the maximum of 12 already met for that contract year, they will be placed on the waiting list as set forth in Paragraph 9 above.  Once the asterisk is removed for an individual on Extra List 5, the individual is no longer mandated to take a Deck and Dock position before seeking a Conventional Clerk work position. They may then choose to mark up for either Deck and Dock or Clerk and Checker jobs (or both).

16. Individuals who are referred for work out of Local 1475 on Extra List 6 and/or any other future Local 1475 Extra List(s) created after the effective date of this MOU may choose to work as Clerks and Checkers, Deck and Dock Clerks, or both.  Those individuals who choose to work as Deck and Dock or both will be required to attend Deck and Dock training.  They may choose not to continue with Deck and Dock clerk work either during or within three (3) days after training.  To ensure that all Deck and Dock jobs are filled moving forward, those individuals who choose to remain with Deck and Dock work or both will have an asterisk placed next to their name indicating that they are mandated to take any Deck and Dock position before seeking a Conventional Clerk position. Their asterisk would be removed as set forth above with an hour requirement and subject to availability of an open slot in the 12 that can transition in a single contract year.

17. Those individuals with an asterisk next to their names on Extra List 6 and/or any other future Local 1475 Extra List(s) or list of workers created after the effective date of this MOU will be required to mark up for Deck and Dock work until they have the asterisk removed from their name as set forth below.  The individual performing Deck and Dock work will be dispatched by their Extra List classification on the Clerks Extra List or their Seniority classification on the Clerks Seniority List (starting in contract year 2021-22 with Group HH, II, JJ, etc.) after the existing Deck and Dock Seniority List has been dispatched.  Failure to accept the Deck and Dock job will result in a penalty as set forth in Paragraphs 24 and 25 of this MOU.  Those who choose to work as both Deck and Dock and as Clerks will be marked up for both Deck and Dock and Clerk and Checker jobs. They will have to accept a Deck and Dock job first when offered employment. Again, the failure to accept the Deck and Dock job will result in a penalty as set forth in Paragraphs 24 and 25 of this MOU.  If a Deck and Dock job is not available, such an individual may take a Clerk and Checker job.

18. The asterisk placed next to the names of those individuals on Extra List 6 and/or any other future Local 1475 Extra List(s) created **after** the effective date of this MOU will be removed once the individual has accumulated 10,000 hours from the contract

year beginning in 2021-2022 (counting both Deck and Dock hours and Clerk and Checker hours) and if they are eligible as one of the 12 who can transition in a single contract year pursuant to Paragraph 9 above.   If they have the hours but there is no available slot given the maximum of 12 has already been met, they will be placed on the waiting list as set forth in Paragraph 9 above.  Once the asterisk is removed for one of these individuals, the individual is no longer mandated to take a Deck and Dock position before seeking any Conventional Clerk work position. They may then choose to mark up for either Deck and Dock or Clerk and Checker jobs (or both).

19. There shall be no other Seniority classifications on the Clerks Seniority List created based upon hours worked through the 2020-2021 Contract Year, other than those set forth in Paragraphs 1, 3 and 5.  Commencing with the 2021-22 Contract Year, ALL INDIVIDUALS who earn a minimum of 700 hours (COUNTING BOTH CLERKS AND CHECKER AND DECK AND DOCK HOURS) will be placed on the Clerks Seniority List and moved to the seniority classification created for the year in which the individual qualified. (Example: Those individuals who work at least 700 combined Clerk and Checker and Deck and Dock hours in the 2021-22 Contract Year will be placed in Clerk Seniority Classification HH).

20. Going forward, all hours performed by Local 1475 personnel (either Deck and Dock or Clerk and Checkers) will count towards an individual's accumulation of 700 hours in a given contract year for purposes of seniority classification.

21. Any Current Deck and Dock Extra List (Extra List 1, 2, 3, or 4) personnel who has not previously qualified for seniority and/or any Deck and Dock Casual will be given an asterisk mandating that they must take any Deck and Dock position before seeking any Conventional Clerk work position.  Any such individual refusing to take a Deck and Dock job is subject to discipline as set forth in Paragraphs 24 and 25 of this MOU.  The asterisk will be removed once the individual has accumulated 10,000 hours from the contract year beginning in 2021-2022 and if there is an open slot of the twelve people allowed to transition in a single contract year.  If there is not, these individuals will go on the waiting list and be subject to the same rules as set forth above.

22. In the event ILA Local 1475 exhausts all qualified Deck & Dock personnel and are unable to fill a deck and dock position, Local 1475 and GSA reserve the right to recall any qualified Deck & Dock personnel beginning with the lowest seniority or extra list category to fill this need. This provision will only be enacted in emergency situations. Should the shortage of qualified Deck & Dock personnel persist, ILA

6

Local 1475 and GSA will immediately begin the process to increase the number of Deck & Dock personnel.

23. Effective October 1, 2021, any individual who holds a Seniority Classification under either Clerks Seniority List or Deck and Dock Seniority List who fails to earn 700 hours during any contract year will drop to the next classified seniority category. Such individual will serve a two year probation the following two contract years. The individual may regain his or her original seniority category by earning at least 700 hours during each of these two years of probation. Failure to earn 700 hours in a contract year during this probationary period will result in a loss of seniority and the individual will drop to Casual status.

24. The following provision **only applies to clerks who have attained a seniority classification** on the Deck and Dock Seniority List or the Clerk and Checker Seniority List.  Any Deck and Dock or Clerk and Checker seniority personnel who marks up and accepts a job, but does not show up for work, shall be subject to discipline, up to and including suspension from work referrals.  Such individuals who do not show up for work shall be disciplined as follows:

**First No Show In A Contract Year**: The first no show for work (after marking up and accepting a job) in a contract year shall result in a seventy-two (72) hour suspension effective immediately.  During the term of this suspension, the individual will not be eligible to work as either a Clerk and Checker or Deck and Dock clerk.

**Second No Show In A Contract Year**: The second no show for work (after marking up and accepting a job) in a contract year shall result in a thirty (30) day suspension effective immediately.  During the term of this suspension, the individual will not be eligible to work as either a Clerk and Checker or Deck and Dock clerk.

**Third No Show In A Contract Year**:  The third no show for work (after marking up and accepting a job) in a contract year shall result in a one-hundred and eighty (180) day suspension effective immediately.  During the term of this suspension, the individual will not be eligible to work as either a Clerk and Checker or Deck and Dock clerk.

25. The following provision **only applies to clerks who have not attained a seniority classification** on the Deck and Dock Seniority List or the Clerk and Checker

Seniority List. Any non-seniority personnel (either Deck and Dock or Clerk and Checker) are required to mark up and be available for work for twenty-four (24) hours once every thirty (30) days. Any non-seniority personnel who marks up and is offered work, but who refuses such work (by failing to accept work, failing to respond to the phone call from the dispatcher, and/or failing to show up after accepting work) shall be subject to discipline, up to and including suspension from work referrals. Such individuals who refuse work and/or who fail to mark up for work once in a 30-day period shall be disciplined as follows:

**First Refusal to Accept Work And/or Failure to Mark Up Once Every 30 Days In A Contract Year**: The first refusal of a work referral and/or failure to mark up for 30 days in a contract year shall result in a seventy-two (72) hour suspension effective immediately. During the term of this suspension, the individual will not be eligible to work as either a Clerk and Checker or Deck and Dock clerk.

**Second Refusal to Accept Work And/or Failure to Mark Up Once Every 30 Days In A Contract Year**: The second refusal of a work referral and/or failure to mark up for 30 days in a contract year shall result in a ninety (90) day suspension effective immediately. During the term of this suspension, the individual will not be eligible to work as either a Clerk and Checker or Deck and Dock clerk.

**Third Refusal to Accept Work And/or Failure to Mark Up Once Every 30 Days In A Contract Year**: The third refusal of a work referral in a contract year shall result in permanent suspension from the Local 1475 Extra List effective immediately. The individual will no longer be eligible to be hired to work as either a Clerk and Checker or Deck and Dock clerk.

Those who have worked as a Deck and Dock or a Clerk and Checker clerk in the last twenty-four (24) hours before refusing a job **will not be** subject to the above discipline.

26. If Local 1475 opens its list for new workers, it will do so in a non-discriminatory manner. The first new list after this MOU is entered (Extra List 6) will be capped at 1,000 new members. After that, the number of individuals on any new list would be based on the needs at that time. Out of any new list of workers, workers will only be allowed to be dispatched after being properly trained. GSA and Local 1475 will jointly decide how many workers each contract year are trained and allowed to be dispatched. Once the number of workers to be trained for a contract year is jointly

8

decided, they will be selected for training in a non-discriminatory manner, such as a random drawing from the list.

No new workers on Extra List 6 or any future Extra List(s) will be dispatched for Conventional Clerk Work or Deck and Dock Work until he/she has passed: 1) a physical examination; 2) a drug test; and 3) a proficiency test, as set forth in Article V, Section 1 of the Master Contract.  They will not be dispatched for Conventional Clerk Work or Deck and Dock Work until properly trained to the satisfaction of GSA/Management.

27. Going forward, the GSA and Local 1475 should make all efforts to ensure that at least thirty (30) workers from any new extra list(s), including Extra List 6, receive Deck and Dock training in a given contract year.

28. The records of the Pension and Welfare Fund shall be the official source of years of service and hours worked and where such records are questioned, the Seniority Board shall have the authority to determine the figures to be used for classification under both Seniority Plans.

29. In the event work opportunities for personnel who have earned seniority under either Plan are negatively impacted by unforeseen events, the Seniority Board may adjust the order of hiring preferences between Seniority and non-Seniority personnel to address such unforeseen events.

30. A Deck and Dock clerk who has exercised his option to remove the asterisk and transition to Conventional Clerk work, and wishes to switch back being dispatched from their old placement on the Deck and Dock Seniority Roster, may petition the Seniority Board after completing one contract year of Conventional Clerk work.  The Seniority Board will have the discretion to grant this request; however, such requests shall be granted liberally and should only be denied in extraordinary circumstances.

31. All seniority re-classification criteria that are currently in place will remain in effect unless modified by Local 1475 and GSA and approved by the South Atlantic and Gulf Coast District.

32. The Clerk Seniority List and Plan may be amended by mutual written agreement between Local 1475 and GSA hereto provided such amendment is approved by the South Atlantic and Gulf Coast District.

By: _____
Alan Robb, President
South Atlantic & Gulf Coast District

Date: _10 - 1 - 21_

By: _____
Derrick Miles, President
Georgia Stevedore Association

Date: _____

By: _____

Alan Robb, President
South Atlantic & Gulf Coast District

Date: _____

By: _____

Derrick Miles, President
Georgia Stevedore Association

Date: _10 - 1 - 2021_

# EXHIBIT D

# MASTER CONTRACT

BETWEEN

## UNITED STATES MARITIME ALLIANCE, LTD.
(FOR AND ON BEHALF OF MANAGEMENT)

AND

## INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO
(FOR AND ON BEHALF OF ITSELF AND EACH OF ITS AFFILIATED DISTRICTS AND LOCALS
REPRESENTING LONGSHOREMEN, CLERKS, CHECKERS AND MAINTENANCE
EMPLOYEES WORKING ON SHIPS AND TERMINALS
IN PORTS ON THE EAST AND GULF COASTS OF THE UNITED STATES)

EFFECTIVE OCTOBER 1, 2012 FOR THE SIX-YEAR TERM
EXPIRING ON SEPTEMBER 30, 2018

## PREAMBLE

**THIS COLLECTIVE BARGAINING AGREEMENT** made and entered into on the 28th day of August, 2013, by and between UNITED STATES MARITIME ALLIANCE, LTD. ("USMX") for and on behalf of its members and any stevedores, marine terminal operators, and carriers which may hereafter become members of USMX or which may hereafter subscribe to this Agreement (hereinafter sometimes collectively referred to as "Management") and the INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO ("ILA") for and on behalf of itself and each of its affiliated districts and locals representing longshoremen, clerks, checkers, and maintenance employees working on ships and terminals in ports on the East and Gulf Coasts of the United States constitutes the Master Contract establishing the terms and conditions of employment for longshoremen, clerks, checkers, and maintenance employees employed in container and roll-on/roll-off ("ro-ro") operations at ports on the East and Gulf Coasts of the United States.

## ARTICLE I
## SCOPE OF AGREEMENT

**Section 1.    Management.**

The multiemployer Management group bound to the Master Contract consists of the carriers, stevedores, marine terminal operators, and port associations that are members of USMX; the carriers, stevedores, and marine terminal operators that are members of the port associations that are members of USMX; and the carriers, stevedores, and marine terminal operators that hereafter become members of USMX or hereafter subscribe to this Master Contract as well as those carriers and other employers bound hereto by operation of law.

1

**Section 2.      Recognition.**

Management recognizes the ILA as the exclusive bargaining representative of longshoremen, clerks, checkers, and maintenance employees who are employed on ships and terminals in all ports on the East and Gulf Coasts of the United States, inclusive from Maine to Texas, and the ILA recognizes USMX as the exclusive employer representative in such ports on Master Contract issues.

**Section 3.      Complete Labor Agreement.**

This Master Contract is a full and complete agreement on all Master Contract issues relating to the employment of longshore employees on container and ro-ro vessels and container and ro-ro terminals in all ports from Maine to Texas at which ships of USMX carriers and carriers that are subscribers to this Master Contract may call.  This Master Contract as supplemented by local bargaining constitutes a complete and operative labor agreement.

**Section 4.      Local Bargaining.**

The port associations which are bound by this Master Contract will engage in local negotiations on those bargaining subjects left open to local negotiations by USMX and ILA.  Local agreements must be consistent with and will supplement the terms and conditions of the Master Contract in the local ports covered by this Master Contract.

**ARTICLE II**
**WAGES**

**Section 1.      Wage Increases.**

(a)   Effective October 1, 2014, employees who were employed as of September 30, 2013 and who are receiving a straight-time basic wage rate of $32.00 per hour as of September 30, 2014 shall receive an increase of $1.00 per hour in their straight-time basic wage rate.

2

(b)   Effective October 1, 2016, employees who were employed as of September 30, 2015 and who are receiving a straight-time basic wage rate of $33.00 per hour as of September 30, 2016 shall receive an increase of $1.00 per hour in their straight-time basic wage rate.

(c)   Effective October 1, 2017, employees who were employed as of September 30, 2016 and who are receiving a straight-time basic wage rate of $34.00 per hour as of September 30, 2017 shall receive an increase of $1.00 per hour in their straight-time basic wage rate.

**Section 2.    New Employees.**

The starting straight-time basic wage rate for new employees who enter the industry on or after October 1, 2012 shall be $20.00 per hour.  New employees shall include any former employee who did not work at least one (1) hour under the prior Master Contract during the period from October 1, 2004 through and including September 30, 2012.  New employees hired during the term of this Master Contract shall be entitled to receive the increases set forth in Article II, Section 3 of this Master Contract that go into effect after the date of their hire.

**Section 3.    Wage Progression Formula ("Formula").**

(a)   Effective October 1, 2013, all employees who are receiving a straight-time basic wage rate on September 30 of the prior Contract Year that is less than the highest straight-time basic wage rate will receive an increase in their straight-time basic wage rates in accordance with the following Formula:

> (i)   On their second (2nd) Industry Employment Anniversary Date, twenty-five percent (25%) of the difference between the highest straight-time basic wage rate and the employee's straight-time basic wage rate on September 30 of the prior Contract Year;

3

    (ii)  On their fourth (4th) Industry Employment Anniversary Date, fifty percent (50%) of the difference between the highest straight-time basic wage rate and the employee's straight-time basic wage rate in effect on September 30 of the prior Contract Year; and

    (iii) On the sixth (6th) Industry Employment Anniversary Date, one hundred percent (100%) of the difference between the highest straight-time basic wage rate and the employee's straight-time basic wage rate in effect on September 30 of the prior Contract Year.

(b)    The following definitions shall apply to the Formula:

    (i)  An employee's Industry Employment Anniversary Date will be based upon the number of Qualified Anniversary Years with which the employee has been credited as of September 30 of the prior Contract Year.

    (ii)  A Qualified Anniversary Year for all Contract Years prior to October 1, 2009 is one in which the employee is credited with at least one (1) hour of service.  A Qualified Anniversary Year for all Contract Years after September 30, 2009 is one in which the employee is credited with at least 700 hours of service.

    (iii) When applying the Formula, the highest straight-time basic wage rate shall be the rate in effect on the date the Formula is applied.

    (iv) If any employee did not work at least one (1) hour under the Master Contract during the period from October 1, 2000 through and including September 30, 2004 that employee shall not receive any Qualified Anniversary Years for any years prior to the Contract Year ending September 30, 2005.

(c)    USMX and the ILA agree that the application of the Formula will result in the following base wage rates in each year of this Master Contract.

4

| Contract Years | | 10/01/13 09/30/14 | 10/01/14 09/30/15 | 10/01/15 09/30/16 | 10/01/16 09/30/17 | 10/01/17 09/30/18 |
|---|---|---|---|---|---|---|
| If the employee has the following Qualified Anniversary Years of service on October 1 of the Contract Years set forth above, the employee's straight-time basic wage rate for each Contract Year of this Master Contract will be: | | | | | | |
| 0 | | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| 1 | | $20.00 | $20.00 | $20.00 | $20.00 | $20.00 |
| 2 | | $23.00 | $23.25 | $23.25 | $23.50 | $23.75 |
| 3 | | $23.00 | $23.25 | $23.25 | $23.50 | $23.75 |
| 4 | | $27.50 | $28.15 | $28.15 | $28.75 | $29.40 |
| 5 | | $27.50 | $28.15 | $28.15 | $28.75 | $29.40 |
| 6 or More | | $32.00 | $33.00 | $33.00 | $34.00 | $35.00 |

(d)  If an employee's straight-time basic wage rate is higher than what the employee is entitled to receive based on the Qualified Anniversary Years of service on October 1 of a Contract Year, the employee's straight-time basic wage rate will stay at the higher level until the employee is entitled to move to the next level, based on the employee's Qualified Anniversary Years of service.

(e)  The Formula shall continue in full force and effect in extensions of this Master Contract and subsequent Master Contracts.  On October 1, 2013 and on each October 1 thereafter while the Formula remains in effect, employees shall be entitled to receive an increase in their straight-time basic wage rate pursuant to the Formula payable on that date.

5

## ARTICLE VII
## ILA JURISDICTION GENERALLY

**Section 1.    Containerization Agreement.**

(a)    Management hereby reaffirms that employees covered by this Master Contract have jurisdiction over longshore, checker, maintenance, and other craft work conferred on such workers by the Containerization Agreement, a copy of which is appended to this Master Contract as Appendix A.

(b)    The carriers and marine terminal operators that are parties to this Master Contract shall not contract out to any affiliate, subsidiary, or other entity in which they have an interest any Master Contract work that has historically and regularly been performed by employees covered by the Master Contract at waterfront piers and terminals or at off-pier facilities within port areas covered by the Master Contract, unless the affiliate, subsidiary, or other entity employs workers covered by the Master Contract to perform the work.

**Section 2.    Rules On Containers.**

The Rules On Containers that were in effect on September 30, 2004, a copy of which is appended to this Master Contract as Appendix B, shall remain in effect during the term of this Master Contract.

**Section 3.    Maine to Texas.**

The ILA's Master Contract jurisdiction continues on a multi-port bargaining-unit basis covering all ports from Maine to Texas at which ships of USMX carriers and subscribers may call.

**Section 4.    Jurisdiction Committee.**

(a)    **Fact Finding.**  The Jurisdiction Committee will visit every port that raises an issue concerning any violation of the Master Contract's jurisdiction provisions.   The Jurisdiction Committee will render a report within thirty (30) days of each visit.  The Jurisdiction Committee can use an independent third party to perform fact-finding, whenever the Committee agrees that such action is necessary.

12

(b)    **Labor Adjustor System.**  After October 1, 2004, Management and the ILA will set up a labor adjustor system to hear and resolve Master Contract jurisdictional disputes within thirty (30) days of the dispute being presented.  Part of this system will permit the labor adjustors, on an as-needed basis, to use an independent third party to perform fact-finding, whenever the labor adjustors agree that such action is necessary.

(c)    **Jurisdiction Committee Decisions.**

   (i)    Decisions of the Jurisdiction Committee are to be implemented in accordance with the time schedule set forth in the Jurisdiction Committee's decision.  The Jurisdiction Committee shall have the power to award actual damages incurred as a result of any violation of the jurisdictional provisions of the Master Contract.  Decisions of the Jurisdiction Committee shall constitute final and binding arbitration awards, and the parties agree to waive the right to seek judicial review.  In addition, the parties shall establish a procedure to resolve a deadlock of the Jurisdiction Committee by selecting in advance a panel of mutually acceptable arbitrators and use the next available arbitrator to resolve the deadlock on a set time schedule.  The parties agree that the arbitrator's award is final and binding.

   (ii)    The failure to comply with the final and binding decision and award of the Jurisdiction Committee or the deadlock-breaking arbitrator shall constitute a breach of this Master Contract, and the ILA reserves the right to take whatever legal action may be appropriate in the circumstances, including, but not limited to, the refusal to provide labor to the offending carrier, marine terminal operator, or stevedoring company.  This refusal to supply labor shall not constitute a violation of the No-Strike Clause of the Master Contract or any local longshore collective bargaining agreement.

   (iii)    Anyone failing to comply with an outstanding award of the Jurisdiction Committee or the deadlock-breaking arbitrator shall be liable for liquidated

13

damages in the amount of $10,000 per day for each day that the offending local union, carrier, marine terminal operator, or stevedoring company fails to comply with the schedule set forth in the award. In the event the losing party commences an action in federal court to vacate an award issued by the deadlock-breaking arbitrator, the ILA shall not have the right to refuse to provide labor so long as liquidated damages are paid for failure to comply with the deadlock-breaking arbitrator's award. Actual damages payable by an offending carrier, marine terminal operator, or stevedoring company shall be paid to the aggrieved workers or the Fringe Benefit Fund in the port as determined by the Jurisdiction Committee or the arbitrator. Liquidated damages shall be paid to the Fringe Benefit Fund in the port. Actual damages and liquidated damages payable by a local union shall be paid to the aggrieved Management party.

(iv)    In the event that USMX or the ILA shall institute suit to confirm and enforce an award under this section, they shall be entitled to recover prejudgment interest, costs, reasonable attorneys' fees, and other expenses incurred in the litigation.

(v)    The losing party shall have the right to commence an action in federal court to vacate an award issued by the deadlock-breaking arbitrator. The limitations period for this action shall be 60 days from the date of the award. The losing party must comply with the award notwithstanding the pendency of any federal court action. Any actual damages awarded by the arbitrator and any liquidated damages for failure to comply must be paid in escrow to the co-chairmen of the Jurisdiction Committee pending the final disposition of the federal court action. If it does not prevail in the federal court action, the losing party shall pay reasonable attorneys' fees to the opposing party.

# ARTICLE VIII
# ILA JURISDICTION OVER CLERICAL WORK

**Section 1.     Clerical Work.**

Clerks shall perform all clerical work on container waterfront facilities which traditionally and regularly has been performed by them, including, but not limited to, work related to the receipt and delivery of cargo, hatchchecking, prestow, hatch sequence sheet, plan clerking, recording of receipt and delivery of containers received or delivered at waterfront facilities, timekeeping, location and yard work, and demurrage recording, which work shall not be removed from the waterfront facility. The input and output of information by computers related to the foregoing work functions shall also be performed by Checkers and Clerks.

**Section 2.     Guidelines.**

(a)     **Framework.** The members of the Jurisdiction Committee, in order to provide a framework to resolve outstanding issues regarding the jurisdiction of the ILA Clerks and Checkers, have agreed upon the following definitions and the statement of principle that will be used to define and identify the specific functions that fall within the ILA's jurisdiction.

(b)     **Statement of Principle.** In applying Article VIII, Section 1 of the Master Contract, members of the Jurisdiction Committee shall be bound by the following principle: Management and the ILA agree that the ILA Clerks and Checkers shall have jurisdiction over each and every function set forth in Article VIII, Section 1 of this Master Contract which is performed on container waterfront facilities on behalf of signatory employers in each and every port covered by the Master Contract, provided that such function was at any time in the past performed by the ILA Clerks and Checkers in that port. It is further understood that clerical work currently performed by state port authorities or government agencies, if discontinued, will fall under the ILA's jurisdiction.

18

(c)      **No Waiver.**  Unless there is agreement between the ILA in a local port and an employer in the local port, any deviation from the jurisdiction provisions of the Master Contract shall not constitute a waiver, amendment, or rescission of the jurisdiction provisions of the Master Contract.

**Section 3.      Glossary of Terms.**

The following basic list of terms are intended to be descriptive and not all encompassing and are not intended to limit the jurisdiction or functions of the ILA Clerks and Checkers as they exist under local agreements in the various ports covered by the Master Contract:

(a)      **Receiving and Delivery** of cargo shall mean checking and/or clerking of all cargo received into and/or out of a container terminal operated and controlled by a USMX-member company.  The input and output of information related to change of status (*e.g.*, change of vessel, change of discharge port, etc.) once the container is received at the waterfront facility shall also be performed by the Checkers and Clerks.  Management and the ILA agree that they will develop a methodology to confirm who is performing computer input work that falls within the ILA's jurisdiction.  Both Management and the ILA agree that the methodology will vary from one terminal to another because of the different computer systems utilized in various ports and terminals. Both the ILA and Management are committed to fully implementing this Article VIII of the Master Contract during its term.

(b)      **Hatchchecking** shall mean the checking, tallying, verification, and recording of all containers and/or cargo loaded, discharged, or restowed to or from a vessel or barge at a container terminal operated and controlled by a USMX-member company.

(c)      **Prestow & Plan Clerking** shall mean the making of sequence sheets and/or the making of a prestow plan that would be used in loading and discharging vessels and barges in accordance with Management's instructions.  Such work shall include, but not be limited to, all work relating to the bay plan.  The use of a computer in the performance of the above function falls within the ILA's jurisdiction.

(d)      **Timekeeping** shall mean the timekeeper's duties and functions, which shall include, at the discretion of Management, but not be

19

limited to, keeping longshore time and the preparation of time sheets and payroll information. If a computer is used to perform this function, this will fall under the ILA's jurisdiction.

(e) **Location and Yard Work** shall mean the identification, location and control of all containers, chassis, and/or cargo to be loaded, discharged, or restowed to or from the vessel or barge. Necessary paperwork and computer utilization required to perform these clerical functions, as required by Management's direction and planning, shall fall within the ILA's jurisdiction.

(f) **Demurrage Recording** shall mean the preparation, computation, and checking of container-demurrage receipts.

## ARTICLE IX
## ILA JURISDICTION OVER MAINTENANCE AND REPAIR WORK

**Section 1.    Maintenance and Repair Work.**

It is agreed that the jurisdiction of the ILA shall cover the maintenance and repair of equipment (which term includes containers and chassis) and such equipment as its members have historically maintained and which is owned, controlled, operated, or interchanged by USMX members including, but not limited to, (a) container cranes, (b) container-handling equipment, and (c) container cranes and container-handling equipment which are acquired for new deep-sea terminal facilities. The ILA's jurisdiction remains in effect at waterfront container facilities and/or off-pier premises used for servicing and repairing equipment covered by this Master Contract in accordance with the Containerization Agreement. Further, all said equipment, be it owned, leased, or controlled by USMX members and/or signatories to the Master Contact, once it is presented at waterfront facilities, shall be covered by this Master Contract. Furthermore, it is recognized that the marine-terminal work of all ILA crafts has been traditionally performed on piers and waterfront facilities. When such marine-terminal work is moved off the marine terminal by the terminal operator or by a

20

in accordance with this Master Contract. Both the Special Panel's determination and the arbitrator's decision shall be final and binding and shall constitute an enforceable arbitration award.

**Section 3.    Guiding Principles.**

(a)    All jobs created by technology and automation shall be filled by qualified ILA-represented employees within their respective crafts after mandatory employer-provided training.

(b)    Any Displaced Employee must be available to accept work opportunities within the employee's craft at the terminal in question or other port areas in accordance with current port seniority requirements and port practices. ILA-represented employees displaced by technology or automation as defined in Section 2(c) of this Article XI shall be offered protection in wages and benefit contributions. Displaced Employees who worked between 1,000 and 1,199 hours in the prior contract year will be offered protection for up to 35 hours per week, and Displaced Employees who worked 1,200 hours or more in the prior contract year will be offered protection for up to 40 hours per week.

## ARTICLE XII
## CONTAINER ROYALTIES

**Section 1.    First and Third Container Royalties.**

The First and Third Container Royalties (effective in 1960 and 1977) each in the amount of $1.00 per weight ton of containerized cargo not stuffed or stripped by ILA-represented labor (with lesser amounts for containerized cargo carried on vessels that are not full container vessels as determined in the Stein Award, a copy of which is appended to this Master Contract as Appendix D) shall continue to be paid. The amount of the First and Third Container Royalties, which are subject to the provisions of the Stein Award and any accommodation approved pursuant to Article XV of

28

this Master Contract, paid to the various local port and district container-royalty funds in accordance with Article XII, Section 3 of this Master Contract shall be used to provide supplemental-wage benefits to eligible employees covered by this Master Contract.

**Section 2.**    **Second Container Royalty.**

The Second Container Royalty (effective in 1971) in the amount of $1.00 per weight ton of containerized cargo not stuffed or stripped by ILA-represented labor (with lesser amounts for containerized cargo carried on vessels that are not full-container vessels as determined in the Stein Award, which is attached to this Master Contract as Appendix D) shall continue to be paid during the term of this Master Contract to MILA to be used exclusively for the purpose of funding the managed-healthcare program administered by MILA in accordance with the provisions of Article XIII of this Master Contract.  The Second Container Royalty is subject to the provisions of the Stein Award.

**Section 3.**    **Container Royalty Distribution.**

(a)    Each year during the term of this Master Contract the total amount of Container Royalty benefits payable to the eligible workforce under the Master Contract shall be no less than the total sum paid in all ports in 2011.  Similarly, each year during the term of this Master Contract, administrative expenses payable to the local port container royalty funds covered by the Master Contract shall be no less than the total sum of administrative expenses paid by those funds in 2011, except in any year when the total sum of administrative expenses paid by a port is less than the total sum of administrative expenses paid in 2011 by that port. For all ports other than the Port of New York and New Jersey, the year 2011 shall mean the contract year ending September 30, 2011; for the Port of New York and New Jersey, the year 2011 shall mean the calendar year ending December 31, 2011.

(b)        Each year during the term of this Master Contract any Container Royalty Nos. 1 and 3 assessments collected that are in excess of the amounts needed to satisfy the contractual obligations set forth in Article XII, Section 3(a) of this Master Contract shall be divided into two equal shares.  The ILA shall have the right to designate how one of those shares will be used, and USMX shall have the right to designate how the other share will be used.

**Section 4.        Container Royalty Central Collection Fund.**

(a)        During the term of this Master Contract, USMX and the ILA shall create and maintain a Container Royalty Central Collection Fund (CCF) to collect and distribute all container royalties payable pursuant to this Master Contract.

(b)        The CCF shall constitute an irrevocable trust for the sole and exclusive purpose of collecting all assessments payable in accordance with this Master Contract to the following joint labor-management fringe-benefit-trust funds: the Carrier-ILA Container Freight Station Trust Fund, the Carrier-ILA Container Royalty Fund No. 5, the local port container royalty funds entitled to receive the First Container Royalty and Third Container Royalty Assessments, and MILA, which is entitled to receive the Second Container Royalty and the Fourth Container Royalty Assessments.

*(This space intentionally left blank.)*

30

(c)     The CCF will distribute automatic payouts that are substitutes for CAP refund payments established in the 2004 Master Contract that were made to local ports to be used for local fringe benefits other than supplemental cash benefits. These automatic payments include the following payments provided for in the 2009 Memorandum of Settlement extending the 2004 Master Contract.

(i)     Each local port and district shall be entitled to receive each year during the term of this Master Contract the following amounts that are equal to the CAP excess distributions paid to those ports for the Contract Year ending September 30, 2009:

| Port/District | Contractual Amount |
|---|---|
| Boston | $    342,095 |
| NY & NJ | 6,183,757 |
| Philadelphia | 439,674 |
| Baltimore | 1,397,081 |
| Hampton Roads | 2,273,807 |
| Wilmington, NC | 530,947 |
| Charleston | 213,805 |
| Savannah | 4,000,616 |
| Jacksonville | 1,040,114 |
| Southeast Fl. | 584,161 |
| Tampa | 77,927 |
| New Orleans | 2,081,996 |
| West Gulf | 2,828,687 |

(d)     The South Atlantic and West Gulf regions will be entitled to receive the following additional automatic payments each year during the term of this Master Contract.

(i)     The South Atlantic District Escrow Fund (SADEF) shall receive an annual amount not to exceed $7,535,968 for vacation and holiday benefits calculated pursuant to the formula set forth in the April 12, 2005 letter agreement between USMX and the South Atlantic & Gulf Coast District (SAGCD).

31

(ii)    The Maritime Association-ILA Funds shall receive an amount not to exceed $7,885,656, to fund the cost of supplemental wages in lieu of vacation and holiday benefits calculated pursuant to the formula set forth in the April 6, 2005 letter agreement between USMX and SAGCD.

(iii)    Copies of the April 6, 2005 and April 12, 2005 USMX-SAGCD letter agreements are attached as Appendix E.

**Section 5.**    **Carrier-ILA Container Royalty Fund No. 4.**

The Fourth Container Royalty (CR-4) assessment of $1.15 per weight ton shall continue during the term of this Master Contract. USMX and the ILA will terminate the Carrier-ILA Container Royalty Fund No. 4, since the CCF will transmit the Fourth Container Royalty Assessment directly to MILA. During the term of this Master Contract, USMX and the ILA shall have the right to agree upon a modification, suspension, or elimination of the CR-4 assessment.

**Section 6.**    **Carrier-ILA Container Royalty Fund No. 5.**

(a)    The Carrier-ILA Container Royalty Fund No. 5 ("CR-5 Fund") shall be continued during the term of this Master Contract for the sole and exclusive purpose of providing financial assistance to joint Management-ILA employee welfare benefit plans that provide healthcare, vacation or holiday benefits in the local ports or districts. Employee pension benefit plans and employee benefit plans that do not provide healthcare, welfare, vacation, or holiday benefits, including, but not limited to, container royalty plans or other plans providing supplemental cash benefits, supplemental unemployment benefit plans, scholarship plans, and severance plans, are not eligible plans for assistance from the CR-5 Fund. Applications for financial assistance will be granted to local employee benefit plans that are in need due to shortfalls in funding, provided the plans meet the criteria for assistance established by the CR-5 Fund trustees.

(b)    During the term of this Master Contract, Management will fund Container Royalty Fund No. 5 as required to provide financial assistance to joint Management-ILA employee-benefit plans in the local ports or districts as provided in Article XII, Section 6(a) of this Master Contract. During the term of this Master Contract, management shall have the right to modify the Container Royalty Fund No. 5 assessment.

## Section 7.  Carrier-ILA Container Freight Station Trust Fund.

### (a)    Preamble

The Carrier-ILA Container Freight Station Trust Fund ("CFS Fund") shall continue in effect during the term of this Master Contract.  The periodic distribution of the amounts to be paid from the CFS Fund and the purposes thereof shall be determined solely by the trustees of the CFS Fund.  The CFS Fund shall continue to provide funding for training purposes to the extent that any funds remain after payment for the support of container-freight stations.  Training programs in each port or district shall be operated under guidelines approved by the trustees of the CFS Fund and shall be funded primarily by funds generated in each local port or district before application is made to the trustees of the CFS Fund.

### (b)  CFS Subsidy and Training Program

#### (i)   Assessment Rate

There will be an assessment rate equivalent to $0.25 per ton for the first three (3) years of the Master Contract.

#### (ii)  Subsidy

The wages, manning, and scope of work will be negotiated on a local level to accommodate the subsidy rates listed below and to compete with the local competition:

33

## ARTICLE XIII
## MILA

**Section 1.    Management-ILA Managed Health Care Trust Fund.**

The Management-ILA Managed Health Care Trust Fund ("MILA") is a joint labor-management, Taft-Hartley trust fund managed by an equal number of Management and Union trustees to administer an employee welfare benefit healthcare plan covering active and retired dockworkers covered by this Master Contract and their dependents in all ports. There will be no reduction in MILA benefits during the term of this Master Contract.

**Section 2.    Funding.**

MILA is a defined contribution welfare plan that is funded by the following contributions.

(a)    **Fourth Container Royalty Assessment.**  During the term of this Master Contract, the Fourth Container Royalty Assessment for the funding of MILA shall be in the amount of $1.15 per weight ton of containerized cargo not stuffed or stripped by ILA-represented labor (or such lesser amount as may be required under the Stein Award, which is attached to this Master Contract as Appendix D, for containerized cargo carried on vessels that are not full container vessels) and shall be paid to MILA to be used exclusively to fund the managed healthcare program administered by MILA.  During the term of this Master Contract, USMX and the ILA shall have the right to agree upon a modification, suspension, or elimination of the Fourth Container Royalty Assessment contributions payable to MILA.

(b)    **Second Container Royalty Assessment.**  During the term of this Master Contract, the Second Container Royalty Assessment in the amount of $1.00 per weight ton of containerized cargo not stuffed or stripped by ILA-represented labor (or such lesser amount as may be required under the Stein Award, which is attached to this Master Contract as Appendix D, for containerized cargo carried on vessels that are not full container vessels) shall be paid to MILA to be used

36

exclusively to fund the managed healthcare program administered by MILA.  During the term of this Master Contract, USMX and the ILA shall have the right to agree upon a modification, suspension or elimination of the Second Container Royalty Assessment payable to MILA. The container royalty provisions set forth in Article XII, Section 3 of this Master Contract shall not apply to the Second Container Royalty Assessment to MILA.

(c)    **Hourly Contributions.**  During the term of this Master Contract, $5.00 of the hourly contributions for local pension, welfare, and other employee fringe benefits set forth in Article IV, Section 1 of this Master Contract shall be paid to MILA.

**Section 3.  Second Container Royalty Contributions.**

The Second Container Royalty contributions shall be used exclusively for the funding of MILA healthcare benefits in all ports and districts covered by this Master Contract that participate in the MILA healthcare plan.  If the South Atlantic or the West Gulf continue to use the Second Container Royalty contributions for other purposes, then, either or both such areas must pay to the trustees of MILA the equivalent of said Second Container Royalty contributions in total dollars out of the 1993 dollar contributions, if they are being used for welfare purposes, as well as out of other fringe benefit contributions, such as the local fringe benefit contributions set forth in Article IV, Section 1 of this Master Contract and the payments distributed to those areas in accordance with Article XII, Section 4 of this Master Contract.

37

Implementation Team to take all required action to implement this Master Contract.

**IN WITNESS WHEREOF** the parties hereto have executed this Master Contract as of the date first above written.

UNITED STATES MARITIME ALLIANCE, LTD.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO

By  <u>S/ David F. Adam</u>                
      David F. Adam,
      Chairman/CEO

By  <u>S/ Harold J. Daggett</u>        
      Harold J. Daggett,
      President

# EXHIBIT E

9/1/25, 10:22 AM
Case 4:25-cv-00199-RSB-CLR Document 25-2 Filed 09/16/25 Page 69 of 106
MARINE TERMINALS CORP. EAST d/b/a PORTS AMERICA | National Labor Relations Board




**NLRB**
**National Labor Relations Board**

☰ **MENU**

Home

## Case Search Results

# MARINE TERMINALS CORP. EAST d/b/a PORTS AMERICA

E-File          Follow

**Case Number:** 10-RC-080061                    **Location:** Savannah, GA
**Date Filed:** 05/01/2012                         **Region Assigned:** Region 10, Atlanta, Georgia
**Status:** Closed

**Tally Issued Date:** 07/16/2012                  **Tally Type:** Initial
**Status:** Closed                                 **Ballot Type:** Single Labor Organization
**No. of Eligible Voters:** 40                     **Unit ID:** A
**Void Ballots:** 0                                **Votes Against:** 0
**Total Ballots Counted:** 38                      **Challenges Determinative:** No
**Challenged Ballots:** 0                           **Reason Closed:** Certific. of Representative
**Votes for Labor Union:** 38

**Labor Union:** SOUTH ATLANTIC & GULF COAST DISTRICT, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION

**Voting Unit (Unit A):** All hourly part-time stevedores employed by the Employer at its Garden City Terminal, excluding all full-time salaried stevedores, planning superintendents, office clerical employees, professional employees, guards and supervisors as defined in the Act.

**Union to Certify:** SOUTH ATLANTIC & GULF COAST DISTRICT, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION

**Docket Activity**                                          **Items per page**

| Date ↓⁼ | Document | Issued/Filed By |
|---|---|---|
| 09/18/2012 | Tally of Ballots* | NLRB - GC |
| 08/01/2012 | RD Supplemental Decisions* | NLRB - GC |
| 07/18/2012 | Answering Brief* | NLRB - GC |
| 07/16/2012 | Board Decision | NLRB - Board |
| 07/12/2012 | Opposition to RFR of D&DE | Petitioner |
| 07/05/2012 | Request for Review of D&DE | Employer |
| 07/02/2012 | Notice of Election* | NLRB - GC |
| 06/20/2012 | Decision and Direction of Election | NLRB - GC |
| 05/02/2012 | Notice of Hearing in Representation Case* | NLRB - GC |
| 05/02/2012 | Signed RC Petition* | NLRB - GC |

The Docket Activity list does not reflect all actions in this case.

* This document may require redactions before it can be viewed. To obtain a copy, please file a request through our FOIA Branch.

## Related Documents

Related Documents data is not available.

## Allegations

Allegations data is not available.

## Participants

| Participant | Address | Phone |
|---|---|---|
| **Employer**<br>Legal Representative<br>DUNCAN, BROOKE<br>ADAMS & REESE LLP | 4500 One Shell Sq<br>New Orleans, LA<br>70139- | (504)585-0220 |
| **Petitioner**<br>Legal Representative<br>HERMAN, CHARLES<br>Bignault & Carter | 7505 Waters Ave<br>Park South Unit F9<br>Savannah, GA<br>31406-3825 | |
| **Employer**<br>Legal Representative | PO BOX 11612<br>COLUMBIA, SC | (803)730-4901 |

| Participant | Address | Phone |
|---|---|---|
| Carrouth, Michael | 29211 | |
| Fisher & Phillips LLP | | |
| | | |
| **Employer** | 1320 Main Street, Suite 750 | (803)255-0000 |
| Legal Representative | Columbia, SC | |
| Lominack, Reyburn | 29201 | |
| Fisher & Phillips, LLP | | |
| | | |
| **Petitioner** | 7505 Waters Ave | (912)356-0388 |
| Legal Representative | Park South Unit F9 | |
| BIGNAULT, W. | Savannah, GA | |
| Bignault & Carter | 31406-3825 | |
| | | |
| **Employer** | Garden City, GA | |
| Employer | 31408- | |
| | | |
| **Petitioner** | WEBSTER, TX | |
| Union | 77598-6604 | |
| SOUTH ATLANTIC & GULF COAST DISTRICT, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION | | |

## Related Cases

Related Cases data is not available.

## Most Popular Pages

Who We Are

National Labor Relations Act

Cases & Decisions

Recent Charges & Petitions Filings

The Law

The Right to Strike

Case Search

Contact Us

Frequently Asked Questions

## Content in Other Languages

Español - Spanish
العربية - Arabic

中文 (繁體中文) - Chinese (Traditional)

中文 (简体中文) - Chinese (Simplified)

Français - French

Kreyòl ayisyen - Haitian Creole

हिंदी - Hindi

Hmong - Hmong

한국어 - Korean

Polski - Polish

Português - Portuguese

ਪੰਜਾਬੀ - Punjabi

Русский - Russian

Somali - Somali

Tagalog - Tagalog

اردو - Urdu

Tiếng Việt - Vietnamese

## Connect With NLRB

### NLRB Subscription Updates

 



**National Labor Relations Board**

Site Map | Policies | OpenGov | USA.gov | FOIA | Privacy | No Fear Act

**About**

Rights We Protect

What We Do

Who We Are

**Resources**

Inspector General

Fact Sheets

Fillable Forms

Related Agencies

E-file via SecureRelease

Section 508

Employee Rights Poster

**Other**

Site Feedback

FAQ

Contact Us

# EXHIBIT F

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 10


MARINE TERMINALS CORP. – EAST
d/b/a PORTS AMERICA

       Employer

           and

SOUTH ATLANTIC & GULF COAST DISTRICT,
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

       Petitioner

Case 10-RC-80061


## DECISION AND DIRECTION OF ELECTION

The Employer, Marine Terminals Corp. – East d/b/a Ports America, is a California corporation with an office and place of business located in Savannah, Georgia, where it is engaged in the business of stevedoring operations. The Petitioner, South Atlantic & Gulf Coast District, International Longshoremen's Association, filed a petition with the National Labor Relations Board under Section 9(c) of the National Labor Relations Act. At the opening of the hearing in this matter, Petitioner amended the petition to seek a unit of all deck men and dock men employed by the Employer at the Garden City Terminal, Port of Savannah, Georgia, excluding all other employees, professional employees, office clericals, guards and supervisors as defined in the Act. A hearing officer of the Board held a hearing and the parties filed post-hearing briefs which have been duly considered.

## POSITIONS OF THE PARTIES

As amended and set forth in its post-hearing brief, the Petitioner seeks an election in a unit of all hourly Deck, Dock and Field Stevedores employed by the Employer at its Garden City Terminal. The unit proposed by the Petitioner would include approximately 41 employees. The Employer contends that the petition should be dismissed because the employees the Union seeks to represent are supervisors under Section 2(11) of the Act. In the event that the Region determines that the subject employees are not supervisors, the Employer asserts that the smallest appropriate unit under Section 9(b) of the Act must include both hourly and salaried stevedores (whom the Employer calls "superintendents"), excluding planning superintendents, employed by the Employer at its Garden City and Ocean terminals at the Port of Savannah. The expanded unit proposed by the Employer would include approximately 75 employees. The Petitioner is willing to proceed to an election in any alternative unit the Region might direct.

## OVERVIEW OF OPERATIONS

The Employer operates a stevedoring business at the Port of Savannah ("the Port") and performs loading and unloading services for various shipping lines. It is a member of the Georgia Stevedore's Association ("GSA" or "the Association"). The Association and the Petitioner ("ILA") are parties to master and local collective bargaining agreements which set forth the terms and conditions of employment for the labor that member employers hire through the ILA hiring hall.

The employees at issue in this proceeding are referred to by various names. The Employer refers to them as "superintendents" while the Petitioner refers to them by the positions to which they are most regularly assigned: deck men, dock men, field men and lead men or "quarterbacks". I will refer to them collectively herein as "stevedores."

2

The Port is owned by the Georgia Ports Authority ("GPA"). The Employer operates three separate terminals at the Port: Garden City Terminal, Ocean Terminal and Savannah Foods Terminal. The Savannah Foods Terminal only handles vessels containing bulk sugar and is overseen by a single full-time stevedore. Neither party alleges that that employee should be included in the bargaining unit at issue here.

The Garden City Terminal services container ships almost exclusively. Container ships carry large, standardized cargo containers. The ships are built to hold multiple "cells" or stacks of containers. These containers are loaded and unloaded by cranes owned and operated by the GPA and moved around the terminal on "jockey trucks" leased to the Employer by a company named "TICO" and driven by ILA longshoremen. Offloaded containers are stored in large stacks in the terminal.

The Garden City Terminal services 18 to 20 ships per week and moves an average of 80,000 containers per month. It almost always takes one day or less to service a ship. The only non-container cargo that Garden City handles, on rare occasions, is yachts, which are moved from a ship to the water or vice versa.

Chris Garbarino is the general manager at Garden City. The planning manager, two line managers, and the site manager report directly to Garbarino. The line managers handle customer relations issues with the shipping lines. Planning manager Todd Glaize oversees four full-time planning superintendents who are responsible for planning how each ship will be loaded and unloaded. Both parties agree that the planning superintendents should be excluded from the bargaining unit. Eleven full-time stevedores and 41 part-time stevedores report to site manager Casey Dexter.

3

Ocean Terminal, which is located about seven miles from the Garden City Terminal, services break/bulk and RoRo (roll-on, roll-off) vessels. Break/bulk cargo includes items such as lumber, steel coils, pipes and bags of clay. RoRo cargo consists of wheeled vehicles that can move under their own power or be towed, such as dump trucks, freightliners and trailer boats. RoRo vessels were described as "floating parking decks" with multiple levels connected by ramps. Break/bulk ships may have a variety of full or partial decks on which cargo is placed. Break/bulk cargo is generally loaded and unloaded by onboard cranes operated by ILA longshoremen.

Ocean Terminal services an average of three vessels per week. It can take two to three days to work a vessel. Offloaded cargo is stored in warehouses or placed on a truck and taken directly to the recipient. A very small number of ships serviced at Ocean terminal carry containers in addition to break/bulk or RoRo cargo. The terminal averages fifty containers per month.

Derrick Miles is the general manager at Ocean Terminal. The maintenance and repair supervisor, terminal operations clerk, the Savannah Foods terminal superintendent and the operations manager all report to Miles. Eight full-time and five part-time stevedores report to operations manager Pat Douberly.

### THE GARDEN CITY CONTAINER OPERATION

Before a ship comes into port, it sends the Employer an electronic file called a BAPLIE, which shows a schematic of the ship and the location of the cargo to be unloaded. The BAPLIE is transmitted electronically to the Employer's managers, planners and the lead stevedore working the ship. The planning superintendents use the BAPLIE, along with the customer's specific stowage instructions for incoming cargo, to develop the plans for loading and unloading

4

the vessel. They must account for a variety of requirements such as the location of hazardous, refrigerated or non-standard cargo, the ultimate destination of the cargo ("POD" or "port of discharge") and the weight limitations for a stack of containers. Sometimes a particular area of a ship cannot be used if, for example, the "cell guides," which help to secure stacks of containers below deck, are damaged.

The planners generate the documents that comprise the overall plans for an operation: the game plan, sequence sheets and stow plans. The game plan identifies where the cranes will be operating and how many moves each crane will make. The sequence sheet, used primarily by the hatch and field clerks, lists all the containers that are to be loaded and unloaded. The bay plans are diagrams that show where outgoing containers are located on the ship and where incoming containers should be loaded. Each bay on the vessel is shown on a separate grid and, when combined, the bay plans show all possible positions for container stowage on the vessel. Similar diagrams show where stored containers are located in the field and where containers removed from the ship should be stacked. The bay plans and field plans are collectively referred to as the stow plans. At the beginning of an operation, all stevedores receive copies of the game plan and the bay plans. The plans are also distributed to the ILA clerks and gang headers, whose duties are described below.

Longshoremen perform the physical labor associated with loading and unloading the ships, including lashing (securing) and unlashing containers and driving containers to and from the cranes. Longshoremen are ordered from the hiring hall by "gangs." Gangs are comprised of a set number of longshoremen who perform specified duties. A gang includes seven drivers and a driver header, six lashers and a lasher header, two deck workers (shoe men), four dock men (pin men) and a water boy. The headers select the longshoremen for their gangs. The number of

5

gangs needed to service a ship depends on the amount of cargo on the ship and how many cranes will be used for the operation. For every crane used, one gang of longshoremen is ordered. Larger ships may require as many as five gangs, while small ships may only require one.    If more than one gang is ordered, the Employer must also order another type of header called a "walking boss" who oversees all the gangs.

Clerks and checkers are also hired from the ILA and include hatch clerks, field clerks, a plan clerk, a chief clerk and a timekeeper. The hatch clerks record all the containers that are loaded onto or unloaded from the ship. The field clerks work in and around the terminal where containers are stored. The plan clerk notates changes to the ship's plans and the chief clerk serves as the header over the clerks. There is only one timekeeper, plan clerk and chief clerk per vessel, while the number of hatch and field clerks increases for each crane used.

At the Port, longshoremen are represented by ILA Local 1414 and clerks and checkers are represented by Local 1475. When longshoremen, clerks and checkers are hired by a stevedoring company for an operation, they are employees of that company for the day. Crane operators at Garden City are employed by GPA and are considered "shared servants" of the GPA and the company for whom they are assigned to work.

During an operation, all stevedores communicate with each other and with ILA personnel by radio. The lead stevedore, also called the "quarterback," manages the entire vessel operation. There is only one lead stevedore per ship. The quarterback ensures that the operation begins on time and runs smoothly. His work takes place in a number of locations: he would normally spend about forty percent of his time in the office on the computer, but also goes to the deck, the dock and other areas in and around the terminal, such as the GPA facility. The lead stevedore obtains the hourly move counts from the dock stevedores and uses that and other information to

generate the vessel activity report. He also communicates the move counts and other information to the port captain, an employee of the shipping line. The port captain makes decisions about the manning required to complete the operation such as whether to work the longshoremen past the meal hour or whether an emergency (overtime) gang needs to be ordered. The lead stevedore also has some input in the manning process and can specify which gang headers he would like to have on the operation. As part of the operation, he creates the vessel activity report. This report tracks the entire operation, including changes made in the placement of containers. This information is used by the planners to create an outgoing BAPLIE for the ship. The lead stevedore is also responsible for investigating and filling out a report of any accidents that might occur.

Field stevedores are only used when there are three or more cranes assigned to a ship. This stevedore works in conjunction with the lead and dock stevedores to coordinate traffic to and from the cranes. The field stevedore's duties require him to move around between the various cranes and the areas in the field where containers are stacked and he drives around to these areas in a company truck.

There is one dock stevedore and one deck stevedore for each crane used in the operation. Dock stevedores are stationed on the dock at the area under the crane known as the "lead." This is the area where the crane moves containers on and off the trucks. The dock stevedore works with ILA truck drivers and pin men. Jockey truck drivers move containers between the lead and the areas in the terminal where containers are stored. Pin men install and remove "twist locks" which are used to couple the containers together once they are placed on the ship. The dock stevedore uses the game plan, bay plans and field plans to direct drivers to retrieve outbound cargo from the field or to take incoming cargo to a particular area. The dock stevedore also

7

works with the field clerk to determine which stacks of containers in the field need to be moved to the ship and where containers taken off the ship need to be placed. Field clerks are stationed at rubber tire gantries (RTGs), which are movable cranes that transfer containers between the trucks and the stacks in the terminal. The dock stevedore gives the lead stevedore an hourly count of the number of containers moved.

Deck stevedores are stationed on the vessel. They work with the ILA lashers and shoe men. Lashers secure the incoming containers to the deck with lashing rods and couple the containers together using twist locks. They unlash the containers and unlock the twist locks when containers are being removed. Shoe men place "shoes" or bases upon which the containers are seated. The deck stevedore also directs the GPA crane operator. Crane operators will not move containers without direction from the deck stevedore. The deck stevedore refers to the game plan and bay plan to determine where containers are to be loaded and in what sequence they are to be removed. They make sure that containers are loaded in the correct position within the pre-determined parameters of the plan.

THE OCEAN TERMINAL OPERATION

Full-time stevedores Mark Roberson and Bruce Shearouse are usually responsible for planning vessel operations at Ocean Terminal. Roberson and Shearouse also work as lead stevedores. Using the vessel's cargo plan, they generate a game plan, a stow plan and a lot sheet. The stow plan is a schematic diagram of the ship as viewed from the side and shows where incoming cargo is stowed and where outgoing cargo should go. The lot sheets are sometimes prepared by the lead superintendent who will be in charge of the operation.

The ILA gangs used at Ocean Terminal differ in size and structure from the gangs used at Garden City. The number of gangs needed for an operation depends on the number of hatches

8

on the ship and the nature of the cargo. The lead superintendent responsible for the vessel may suggest the number of gangs he thinks will be needed. Site manager Pat Douberly orders the ILA labor for each operation.

The ILA headers' responsibilities are more extensive in a break/bulk or RoRo operation than in a container operation. Douberly usually requests specific headers and these headers work almost exclusively in either break/bulk or RoRo. All longshoremen are paid more for break/bulk and RoRo operations than for a container operation. Ocean Terminal General Manager Derrick Miles described a longshoreman's duties on these operations as more "hands-on" than in a container operation where "there's a lot of sitting around and letting the crane do the work."

The stevedores' titles and duties are different on each type of operation. A break/bulk operation uses a lead stevedore, a field stevedore (also known as a dock stevedore) and a deck stevedore. There is only one lead stevedore per operation but the number of field and deck stevedores will depend on the nature of the cargo and the complexity of the operation.

Break/bulk cargo is moved by onboard cranes operated by ILA longshoremen. Lifting gear is attached to the bottom of the crane to lift the cargo. Different types of lifting gear are used for different types of cargo and each type of gear has its own weight limit and size capacity. Several witnesses testified that there are "hundreds of options" involved in moving break/bulk cargo.

RoRo operations use one lead stevedore and one ramp stevedore. The ramp stevedore is responsible for directing and controlling vehicular cargo moving in and out of a RoRo vessel. He is stationed at the end of the cargo ramp. The number of deck and field/dock stevedores used depends on the number of gangs and the complexity of the operation.

9

Site manager Pat Douberly occasionally requests part-time stevedores from Garden City. He requests specific stevedores who have worked at Ocean Terminal in the past and who know how the operation works.

## APPROPRIATENESS OF A SINGLE FACILITY UNIT

A single-facility unit is presumptively appropriate unless the single facility has been effectively merged into a more comprehensive unit, or is so functionally integrated with another unit that it has lost its separate identity. Budget Rent a Car Systems, 337 NLRB 884, 885 (2002), citing R & D Trucking, 327 NLRB 531 (1999). "To determine whether the single-facility presumption has been rebutted, the Board looks at such factors as the similarity of employee skills, functions and training, the distance between the facilities, the functional coordination in operations of the facilities, common supervision, centralized control of operations and labor, contact between employees at different facilities, employee interchange (particularly temporary transfers) between facilities, common wages, benefits and terms and conditions of employment, and bargaining history, if any." Id. at 885, citing Waste Management Northwest, 331 NLRB 309 (2000) and New Britain Transportation Co., 330 NLRB 397 (1999).

Employee contact may be considered "interchange" where there is evidence that a significant portion of the work force is involved. New Britain Transp. Co., 330 NLRB 397, 398 (1999). See, Purolator Courier Corp., 265 NLRB 659, 661 (1982) (interchange factor met where 50 percent of the work force came within the jurisdiction of other branches on a daily basis and there existed a greater degree of supervision from supervisors at other terminals than from the supervisors at their own terminals); Dayton Transport Corp., 270 NLRB 1114 (1984) (Board found the presumption rebutted where in one year there were approximately 400-425 temporary

employee interchanges between terminals among a workforce of 87 and the temporary employees were directly supervised by the terminal manager from the point of dispatch).

The Garden City Terminal and Ocean Terminal operate separately and independently of each other. Each terminal has its own general manager, site manager, stow chief, line managers and planners. Aside from communications between the site managers at Garden City and Ocean Terminal, there is no evidence of any physical, telephonic, electronic or other communication between employees at the two terminals.

The break/bulk and RoRo operation is more complex than the container operation and the cargo handled at each terminal is substantially different. The break/bulk and RoRo vessels serviced at Ocean terminal carry an average of only fifty containers a month, while Garden City handles around 80,000 containers during the same period. The cargo at Ocean Terminal is stored in warehouses or driven directly off the terminal, while the containers at Garden City are stored in large stacks outside in the container fields.

Stevedores' duties and responsibilities are different at each terminal. A container stevedore can be trained in only a few days, while a great deal more training is needed for break/bulk and RoRo operations. Lead stevedore Bruce Shearouse described a container operation as simply going "square for square," while the cargo he deals with is comprised of non-standard shapes and sizes and must be arranged "like a puzzle." He testified that a dock or deck stevedore from the container operation would not know what to do in a break/bulk or RoRo operation without additional training and experience.

In addition to separate management structure and the differences in operations, there is very little employee interchange. There is no interchange at all of full-time stevedores between the two terminals. Interchange of part-time stevedores is limited to the occasional assignment of

11

a few Garden City stevedores who have experience in break/bulk or RoRo operations.  Kenny Rahn, Mike McDermott and Chris Utley are the only Garden City stevedores who have worked at Ocean Terminal in the recent past.  The Petitioner's analysis of the total number of days worked by all part-time Garden City stevedores shows that only 0.8 percent of those days were worked at Ocean Terminal.  The record shows a similarly low incidence of part-time stevedores from Ocean Terminal working at Garden City:  three or four Ocean Terminal employees worked one day at Garden City during the past six months, representing two percent or less of their working days for the period.

Based on the foregoing, I concluded that the Employer has not met its burden to show that the petitioned-for single unit is inappropriate.  I am, therefore, excluding the Employer's Ocean Terminal employees from the bargaining unit.

EXCLUSION OF FULL-TIME STEVEDORES

The Employer does not dispute that hourly part-time stevedores share the requisite community of interest with each other.  They do contend that these stevedores share such an overwhelming community of interest with the salaried full-time stevedores that a failure to include them in the unit would result in the type of "fractured unit" held to be inappropriate by the Board:  "A petitioner cannot fracture a unit, seeking representation in an arbitrary segment of what would be an appropriate unit."  Specialty Healthcare and Rehabilitation Center of Mobile, 357 NLRB No. 83, slip op. at 13.

Full-time stevedores have an office area and assigned computers.  They have company-provided cell phones and business cards.  They are paid salaries which range from $55,000 to $80,000 annually.  They are paid the same whether they work more or less than forty hours per week.  Full-time stevedores are entitled to paid vacations of two to four weeks, depending on

12

how long they have worked for the Employer.  They also participate in a 401(k) program with matching contributions from the Employer and receive health benefits.  The Employer's operations run twenty four hours a day, seven days a week.  Although salaried stevedores may have to work a holiday, they receive no extra pay for doing so.  Most or all of the salaried stevedores received bonuses last year in amounts ranging from $2000 to $10,000.

Full-time salaried stevedores are generally scheduled to work four days per week, but may work an extra day if someone else is out.  The Employer determines the number of full-time stevedores needed for a particular day based on the expected volume of work.   If there are not enough quarterback positions for all the full-time stevedores scheduled to work that day, the others are assigned to work as field, dock or deck stevedores.

Part-time stevedores are paid at an hourly rate of $16 to $26 and receive overtime if they work more than forty hours per week.  The number of hours worked by each hourly part-time stevedore varies substantially.  Some could work as little as fifteen to twenty hours, while others average thirty or more.  They are not entitled to paid vacations, paid holidays or health benefits.  The Employer does try to work around part-timers' scheduling preferences and availability.  They become eligible for a 401(k) after they have worked a threshold number of hours in a year.  Last year, about 75 percent of the hourly part-time stevedores received bonuses of $1000.

The Employer does not conduct meetings with the stevedores on any set schedule.  Sometimes full- and part-time stevedores attend the same meetings and sometimes separate meetings are held for full-timers only.   Safety and operational meetings usually include all stevedores, while a meeting with full-timers may only be held regarding a particular customer or when sensitive or confidential information will be discussed.  Sometimes, at the conclusion of a

13

meeting with all stevedores, the full-timers will stay behind after the part-timers leave to discuss other matters.

Hourly part-time stevedores only have computer access to the Employer's Prism system, which tracks and records safety incidents. SPARCS is a program provided by the GPA and all stevedoring companies in Savannah use it. It is a terminal operating system which shows pictures of all containers that are in the terminal as well as each ship's profile and contents. All planning and recording of vessel operations is done through this system. Both the planning superintendents and the lead superintendent use it during an operation. Only salaried full-time stevedores have a log-in and password for SPARCS. Hourly stevedores can use a full-time stevedore's password to access the system and, presumably, this is what they would do on those occasions when they were acting as a lead stevedore. However, only full-timers are trained on the system and have passwords issued to them solely for their use.

The Board's decision in Specialty Healthcare and Rehabilitation Center of Mobile, 357 NLRB No. 83 (2011), sets forth the principles that apply in cases in which a party contends that the smallest appropriate bargaining unit must include additional job classifications beyond those in the petitioned-for unit. First, the Board assesses whether the petitioned-for unit is appropriate by applying traditional community of interest standards. Id., at 8-9. If the petitioned-for unit satisfies that standard, the employer has the burden to demonstrate that the additional employees it seeks to include share an overwhelming community of interest with the petitioned-for employees, such that there "is no legitimate basis upon which to exclude certain employees from" the larger unit because the traditional community-of-interest factors "overlap almost completely." Id. at 11-13, and fn. 28.

14

The union in <u>Specialty Healthcare</u> sought a bargaining unit of all CNAs, while the employer contended that the smallest appropriate unit must also include its other non-supervisory service and maintenance employees. <u>Id</u>. at 2. The Board concluded that the employees the employer sought to add to the unit did not share such an overwhelming community of interest with the CNAs that they must be included in order to render the unit appropriate.

> If the proposed unit here consisted of only selected CNAs, it would likely be a fractured unit: the selected employees would share a community of interest but there would be no 'rational basis' for including them but excluding other CNAs....If the proposed unit here consisted only of CNAs working on the night shift or only CNAs working on the first floor of the facility, it might be a fractured unit....In other words, no two employees' terms and conditions of employment are identical, yet some distinctions are too slight or too insignificant to provide a rational basis for a unit's boundaries.

<u>Id</u>. at 18.

Applying the principles set forth in <u>Specialty Healthcare</u>, the Board reversed the Regional Director's finding that an appropriate unit should include classifications not sought by the petitioner and concluded that the employer did not demonstrate that the employees it sought to include shared an overwhelming community of interest with the petitioned-for employees. <u>DTG Operations, Inc.</u>, 357 NLRB No. 175 (2011). The Board noted that the employees sought to be included worked inside an office, had different duties and functions, a different compensation system, different equipment (computers), different experience requirements and little or no interchange with the unit sought by the union.

The Board reached the opposite conclusion in <u>Odwalla, Inc.</u>, 357 NLRB No. 132 (2011), wherein it concluded that the employer had met its burden to show that the petitioned-for unit was not appropriate where the unit excluded one specific job classification, while including a number of other classifications. The Board found that there was no rational basis for excluding the single classification because none of the traditional bases for drawing unit boundaries

15

supported the exclusion of one classification. Id. at 7. The Board noted that the proposed unit did not track any lines drawn by the employer such as (1) classification -- the proposed unit included several classifications; (2) department -- the proposed unit included several departments; (3) function -- some employees in the proposed unit had functions closer to the excluded classification (merchandisers) than to other employees in the proposed unit; (4) compensation -- the proposed unit included employees who were compensated with various combinations of salaries, wages, bonuses and commissions; or (5) location --employees were at different locations and spent differing amounts of time at such locations. Id. at 6.

Here, full-time (salaried) and part-time (hourly) stevedores are compensated differently and the full-time stevedores receive benefits that the part-timers do not receive. Although all stevedores attend certain meetings, management also holds meetings for full-timers only.

Although the Employer argues otherwise, the evidence reflects very little interchange between the petitioned-for unit and the salaried stevedores. The Employer's records show that, during the six month period from November 1, 2011, through April 30, 2012, nine part-timers (Chris Boaen, David Noble[1], Jerry Swafford, Jonathan Lewis, Kris Griner, Mark West, Troy Sexton, Tracy Emmett and Roy Ritter) worked as a lead stevedore on 17 total occasions. The Petitioner disputes all but two of these occasions because of internal inconsistencies, discrepancies and errors in the Employer's exhibits. Swafford testified that he had not worked as a quarterback during the past three years because the Employer told him he would have to become a full-time stevedore if he wanted to continue to work as a lead. Four of the part-timers who are alleged to have worked as lead stevedore, Ritter, West, Griner and Lewis, all testified at

---

[1]    The record revealed that part-timer Noble worked primarily as a field stevedore and occasionally as a lead stevedore because he had undergone knee surgery and was unable to work as a deck or dock stevedore.

16

the hearing that they had never worked as a lead. Thomas McDermott, who is not alleged to have worked as a quarterback, testified that he was offered a full-time position a few months ago, but could not accept because of child custody issues. Site manager Casey Dexter informed him that he could not work as a quarterback if he was not a full-time stevedore. According to the Petitioner's analysis, even assuming the accuracy of all instances alleged by the Employer, part-timers worked in a lead stevedore position 0.6 percent of the time during the six-month period.

The record does reflect that salaried full-timers occasionally serve as field, deck and dock stevedores when they are not working as lead stevedores[2]. According to the Petitioner's calculations, the field stevedore position, which has been described as a "quarterback-in-training" was filled 31 percent of the time by a full-time salaried stevedore. Deck and dock positions were worked by full-timers less than four percent of the time. Since full-time stevedores are paid a salary and are scheduled to work a certain number of days per week, it appears that these assignments are made when there are not enough lead positions on a given day to accommodate all the full-times who are scheduled to work.

Based on the foregoing, I conclude that the Employer has not demonstrated that the full-time salaried stevedores share such an overwhelming community of interest with the hourly part-time stevedores that their exclusion would render the unit inappropriate. It is also very likely that the full-time stevedores are statutory supervisors. The Board has found that full-time,salaried stevedores are supervisors where they received a fixed salary, had their own offices, and were permitted to take time off for personal business; they obtained instructions from top management, regularly met and conferred with the masters and chief officers of the

---

[2] I note that stevedore Clay Connors was promoted to full-time towards the end of the six month period. Although he is listed as a full-time stevedore for the entire period, the record reflects his assignments as a part-time stevedore as well. Record testimony revealed that he has only worked as a lead since his promotion.

vessels and were responsible for completing reports on the operations performed; they exercised independent judgment in the interest of the employer in settling disputes and adjusting grievances at the site with union representatives, and in investigating and reporting accidents. Oregon Stevedoring Company, Inc., 162 NLRB 1272 (1967). However, because the Employer has failed to demonstrate the requisite community of interest with the petitioned for unit, it is not necessary to reach a specific conclusion as to whether full-time salaried stevedores are supervisors.

SUPERVISORY STATUS OF HOURLY PART-TIME STEVEDORES

The Employer contends that hourly part-time stevedores are supervisors because they have the authority to assign work, responsibly direct employees and effectively recommend discharge or discipline. The Employer also contends that hourly stevedores possess supervisory authority when they act in the capacity of lead stevedores and that they possess secondary indicia of such authority.

The burden of proving supervisory authority rests with the party asserting it and must be established by a preponderance of the evidence. Oakwood Healthcare, Inc., 348 NLRB 686, 687 (2006), citing NLRB v. Kentucky River Community Care, 532 U.S. 706, 713 (2001)). Any lack of evidence in the record is construed against the party asserting supervisory status. Dean & Deluca New York, Inc., 338 NLRB 1046, 1048 (2003); Elmhurst Extended Care Facilities, 329 NLRB 535, 536 fn. 8 (1999). Whenever the evidence is in conflict or otherwise inconclusive regarding a particular indicium of supervisory authority, the Board will find that supervisory status has not been established on the basis of that indicium. Phelps Community Medical Center, 295 NLRB 486, 490 (1989). Mere inferences or conclusory statements without detailed, specific evidence are insufficient to establish supervisory status. Golden Crest

18

Healthcare Center, 348 NLRB 727, 731 (2006); Volair Contractors, 341 NLRB 673, 675 (2004); Sears, Roebuck & Co., 304 NLRB 193, 194 (1991). The Board has frequently warned against construing supervisory status too broadly because an employee deemed to be a supervisor loses the protection of the Act. Vencor Hospital – Los Angeles, 328 NLRB 1136, 1138 (1999); Bozeman Deaconess Hospital, 322 NLRB 1107, 1114 (1997).

> Section 2(11) of the Act defines a supervisor as:
>
> Any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly direct them, or to adjust their grievances, or effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The Supreme Court interpreted the provisions of Section 2(11) as setting forth a three-part test for determining supervisory status. NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706 (2001). Employees are statutory supervisors if (1) they hold the authority to engage in any one of the twelve supervisory functions listed, (2) their exercise of such authority requires the use of independent judgment and is not merely routine or clerical in nature, and (3) their authority is held in the interest of the employer. Kentucky River at 713, citing NLRB v. Health Care & Retirement Corp. of America, 511 U.S. 571, 573-574 (1994). The Board explained that to exercise "independent judgment," an individual must act or effectively recommend action "free of the control of others and form an opinion or evaluation by discerning and comparing data." Oakwood Healthcare, Inc., 348 NLRB 686, 693 (2006).

A. Assignment of Work

In Oakwood Healthcare, Inc., the Board explained that the term "assign" means designating an employee to a place (such as location, department, or wing), appointing an

individual to a time (such as a shift or overtime period), or giving significant overall duties as opposed to discrete tasks. 348 NLRB at 689 (2006). There is no record evidence of hourly stevedores assigning longshoremen to a particular time, to a particular place, or to "significant overall duties." The ILA laborers for a particular job are chosen by the header. Their job duties are established by the collective bargaining agreement and once they arrive for an operation, they cannot be reassigned. Therefore, part-time stevedores do not have the authority to assign work.

B. Responsible Direction

Responsible direction means that the individual must have employees "under" him with the authority to direct those employees on what work to perform, and that individual must be "responsible" for the performance of this work by the employees. Oakwood Healthcare, 348 NLRB at 691. To establish that a putative supervisor is "responsible," the Employer must establish that the putative supervisor is held accountable for the performance of other employees. Id. at 691-92. To prove accountability, the party asserting supervisory status must show both that the putative supervisor has "the authority to take corrective action" and can potentially receive "adverse consequences" for the performance errors of other employees.[3] Id. Finally, the putative supervisor must also exercise independent judgment in responsibly directing the work of the employees under him. Where tasks are highly regulated, repetitive, and well-known to employees, the degree of independent judgment is reduced when directing employees in such tasks. Id. at 693; Croft Metals, Inc., 348 NLRB 717, 721-722(2006) (No responsible direction

---

[3] Regarding the accountability of deck, dock and field stevedores for the performance of other employees, the Employer submitted a written warning dated six days after the petition was filed and two days prior to the hearing. The warning was issued by site manager Casey Dexter to Trey Hopkins, who was working as a deck superintendent on May 5, 2012. The warning alleges that Hopkins did not follow procedure and caused two drivers to go into overtime because he had misdirected the crane operator. The warning was issued to Hopkins, who had only been working for the Employer a few weeks, for his own performance and not for the performance of those allegedly working under him.

where lead persons follow a pre-established schedule and loading plan that dictates the placement of different products in the trucks and instructions to employees consisted of "where to put and how to put it."); Chevron Shipping Co., 317 NLRB 379, 382 (1995) (No supervisory authority where the operations are planned in advance and instructions are given to an employee who then directs others to carry out those operations.)

Much of the work done by deck, dock and field stevedores, including placement of containers on the vessel or in the field, is dictated by the plans, the requirements of the shipping lines and the provisions of the collective bargaining agreement. In situations where decisions must be made to deviate from the plans, such as when containers arrive out of order, changes must either be approved by the lead stevedore or the ship's crew or are made within certain pre-determined criteria. For example, the deck stevedore can place some containers out of the suggested sequence as long as they do not cause the stack to be over its pre-determined weight limit and as long as the container remains with others bound for the same port. Deck stevedores cannot change where a container will go if it will fundamentally alter the plans, such as making a stack higher or lower than planned or cause the weight of the stack to go over its planned limit. If empty containers are being loaded onto a ship, the exact containers represented by the container numbers listed on the plans do not have to be loaded as long as the empties are the right size, owned by the same owner and going to the same port.

On the dock, drivers come to the lead and either pick up the next available container, which has a specific place that it needs to go, or deliver a container from the field which is then placed in a pre-determined spot on the ship. If the checkers notify the dock that a certain sequence of containers can't be sent, the dock stevedore will make arrangements to have another sequence sent. As long as the containers are not hazardous or refrigerated or going to a different

21

port, they can usually be accommodated. If there is an irregularity, the lead stevedore will be notified and will determine what changes need to be made to keep the operation running.

Based on the foregoing, I conclude that hourly part-time stevedores do not have the authority to responsibly direct employees.

C. Authority to Suspend, Discharge or Discipline

The Employer asserts that hourly part-time stevedores have the authority to "fire" or "knock off" ILA longshoremen. These terms refer to sending an employee home for the day, not permanently discharging him. In addition to knocking off an employee, the Employer may decide to pursue the matter further by filing a grievance against the employee. If an employee feels that he was unjustifiably fired, he can also file a grievance. Grievance procedures for ILA labor are set forth in the collective bargaining agreement. Grievances are heard by the Joint Ports Grievance Committee ("the Committee") which is comprised of GSA member employer representatives and union representatives. If neither party decides to pursue the matter, there would be no record of the incident and the knocked off employee would simply not be paid for the rest of the day.

The CBAs for both the Clerks and Checkers and the Longshoremen set forth penalties for first, second and third violations for certain disciplinary infractions including theft, violence, intoxication and use or possession of illegal drugs. If no penalty is specified in the agreement, the Committee decides what, if any, discipline will be imposed.

To confer supervisory status, it must be shown that the exercise of disciplinary authority leads to personnel actions without the independent investigation or review by management personnel. Franklin Home Health Agency, 337 NLRHB 826, 831 (2002). Where warnings simply bring an employer's attention to substandard performance by employees without

22

recommendations for future discipline, the role of those delivering the warnings is nothing more than a reporting function, which is not supervisory authority.    Ohio Masonic Home, 295 NLRB 390 (1989).    In this case, it appears that the Committee, not the stevedore or even the Employer, is responsible for investigating the incident and issuing discipline.  Moreover, it is far from certain that hourly part-time stevedores have any authority at all to send an employee home.

Chris Garbarino testified that all stevedores are told to "instruct, warn, and then fire" any longshoreman who violates policies.  He explained that usually an employee need only be reminded (instructed) to comply with a policy.  If he persists, then he should be warned and, if he still does not comply, he should be fired.  This directive was discussed in a recent series of safety meetings conducted by operations manager Casey Dexter and safety manager Tommy Slider. All stevedores were told something to the effect that they were all responsible for safety and that the Employer would support them in enforcing safety rules.

Full-time stevedore Lawrence "Bubba" Palmer works as a lead superintendent most of the time.  He testified that he has never witnessed a deck or dock stevedore knock someone off, that he had never knocked anyone off before he became a salaried lead stevedore and that only the quarterback, in conjunction with the header or other union official had the authority to knock a longshoreman off.  He stated that if a deck or dock stevedore had a problem with a longshoreman, he would call the quarterback.  The quarterback would get with the header, investigate the situation and decide what to do.

Ricky Deloach, president of ILA clerk and checker's local, testified that someone getting knocked off is "like a circus" and usually involves the quarterback, the header, a union delegate and an irate longshoreman all arguing with each other.  Deck and dock superintendents are

responsible for keeping a very expensive operation running at a rate of about a container a minute and, if nothing else, would not have the time to deal with firing someone. Even assuming that hourly stevedores have the authority to send employees home if they pose a safety threat, such authority does not require sufficient independent judgment to confer supervisory status. Lincoln Park Nursing Home, 318 NLRB 1160, 1162 (1995).

Although the record contains information about all documented disciplinary actions[4] that have occurred in the past several years, there does not appear to be a single concrete example of a part-time stevedore sending an employee home.[5]

1. On May 1, 2012, full-time lead stevedore Sanin "Sonny" Mujezin fired walking boss Steven Williams and forward lashing boss Willie J. Haywood for not being at the port while the ship was working. There is no evidence that any hourly stevedore was involved in the incident.

2. On October 22, 2011, a driver working with part-time dock stevedore Kris Griner was pulled over by the GPA police and arrested for driving under the influence. General Manager Chris Garbarino testified that Griner was responsible for knocking off the driver. However, Griner testified that the driver header came to him and told him what had happened and that he had ordered a replacement driver. Griner's only involvement was to inform the lead stevedore what had happened.

3. On August 15, 2011, a lead stevedore knocked off an ILA timekeeper who was missing during working hours. There is no evidence that any hourly stevedore was involved.

---

[4] As noted above, there would be no record if a longshoreman was knocked off for the day and neither party decided to pursue the matter.

[5] The Employer submitted several grievance reports and other documents relating to incidents that occurred at Ocean Terminal. Since I have already concluded that employees at Ocean Terminal should not be included in the bargaining unit, those incidents are irrelevant to a determination of whether the hourly part-time employees at Garden City are statutory supervisors.

24

4. On July 2, 2011, a dock stevedore noticed that two drivers were missing. The drivers were eventually located and full-time lead stevedore Sergio Orozco told the gang foreman to knock the drivers off. One of the drivers filed a grievance against hourly stevedore Jamie Keeran over being knocked off. The grievance committee concluded that there may have been errors on both sides, so all penalties were waived. The testimony and documents submitted in regard to this incident are ambiguous and it appears that the dock stevedore involved was actually full-timer James Lucas and not part-timer Jamie Keeran. Keeran testified at the hearing that he was not working that day, knew nothing about the incident and did not attend a grievance committee hearing.

5. On August 16, 2010, a driver did not return from a meal break. Hourly stevedore Willie Proctor testified at the hearing that it was not him but the driver header who knocked off the driver. The driver filed a grievance against Proctor but did not pursue the matter.

6. On July 1, 2008, safety supervisor Wayne Rahn, Sr., instructed a driver header to knock off a longshoreman for using his cell phone under the crane. There is no evidence that any hourly stevedore was involved in the incident.

Even assuming that hourly part-time stevedores were responsible for any of the incidents described, reporting obvious violations of an employer's rules does not require the exercise of independent judgment. Michigan Masonic Home, 332 NLRB 1409, 1411, fn. 5 (2000). The Board has consistently found that the authority to order intoxicated or insubordinate employees to leave the workplace does not constitute the statutory authority to discipline employees, as such violations are so egregious and obvious that little independent judgment is needed. Chevron Shipping Co., 317 NLRB 379, 381 (1995); Northcrest Nursing Home, 313 NLRB 491 (1993); Great Lakes Towing Co., 165 NLRB 695 (1967).

The Employer presented evidence regarding safety reports. All employees, including managers, planning superintendents and full- and part-time stevedores are supposed to make entries in the Employer's Prism computer program. As noted above, this system is the only program to which hourly part-time stevedores have access. Employees are supposed to enter "walkabouts" and "near misses" into the system. A walkabout is an entry wherein an employee describes a safety situation, either positive or negative, that he observed. A near miss describes a potential safety hazard such as something sticking out in the roadway. Hourly employees who enter four walkabouts per month and one near miss per quarter are eligible to receive a safety bonus of up to $2700. There is no evidence that employees are disciplined or otherwise held accountable for not making entries, nor is there evidence that Prism entries regarding safety violations result in discipline to the responsible employee. Identifying, reporting and even issuing citations for safety violations does not amount to the exercise of supervisory authority where those actions do not form the basis for future disciplinary action. Brown & Root, Inc., 314 NLRB 19, 21-22 (1994).

Based on the foregoing, I conclude that hourly part-time stevedores do not have the authority to suspend, discharge or discipline employees.

D. Secondary Indicia

Where the putative supervisor engages in at least one supervisory function listed in Section 2(11), the Board may also consider secondary indicia of supervisory authority such as

supervisory ratio, job titles and descriptions[6], attendance at supervisory meetings, pay differentials and amount of time spent performing supervisory tasks as opposed to regular job duties[7].  Pacific Beach Corp., 344 NLRB 1160, 1161 (2005); Progressive Transportation Services, 340 NLRB 1044 (2003).  However, secondary indicia should not be considered in the absence of a least one primary characteristic of supervisory status.  See, e.g., Palagonia Bakery Co., 339 NLRB 515, 535 (2003); Hausner Hard-Chrome of KY., Inc., 326 NLRB 426, 427 (1998).  Since the Employer has failed to establish that hourly part-time stevedores possess any statutory indicia of supervisory authority, in the absence of such evidence, the secondary indicia of supervisory authority which the Employer asserts are immaterial.  International Transportation Service, Inc., 344 NLRB 279, 285 (2005), enf. denied on other grounds, 449 F.3d 160 (2006); Ken-Crest Services,  335 NLRB 777, 779 (2001).

In light of the above, I conclude that hourly part-time stevedores are not statutory supervisors.

---

[6]   The Employer submitted into the record job descriptions for the deck, dock and lead superintendent positions.  Garden City General Manager Chris Garbarino testified that he created the job descriptions in 2011 as a guideline for new hiring in the future.  Although the job descriptions were posted on the bulletin board where notices to employees are usually placed, there is no specific evidence that they were distributed to or discussed with current employees.  While the Employer contends that the job descriptions for the deck and dock positions reflect their authority to responsibly direct and discipline longshoremen, job descriptions and job titles are only paper authority and are not given any controlling weight by the Board.  Avante at Wilson, Inc., 348 NLRB 1056, 1057 (2006); Training School at Vineland, 332 NLRB 1412, 1416 (2000).

[7]   An employee who substitutes for an absent supervisor is not deemed to be a supervisor unless his exercise of supervisory authority is both regular and substantial.  Hexacomb Corp., 313 NLRB 983 (1994); Jakel Motors, Inc., 288 NLRB 730 (1988); Brown & Root, Inc., 314 NLRB 19, 21 (1994) (Even assuming leadmen exercise supervisory authority when substituting, it was not established that their assumption of supervisory duties was anything other than insubstantial, irregular and sporadic.)

## CONCLUSIONS AND FINDINGS

Based upon the entire record in this matter and in accordance with the discussion above, I conclude and find as follows:

1.      The hearing officer's rulings made at the hearing are free from prejudicial error and are hereby affirmed.

2.      The Employer is engaged in commerce within the meaning of the Act and it will effectuate the purposes of the Act to assert jurisdiction in this case.

3.      The Petitioner is a labor organization within the meaning of Section 2(5) of the Act and claims to represent certain employees of the Employer.

4.      A question affecting commerce exists concerning the representation of certain employees of the Employer within the meaning of Section 9(c)(1) and Section 2(6) and (7) of the Act.

5.      The following employees of the Employer constitute a unit appropriate for the purpose of collective bargaining within the meaning of Section 9(b) of the Act.

> All hourly part-time stevedores employed by the Employer at its Garden City Terminal, excluding all full-time salaried stevedores, planning superintendents, office clerical employees, professional employees, guards and supervisors as defined in the Act.

## DIRECTION OF ELECTION

The National Labor Relations Board will conduct a secret ballot election among the employees in the unit found appropriate above.  The employees will vote whether or not they wish to be represented for purposes of collective bargaining by South Atlantic & Gulf Coast District, International Longshoremen's Association.  The date, time, and place of the election will be specified in the Notice of Election that will issue subsequent to this Decision.

A. Voting Eligibility

Eligible to vote in the election are those in the unit who are employed during the payroll period ending immediately before the date of this Decision, including employees who did not work during that period because they were ill, on vacation, or temporarily laid off. Employees engaged in any economic strike, who have retained their status as strikers and who have not been permanently replaced are also eligible to vote. In addition, in an economic strike which commenced less than 12 months before the election date, employees engaged in such strike who have retained their status as strikers but who have been permanently replaced, as well as their replacements are eligible to vote. Unit employees in the military services of the United States may vote if they appear in person at the polls.

Ineligible to vote are (1) employees who have quit or been discharged for cause since the designated payroll period; (2) striking employees who have been discharged for cause since the strike began and who have not been rehired or reinstated before the election date; and (3) employees who are engaged in an economic strike that began more than 12 months before the election date and who have been permanently replaced.

B. Employer to Submit List of Eligible Voters

To ensure that all eligible voters may have the opportunity to be informed of the issues in the exercise of their statutory right to vote, all parties to the election should have access to a list of voters and their addresses, which may be used to communicate with them. Excelsior Underwear Inc., 156 NLRB 1236 (1966); NLRB v. Wyman-Gordon Company, 394 U.S. 759 (1969). Accordingly it is hereby directed that within seven (7) days of the date of this Decision, the Employer must submit to the Regional Office an election eligibility list, containing the full names and addresses of all the eligible voters. North Macon Health Care Facility,

29

315 NLRB 359, 361 (1994). This list must be of sufficiently large type to be clearly legible. To speed both preliminary checking and the voting process, the names on the list should be alphabetized. This list may initially be used by me to assist in determining an adequate showing of interest. I shall, in turn, make the list available to all parties to the election, only after I shall have determined that an adequate showing of interest among the employees in the unit found appropriate has been established.

To be timely filed, the list must be received in the Regional Office, Suite 1000, Harris Tower, 233 Peachtree Street, N.E., Atlanta, Georgia 30303, on or before June 27, 2012. No extension of time to file this list will be granted except in extraordinary circumstances, nor will the filing of a request for review affect the requirement to file this list. Failure to comply with this requirement will be grounds for setting aside the election whenever proper objections are filed. The list may be submitted to the Regional Office by electronic filing through the Agency website, www.nlrb.gov, by mail, by hand or courier delivery, or by facsimile transmission at (404) 331-2858. The burden of establishing the timely filing and receipt of the list will continue to be placed on the sending party. To file the eligibility list electronically, go to the Agency's website at www.nlrb.gov, select File Case Documents, enter the NLRB Case Number, and follow the detailed instructions. The burden of establishing the timely filing and receipt of the list will continue to be placed on the sending party.

C. Notice Posting Obligations

According to Section 103.20 of the Board's Rules and Regulations, the Employer must post the Notices to Election provided by the Board in areas conspicuous to potential voters for a minimum of 3 working days prior to the date of the election. Failure to follow the posting requirement may result in additional litigation if proper objections to the election are filed.

Section 103.20(c) requires an employer to notify the Board at least 5 full working days prior to 12:01 a.m. of the day of the election if it has not received copies of the election notice. Club Demonstration Services, 317 NLRB 349 (1995). Failure to do so estops employers from filing objections based on non-posting of the election notice.

RIGHT TO REQUEST REVIEW

Under the provisions of Section 102.67 of the Board's Rules and Regulations, a request for review of this Decision may be filed with the National Labor Relations Board, addressed to the Executive Secretary, 1099 14th Street, NW, Washington, DC 20570-0001. This request must be received by the Board in Washington by 5:00 P.M., (EDT) on July 5, 2012. The request may be filed electronically through E-Gov on the Board's web site, www.nlrb.gov,[8] but may not be filed by facsimile.

Dated at Atlanta, Georgia, on this 20th day of June, 2012.



Claude T. Harrell, Jr., Regional Director
National Labor Relations Board
Harris Tower, Suite 1000
233 Peachtree St., N.E.
Atlanta, Georgia 30303-1531

---

[8]  To file the request for review electronically, go to www.nlrb.gov and select the E-Gov tab. Then click on the E-Filing link on the menu and follow the detailed instructions. Guidance for E-filing is contained in the attachment supplied with the Regional Office's initial correspondence on this matter and is also located under "E-Gov" on the Board's website, www.nlrb.gov.

# EXHIBIT G

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD


MARINE TERMINALS CORP. -- EAST
d/b/a PORTS AMERICA
                          Employer


          and                                          Case 10-RC-080061


SOUTH ATLANTIC & GULF COAST DISTRICT
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION
                          Petitioner


                          ORDER


     The Employer's Request for Review of the Regional Director's Decision and
Direction of Election is denied as it raises no substantial issues warranting review[1]
.


                    MARK GASTON PEARCE,          CHAIRMAN

                    BRIAN E. HAYES,               MEMBER

                    RICHARD F. GRIFFIN, JR.,       MEMBER

     Dated, Washington, D.C., July16, 2012

---

[1]In agreeing with the Regional Director that the Employer had not sustained its burden of
demonstrating that the part-time stevedores possess the supervisory authority to suspend,
discharge or discipline employees, we do not rely on the Regional Director's suggestion
that to "fire" or "knock off" a longshoremen by sending him home without pay for the
day does not constitute discipline.  Instead, we find that the Employer has not
demonstrated that the part-time stevedores possess this authority.  We find that the
Employer has also not demonstrated that the part-time stevedores, as a group, substitute
on a regular basis for supervisory employees and thus exercise supervisory authority on a
regular and substantial basis.  *Hexacomb Corp.*, 313 NLRB 983 (1984).