**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA,**
**SAVANNAH DIVISION**

-----------------------------------------------------------------X

STEPHEN COWART, JOSEPH HURST, and :
KENNETH RAHN, JR., :
                                    :   4:25-cv-00199-RSB-CLR

                Plaintiffs, :

       v. :

                                      :

ILA LOCAL 1475 CLERKS AND CHECKERS :
UNION, INC., GEORGIA STEVEDORE :
ASSOCIATION, BENNY HOLLAND, JR., RICKY :
DELOACH, FRANK RYAN, JR., STEVE SIMS, :
NORMAN MASSEY, TRACY O'CONNELL, :
MICHAEL PARSONS, DENNIS DAGGETT, :
ALAN ROBB, HAROLD DAGGETT, and JOHN :
DOE(S) 1-10, :
                                      :

                Defendants. :

-----------------------------------------------------------------X

## UNION DEFENDANTS'
## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

Defendants Harold Daggett, Dennis Daggett, and Benny Holland, Jr. ("ILA Defendants") and ILA Local 1475 Clerks and Checkers Union, Inc. ("Local 1475"), Ricky Deloach, Frank Ryan, Jr., Steven Sims and Michael Parsons ("Local Union Defendants"), (collectively, "Union Defendants"), submit this brief in Opposition to Plaintiffs' Motion to Remand. Because Plaintiffs' claims are completely preempted by federal labor law, they must be treated as federal claims properly removed to this Court.

Plaintiffs Stephen Cowart, Joseph Hurst, and Kenneth Rahn, Jr. (collectively "Plaintiffs") brought this action against their local union, their local and international union officials, and their employers over perceived failures in negotiating and administering various collective bargaining agreements ("CBAs") setting forth Plaintiffs' terms and conditions of employment. Defendants properly removed the action to this

Court on the grounds that the claims raised in the Complaint are preempted by federal labor law.  Plaintiffs then filed a Motion to Remand to the Superior Court of Chatham County, Georgia ("Motion"), arguing that the claims in the Complaint were intended to be state-law claims.  Regardless of how Plaintiffs would like to characterize the claims in the Complaint, the allegations make clear that the putative state-law claims are simply "artfully plead" federal claims under the doctrine of "complete preemption."  And therefore, the Motion should be denied.

## BACKGROUND

In the Notice of Removal, ECF #1, Union Defendants asserted that the five (5) claims in Plaintiffs' Complaint were completely preempted by federal law under two (2) related doctrines: (1) preemption under Section 301 of Labor Management Relations Act ("LMRA"), 29 U.S.C. Section 185(a), based upon the need to interpret and apply the terms of the relevant CBAs, and (2) preemption based on the claims in the Complaint implicating the federal duty of fair representation ("DFR").

Since all of Plaintiffs' claims are completely preempted by federal law, Plaintiffs' Complaint is removable to this Court.  *See* 28 U.S.C. §§ 1331, 1441(a).  However, this Court need only find that one of the claims is preempted to assert jurisdiction over the entire Complaint.  *See* 28 U.S.C. § 1367(a); *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 833 (1st Cir. 1997) ("A federal court that exercises federal question jurisdiction over a single claim may also assert supplemental jurisdiction over all state-law claims that arise from the same nucleus of operative facts.")

1003-655
146610

**ARGUMENT**

**I.**

**SECTION 301 OF THE LMRA COMPLETELY PREEMPTS PLAINTIFFS'
PUTATIVE STATE-LAW CLAIMS**

The doctrine of complete preemption is an exception to the well-pleaded complaint rule. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93 (1987). It "allows a state-law claim to be removed to federal court even when the face of the plaintiff's complaint presents no federal question because the preemptive force of certain federal statutes is so strong that their implication in a case can convert a state-law claim into a statutory federal claim." *Baldwin v. Boise Paper Holdings, L.L.C.*, 631 F. App'x 831, 834 (11th Cir. 2015).

The Supreme Court holds that one area of federal law that completely preempts state law is Section 301 of the Labor Management Relations Act ("LMRA"). *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560–61 (1968). Section 301(a) provides as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). This Section "not only provides federal-court jurisdiction over controversies involving collective bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'" *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957)).

Accordingly, if a court must analyze a § 301 contract to adjudicate a claim, complete preemption applies, and the claim is deemed to arise under federal law, regardless of its label.  *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *see also Lingle*, 486 U.S. at 404 (Section 301 preemption exists to "ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes."); *Atwater v. National Football League Players Ass'n*, 626 F.3d 1170, 1176-77 (11th Cir. 2010) ("If the state-law claim either arises out of a CBA or is dependent upon the meaning of a CBA, 'the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles— necessarily uniform throughout the Nation—must be employed to resolve the dispute.").

Preemption under § 301 occurs "when resolution of [the] state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis–Chalmers*, 471 U.S. at 220, or when state law claims are "founded directly on rights created by collective-bargaining agreements," *Caterpillar*, 482 U.S. at 394, or are "inextricably intertwined with consideration of the terms of the labor contract," *Allis–Chalmers,* 471 U.S. at 220.

Most of the allegations in the Complaint relate to the interpretation and application of the terms of the 2013 Memorandum of Understanding ("2013 MOU") and the 2019 Memorandum of Understanding ("2019 MOU") between Local 1475 and Defendant Georgia Stevedore Association ("GSA").  *See* ECF #1-1, Compl., *et. seq..* Plaintiffs attach both of these documents to their Complaint. ECF #1-1, Ex. A, 2013 MOU; and Ex. B, 2019 MOU.  As Plaintiffs do not dispute, these MOUs are agreements

between employers and a labor organization and are therefore "contracts" within the meaning of Section 301. *See Retail Clerks Ass'n v. Lion Dry Goods,* 369 U.S. 17, 28-29 (1962). The 2013 MOU also incorporates by reference the Local Agreement, ECF #25-2, Aff. of Ricky DeLoach, attached thereto as Ex. A, and the Master Contract (*id*, Ex. D). Additionally, the 2021 MOU modifies the 2019 MOU. *Id.*, Ex. C.[1]

The MOUs and other CBAs must all be interpreted to understand the terms and conditions of Plaintiffs' employment as Deck and Dock ("DND") workers and their claims. Plaintiffs' claims therefore arise out of an area of labor law that has been completely preempted by Section 301 and were properly removed to this Court. *See Allis–Chalmers*, 471 U.S. at 220.

## A. PLAINTIFFS' CLAIMS ARE ALL DEPENDENT ON ANALYSIS AND APPLICATION OF SECTION 301 CONTRACTS

Plaintiffs' state law claims all revolve around the formation, administration, and enforcement of the 2013 and 2019 MOUs. In each claim, Plaintiffs are essentially alleging that they and the other DND workers were discriminated against and treated unfairly under these MOUs. These claims cannot be resolved without analyzing these agreements or comparing them to the provisions in the other labor contracts covering Clerk and Checker ("CNC") workers.[2] The claims therefore arise under federal law

---

[1] The Master Contract and the Local Agreement, both of which are incorporated by reference into the 2013 MOU, *see* 2013 MOU, ¶¶ 2, 3, 5, 8, and the 2021 MOU, are likewise Section 301 contracts.

[2] Resolution of such claims alleged against the Union Defendants also requires application of the additional contracts specifically referenced and incorporated into the 2013 MOU—the Master Contract and the Local Agreement, and as modified by the 2021 MOU—in order to evaluate Plaintiffs' assertions that Union Defendants treated the DND workers unfairly as compared to the CNC workers.

despite Plaintiffs protests that they were meant as state claims.  *See Allis-Chalmers*, 471 U.S. at 211.

Plaintiffs contend that their claims do not require analysis of the MOUs because they are supposedly only alleging the "process by which [they] were formed was corrupt."  ECF #28, p. 2.  But Plaintiffs' allegations **do not** just relate to the process that formed the MOUs, but are entirely dependent on, and "**inextricably intertwined**" with, the many substantive rights found in the MOUs.[3]  Counts I to V all contain allegations that Union Defendants created and administered the MOUs in a manner that discriminated against the DND workers in favor of the CNC workers.  Compl., ¶¶ ¶¶ 24-30, 32-49, 56-63, 73-75, 78-81, 84-88, 91-95. Plaintiffs allege this discrimination took various forms, including: a disparate dual seniority system, lower wages, worse benefits, lost job opportunities, barriers to job advancement, mishandled grievances, ignored complaints, and unfair discipline.  *E.g.*, *id.* at ¶¶ 26, 27, 42, 43, 45, 58, 75, 80, 85, 86, 95. Any analysis of whether those allegations are true requires analysis of the CBAs to determine whether and/or how the DND workers were subject to unlawful discrimination in the first place.

---

[3] For instance, a non-exhaustive list of 2013 MOU provisions that must be interpreted in light of Plaintiffs' allegations include: ¶ 2 (incorporates Local Agreement), ¶ 4 (DND job duties), ¶ 5 (wage rates and increases with reference to the Master Contract's Tiered Wage progression and benefit contribution rates), ¶ 6 (seniority list creation and dispatch rules), ¶ 10 (marking off and meal breaks), ¶ 11 (employer right to refuse to employ a DND worker "for just cause"); ¶ 13 (assuring "uninterrupted operations"), and ¶ 15 (agreement modifications).  A non-exhaustive list of 2019 MOU provisions that must be interpreted in light of Plaintiffs allegations listed above in the preceding paragraph include: ¶1 (creation of joint labor and management Seniority Board), ¶2 (disputes, appeals, grievance, and arbitration procedures), ¶3 (seniority rules, including 700 hour(s) requirement and seniority classifications - Class A to Z17 and future classifications), ¶5 (dispatch rules), ¶6 (disciplinary list of offenses, penalties, etc.).

Indeed, it is difficult to point to a **single** paragraph in the Complaint that does not necessitate the interpretation of the MOUs, the Local Agreement, or the Master Contract. The main gist of the Complaint is that the dual seniority system discriminated against the DND workers by "depriving them of fair representation, equal benefits, and equal employment opportunities within the union." *Id.* at ¶ 73. Each claim contains allegations that the dual seniority system prejudiced the DND workers in favor of the CNC workers. *Id.* at ¶¶ 26-28, 35-39, 45, 58(b), 59(c), (d) (e), 60, 62, 63, 67, 75(a)-(c), (f), 80(e), 81(a)-(b), 85(a)-(d), 91-93, 94(a)-(e), 95(a)-(d). As Plaintiffs allege, this seniority system was "established" by the 2013 MOU and "further entrenched" by the 2019 MOU. *Id.* at ¶ 73(a)-(b). Plaintiffs' seniority rights were first set forth in the 2013 MOU, which created "List A" for DND workers and the port-wide "List B." *See id.*, at Exhibit A ("2013 MOU"), ¶ 6. The 2019 MOU expanded on the prior agreement by creating detailed and comprehensive seniority classifications (Class A through Z17), which recognize their years of service in the industry prior to being represented by Local 1475 and gave DND workers priority over CNC workers over all DND jobs. *Id.*, at Exhibit B ("2013 MOU"), ¶ 3. Thus, Plaintiffs cannot deny that the DND workers' seniority is a right founded in the MOUs. *See Frech v. Pensacola S.S. Ass'n*, 903 F.2d 1471, 1474-75 (11th Cir. 1990) (holding that strike agreement affecting seniority and other working agreements is a contract under Section 301 of the LMRA).

Nor can they deny that their claims regarding the allegedly discriminatory seniority system require analysis of the CBAs—such as, Paragraph 6 of the 2013 MOU (establishing the DND seniority list, the joint seniority list and name-based dispatch system) and Paragraphs 3, 4, 5 of the 2019 MOU (setting forth various seniority

classifications for DND workers, seniority rules and hours requirements, and dispatch and hiring rules).[4]  *See* 2013 MOU, at ¶ 6; 2019 MOU, at ¶¶ 3-5.  The relative seniority rights of the workers in the DND and CNC job classifications **can only** be determined by interpretation and application of these seniority provisions in the MOUs and comparing them to the Local Agreement's provisions on CNC seniority.  *See Allis-Chalmers*, 471 U.S. at 211 (Section 301 completely preempts state claims that require "meaning [be] given [to] a contract phrase or term."); *Johnson v. Humphreys*, 949 F.3d 413, 417 (8th Cir. 2020) (holding that claims that require interpretation of terms "unique to the CBA" are completely preempted by §301).

The Complaint also alleges Defendants failed to properly address the DND workers' appeals of the MOUs and their grievances regarding their seniority and other terms and conditions of employment.  Comp., ¶¶ 35-39, 84-88. The MOUs must be analyzed and interpreted to assess whether Defendants failed to properly address the grievances and if Plaintiffs had any appeal rights they could use.  *See* 2019 MOU, ¶ 2 (detailing the procedure for seniority grievances at the local seniority board).

Additionally, the Complaint contains various allegations that the DND workers had disproportionate disciplinary actions imposed against them "compared to similarly situated" CNC workers.  Compl., ¶¶ 75(d), 80(c).   Evaluating these allegations requires

---

[4] In *Oltmanns v. Local 1475*, this Court dealt with a related lawsuit brought by a DND worker who claimed that he was entitled to be awarded CNC seniority based upon his work in the DND classification.  In dismissing the lawsuit, the 11th Circuit observed that his underlying claim was subject to resolution by the relevant joint labor-management grievance committee, which needed to, in the first instance, interpret the Clerk and Checker Seniority Plan, and the relevant practices related to the implementation of that Plan.  837 F. App'x 689, 695 (11th Cir. 2020).  Likewise, the 2019 MOU also provides for interpretation of the DND Seniority Plan by a joint labor management committee. *See* 2019 MOU, at ¶ 2.

analysis of the disciplinary procedures in the various CBAs, including paragraph 6 in the 2019 MOU, which describes the offenses, penalties, and due process available to DND workers in disciplinary proceedings. *See* 2019 MOU, ¶ 6.

Plaintiffs also complain that the 2013 MOU discriminated against them because of where that agreement placed them on the Master Contract wage progression. Compl., ¶ 27. In this regard, the 2013 MOU states that the DND workers would be considered as "new hires' (base $20.00/hour)" and "shall receive all increases under the Master Contract Tiered Wage progression for new hires." 2013 MOU, ¶ 5. The term "new hire" is itself a "term of art" unique to the CBA which needs to be interpreted to determine if the DND workers' placement in this category was discriminatory, *see Allis-Chalmers Corp.*, 471 U.S. at 211, to say nothing of the application of the Master Contract's complex wage progression formula. Similarly, Plaintiffs complain that they receive lower benefit fund contributions than those received by the CNC workers. Compl., ¶ 44. But the question of what benefits the Plaintiffs should have received itself requires application and interpretation of the various CBAs. [5] *See* 2013 MOU, ¶ 5.

Plaintiffs are also incorrect that their allegations relate only to the Defendants' "motivation[s]" in negotiating the MOUs and their purported schemes to "influence the agreements." ECF #28, at pp. 2-4. Not only do the claims in the Complaint substantially

---

[5] The Complaint is full of other allegations arising out of the CBAs—*e.g.*, that DND workers were unlawfully denied access to job opportunities, ¶ 94(d), the DND workers suffered inferior working conditions under the MOUs, ¶26(c), the 2013 MOU restricted their ability to accumulate qualifying hours for seniority, ¶ 45, the CNC workers unfairly received premium job opportunities, higher pay rates, and enhanced benefits, ¶ 59, the separate dispatch system for DND workers deviated from standard procedures, ¶ 94(b), special provisions in the 2013 MOU allowing for name selection during dispatch was discriminatory, ¶ 94(a), and the 15,000 hour requirement to transition to conventional clerk work imposed an "unreasonable barrier[] to advancement," ¶45.

depend on an analysis of specific terms in the CBAs, these claims also specifically allege that Defendants **violated the terms of those agreements.**   On numerous occasions, Plaintiffs allege that Defendants implemented, manipulated, and administered the MOUs in an unlawful manner—they allege that Defendants failed to abide by proper implementation of the MOUs in a fair and nondiscriminatory manner, Compl., ¶ 80(a), manipulated the 700-hour requirement in ways that specifically disadvantaged DND workers, ¶ 75(f), failed to properly address grievances and complaints filed under the MOUs, ¶ 85(d), imposed improper discipline pursuant to the CBA, ¶ 80(c), "manipulated" the hiring hall procedures to favor CNC workers, ¶¶ 58(b), 75(f), and "unlawfully deprive[d] them of the benefits of union membership by stifling their earned seniority," ¶ 60.  These allegations all require that the CBAs be interpreted to determine if the Defendants actually did breach the agreement as alleged.

Thus, regardless of how artfully they are pled, Plaintiffs' claims are completely preempted by Section 301. The Eleventh Circuit has repeatedly applied the § 301 preemption doctrine to state law claims that require similar interpretation of CBAs.  *See, e.g., United Steel, etc. Workers v. Wise Alloys*, LLC, 642 F.3d 1344 (11th Cir. 2011) (tort claim of misrepresentation/fraud); *Bartholomew v. AGL Resources*, 361 F.3d 1333 (11th Cir. 2004) (breach of contract, intentional infliction of emotional distress, and tortious interference and defamation claims arising prior to plaintiffs' termination); *Darden v. United States Steel Corp*, 830 F.2d 1116 (11th Cir. 1987) (claims of breach of contract, false representations, conspiracy, and conversion); *Atwater*, 626 F.3d 1170 (claims of negligent investment, negligent misrepresentation and breach of fiduciary duty).

10

In that regard, this case is nothing like the *Lingle* case that Plaintiffs cite as the sole support for their argument. *See* 486 U.S. 399. *Lingle* involved a plaintiff's claim that her employer discharged her in retaliation for filing a workers' compensation claim. The plaintiff's retaliatory discharge claim turned on whether the employer had a nondiscriminatory reason for her termination, and, thus, the Supreme Court held that its resolution did not require analysis of any provision in the CBA. *Id.* at 407. This holding has no application here. As shown above, in contrast to *Lingle*, Plaintiffs' claims do not "exist independently" from the CBAs but are founded directly on rights created by the MOUs (*e.g.*, seniority, wages, benefits, job opportunities, working conditions, discipline, grievances, etc.). Also, as in *Atwater*, Plaintiffs' claims require the court to interpret and apply language in the CBA to resolve elements of each claim.[6] *See* 626 F.3d at 1179. (11th Cir. 2010)

In Count I, each of the three alleged predicate crimes is supported by the allegations requiring analysis of CBAs. For example, the MOUs must be interpreted to determine whether the DND workers were defrauded of their seniority (Wire Fraud), Compl., ¶ 63-64, or whether the seniority system was "manipulated to allocate premium job opportunities, higher pay rates, and enhanced benefits to [CNC] workers at the expense of eligible [DND] workers" (Embezzlement), *id.* at ¶ 58(b). Further, as the Eleventh Circuit similarly held in *Jackson v. US Steel Corp.* under analogous facts, Plaintiffs' False Statements allegations are preempted because the CBAs must be analyzed to determine whether the statements made about the seniority system were

---

[6] For these same reasons, this case is also not analogous to the *Livadas v. Bradshaw* case cited in Plaintiffs' Opposition to the ILA Defendants' Motion to Dismiss, where the state law claim merely required the court to "look to" the wage rates in the CBA for the purpose of calculating damages. *See* 512 U.S. 107, 125 (1994).

11

indeed false.  *See* 763 F. App'x 805, 807 (11th Cir. 2019) (defamation claim preempted by Section 301 because it required analysis of the CBA to determine if the statement was false).

The conspiracy counts (Counts II and V) do not allege an underlying tort; however, whatever the tort is that they are alleging, it is clearly supported by allegations founded in rights created by the MOUs.  For example, the MOUs must be analyzed to determine whether the 2013 MOU created a "separate and unequal" seniority system; false statements were made about the seniority system; DND workers received disproportionate discipline; DND workers were denied access to jobs for which they were eligible based on seniority; the DND workers were denied access to job training; or the dispatch system deviated from standard procedures used for CNC workers and the standard practice for other Extra Lists.  Compl. ¶¶ 75(a), (d), (e), 94(b), (c), (d).

Likewise, the breach of fiduciary duty counts (Counts III and IV) demand the same analysis.  Under Georgia law, a breach of fiduciary duty claim "requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."  *Atwater*, 626 F.3d at 1183.  Other than a few vague allusions, Plaintiffs do not explain the basis for the fiduciary duty that the Union Defendants supposedly owed them.  Thus, like in *Atwater*, the court must interpret the CBAs to determine whether a fiduciary duty actually exists.  626 F.3d at 1183; *see also Cobb v. Int'l Longshoremen's Ass'n Loc. No. 1414 Savannah Georgia*, No. CV414-182, 2015 WL 5595827, at *2 (S.D. Ga. Sept. 21, 2015) (state claim that "relies on the violation of a duty created solely by a collective bargaining agreement, and which does not exist absent that agreement . . . is preempted by § 301") (citing *Atwater v. Nat'l*

12

*Football League Players Ass'n*, 626 F.3d 1170, 1174 (2010)).  The court must also interpret the CBA to assess whether Union Defendants breached a fiduciary duty as alleged, by, *e.g.*, maintaining a discriminatory seniority system that specifically disadvantaged DND workers and caused them to lose wages and benefits; failing to provide equal representation, training opportunities, and access to preferred job assignments; and failing to properly address the DND workers' complaints over their unfair treatment under the seniority plans.  Compl. ¶¶ 80(d), (e), 81(a), 85(d).

In sum, unlike the retaliatory discharge claim in *Lingle*, Plaintiffs' state law claims cannot be untethered from the CBAs.  Because resolution of Plaintiffs' state law claims are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," they are preempted by § 301 and subject to removal to this his Court.  *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. at 220.  Such questions are federal in nature, and support removal.

## II.

## THE DUTY OF FAIR REPRESENTATION COMPLETELY PREEMPTS PLAINTIFFS' CLAIMS

Removal is also warranted as complete preemption of state law claims arises where the underlying tort claim is effectively a claimed violation of a labor organization's federal duty of fair representation ("DFR").  *See Vaca v. Sipes*, 386 U.S. 171 (1967).  The DFR is a duty created by federal law in that it "is implied from a union's statutory authority under § 9(a) of the [NLRA], to act as the exclusive bargaining agent with the employer on behalf of the members of the bargaining unit it represents." *Gachett v. Retail Wholesale Dep't Store Union*, No. 2:11-CV-398-MEF, 2013 WL 1336743, at *5 (M.D. Ala. Mar. 29, 2013) (citing *Chauffeurs, Teamsters & Helpers, Loc.*

*No. 391 v. Terry*, 494 U.S. 558, 563 (1990)).  A complaint that states a DFR claim alleges a breach by the union of "a duty grounded in federal statutes and . . . federal law therefore governs [the] cause of action."  *Vaca*, 386 U.S. at 177.

The DFR "generally governs a union's conduct vis-a-vis the bargaining unit members when the union is representing them."  *Richardson v. United Steelworkers of Am.*, 864 F.2d 1162, 1166 (5th Cir. 1989); *see also BIW Deceived v. Local S6*, 132 F.3d 824, 830 (1st Cir. 1997) ("A union acting in its representative capacity owes [the DFR] to those on whose behalf it acts.").  Pursuant to this duty, *"*a union must represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *Int'l Bhd. Of Elec. Workers v. Foust,* 442 U.S. 42, 47 (1979); *see also Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 67 (1991) (the DFR "applies to all union activity, including contract negotiation.").  A union therefore violates the DFR when it treats a member of the collective bargaining unit in a manner that is "arbitrary, discriminatory, or in bad faith." *Vaca*, 86 U.S. at 190.

As Union Defendants set forth in the Notice of Removal, Plaintiffs' state-law claims all invoke rights derived from the DFR and thus are completely preempted.  *See* ECF #1; *see also See Johnson v. UFCW, Local No. 23*, 828 F.2d 961, 963, 967 (3d Cir. 1987) (negligence and fraud claims are preempted by the DFR and construing the claims as a DFR claim); *In re Carter*, 618 F.2d 1093, 1104 (5th Cir. 1980) (district court has federal question jurisdiction under DFR over claims that allege unions discriminated against plaintiff by maliciously conspiring to deprive him of employment).

In their Motion to Remand, Plaintiffs do not deny that their state law claims arise under the DFR.  Nor do they contend with any of the cases cited by the Union Defendants

holding that the DFR completely preempts state law. Instead, Plaintiffs rely entirely on a misreading of the holding in *Vaca*. *See* ECF #38, at p. 7. In *Vaca*, the Supreme Court formalized the standard for bringing a breach of DFR claim and held that federal law governs such cases. 386 U.S. at 190. Though *Vaca* did not preclude state courts from having jurisdiction over DFR claims in the first instance, the issue of removal was not addressed, let alone discussed, by the Court.

Courts have since clarified that federal courts **do** have removal jurisdiction over state law claims that implicate the DFR. *See Richardson*, 864 F.2d at 1170 (under *Vaca*, DFR completely preempts state law); *BIW Deceived*, 132 F.3d at 830 (under *Vaca*, district courts possess federal question jurisdiction over state law claims that implicate the DFR); *Thomas v. Letter Carriers*, 225 F.3d at 1158 ("Where a plaintiff's allegations fall within the scope of the duty of fair representation, federal labor law governs and ordinarily preempts any state-law claims based on those allegations." (citing *Vaca*)); *Gachett*, 2013 WL 1336743, at *5 (under *Vaca*, state law tort claims for misrepresentation, fraud, negligence/wantonness, breach of contract, and bad faith were completely preempted by federal law because they all "implicate[d] the federal duty of fair representation"); *Skorupski v. Dale C. Rossman, Inc.,* No. 5:07-CV-447-OC-10GRJ, 2009 WL 10705997, at *4 (M.D. Fla. Sept. 28, 2009), report and recommendation adopted, No. 5:07-CV-447-OC-10GRJ, 2009 WL 10705996 (M.D. Fla. Nov. 6, 2009) (under *Vaca*, plaintiffs' claims for violation of property and privacy rights were completely preempted); *Davis v. Cargill Inc., No. 2:12-CV-704-MEF*, 2013 WL 1294678, at *4 (M.D. Ala. Mar. 28, 2013) (affirming district court's jurisdiction over breach of contract and tort claims arising under union's representational duties).

As the Fifth Circuit explained in *Richardson*:

> We hold that where the NLRA federal law duty of fair representation, actionable in federal court, preempts a state law claim, the suit asserting such a claim arises under section 1337 and may be removed to federal court just as the suit asserting state law claims preempted by section 301 of the NLRA may be removed under *Avco* and its progeny. *Avco* recognized removal based on section 301's complete, displacing preemption of state law because of congressional intent that federal (and state) courts create and administer a comprehensive body of *federal* law for the court enforcement of collective bargaining agreements.

864 F.2d at 1169–70; *see also Davis v. Cargill Inc.,* 2013 WL 1294678, at *4 ("Like with § 301, state law claims alleging conduct within the union's duty of fair representation are subsumed by this duty and, therefore, are preempted.).   Thus, state-law claims, like Plaintiffs,' that arise under the DFR are completely preempted by federal law and removable to federal court.  *See Gachett*, 2013 WL 1336743, at *5.

Aside from mischaracterizing the holding in *Vaca*, Plaintiffs' only other argument is a misplaced reliance on the well-pleaded complaint rule.  But when Plaintiffs invoke rights derived from a union's representational duties, courts "look beneath the face of the complaint to divine the underlying nature of a claim, to determine whether the plaintiff has sought to defeat removal by asserting a federal claim under state-law colors, and [] act accordingly."  *BIW Deceived*, 132 F.3d at 831 (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 (1981).  "In other words, a plaintiff may not, by the expedient of artful pleading, defeat a defendant's legitimate right to a federal forum."  *Id.*

The First Circuit explained in the context of DFR claims:

> If the claim appears to be federal in nature—that is, if it meets the applicable test for one that arises under federal law—then the federal court must recharacterize the complaint to reflect that reality and affirm the removal despite the plaintiff's professed

16

> intent to pursue only state-law claims.  . . . **[W]e hold that a district court possesses federal question jurisdiction when a complaint, though garbed in state-law raiment, sufficiently asserts a claim implicating the duty of fair representation.** We also hold, as a logical corollary, that DFR preemption warrants resort to the artful pleading doctrine.

*Id.* (emphasis added).

Plaintiffs cannot avoid the district court's jurisdiction here by "garb[ing]" their federal claims in "state-law raiment." *See id.*   The gravamen of Plaintiffs' state-law claims is that Union Defendants failed to represent the DND workers fairly when negotiating and administering the MOUs, in obtaining ratification of the agreements, in processing their grievances, and in addressing their complaints about seniority.   Compl., ¶¶ 24-30, 32-49, 56-63, 73-75, 78-81, 84-88, 91-95.

These allegations, taken together, amount to nothing more than claims that Union Defendants breached the DFR by acting arbitrarily or discriminatorily and/or in bad faith when representing the DND workers.  *See, e.g.*, *id.* at ¶ 79 (alleging that certain Union Defendants violated their duty to represent DND workers "fairly and without discrimination").  In this regard, Plaintiffs summarize the allegedly illegal actions of the Union Defendants as "leverag[ing] the union's supposed duty of fair representation to actually undermine the interests of a specific group of members. Union officials who should have advocated for equal treatment of all members instead colluded with management to preserve a discriminatory system that benefited traditional Clerks and Checkers at the expense of Deck and Dock workers."  *Id*. at ¶ 46; *see also* ¶ 73 (DND workers "deprive[ed] [of] fair representation"); ¶88 (DND workers suffered "loss of fair representation in the union").

All of Plaintiffs' state-law claims are based on Union Defendants' actions during collective bargaining and other representational activities.  *See O'Neill*, 499 U.S. at 77 (broadly characterizing the duty of fair representation to cover negotiation, administration, and enforcement of collective-bargaining agreements).  For example, the state RICO charge (Count I) alleges that the RICO Defendants denied DND workers "equal access to the benefits of union membership," Compl., ¶ 58(d); failed to provide DND workers "equal protection" under the MOUs, ¶ 53; and manipulated the seniority system to allocate premium job opportunities, higher pay rates, and enhanced benefits to clerks and checkers, ¶ 58(b).  Likewise, the conspiracy charges (Counts II and V) allege that the relevant Defendants deprived them of fair representation, equal benefits, and equal employment opportunities within the union, *id.* at ¶ 73; created and implemented the discriminatory 2013 MOU that established a separate and unequal seniority system, ¶ 75(a); implemented disproportionate disciplinary actions against deck and dock workers, ¶ 75(d); created a separate dispatch system for Deck and Dock workers that deviated from the standard procedures, ¶ 94(b); and manipulated the hiring hall procedures to favor certain workers over others based on company preferences rather than union principles, ¶ 95(e).  These allegations all implicate the union's role as Plaintiffs' exclusive bargaining representative.

The breach of fiduciary duty charges (Count III and IV) are also supported by allegations invoking the DFR.  Plaintiffs allege that the relevant Defendants failed to abide by the proper implementation of the MOUs in a fair and non-discriminatory manner, ¶ 80(a); failed to provide equal representation, training opportunities, and access to preferred job assignments, ¶ 80(d); created and maintained a discriminatory dual

seniority system that specifically disadvantaged deck and dock workers, ¶ 80(e); and failed to properly address grievances filed with the local seniority board regarding discriminatory practices, ¶ 85(d).  These allegations assert a breach of the DFR implied by the union's status as Plaintiffs' exclusive bargaining representative.  Even though Plaintiffs say these are fiduciary duty claims, they cannot point to any fiduciary duty that Union Defendants actually owed to Plaintiffs.  That is because the only "duty" owed to Plaintiffs by their union is the DFR.  *See Miranda v. Nat'l Postal Mail*, 219 Fed.Appx. 340, 343 (5th Cir.2007) (holding that the plaintiff's claim for breach of fiduciary duty was preempted because "the duty allegedly breached by the [d]efendants ar[ose] from their status as [the plaintiff's] collective bargaining representatives, [and] thus ... [the plaintiff's] claims [were] ... properly characterized as duty of fair representation claims"); *Clark v. Newport News Shipbuilding & Dry Dock Co.*, 937 F.2d 934, 938 (4th Cir.1991) ("[I]n order to point to a duty beyond the duty of fair representation [that a union owes], the employee must be able to identify specific language in the agreement creating an additional obligation or right.").  Accordingly, courts routinely find that the DFR preempts state law claims for breach of fiduciary duty.  *E.g.*, *Towns v. Directors Guild of Am., Inc.*, No. 1:19-CV-03248, 2020 WL 4001131, at *5 (N.D. Ga. July 15, 2020), aff'd, No. 21-12044, 2022 WL 169017 (11th Cir. Jan. 19, 2022) (finding that DFR as a basis to preempt breach of fiduciary duty claim); *Taylor v. Giant Food, Inc.*, 438 F. Supp. 2d 576, 584 (D. Md. 2006) (breach of fiduciary claim completely preempted by the DFR); *Williams v. Amalgamated Transit Union Loc. 689*, 245 F. Supp. 3d 129, 136 (D.D.C. 2017), aff'd, No. 17-7076, 2017 WL 4217248 (D.C. Cir. Aug. 23, 2017) (breach of fiduciary duty claim preempted by DFR).

Thus, no matter how they are stated, each of the first five of Plaintiffs' claims clearly arise under the DFR.  Plaintiffs concede as much in their Motion, when they characterize their lawsuit as alleging that "the process by which the [CBAs] and [MOUs] were formed was corrupt."  (ECF #18, at p. 2.)  This "process" by which CBAs are formed is called contract negotiations.   And the Supreme Court has already explained that the DFR applies to contract negotiations.  *O'Neill*, 499 U.S. at 67 (holding that the DFR applies to contract negotiations); *Communications Workers of Am. v. Beck*, 487 U.S. 735, 743 (1988) ("This jurisdiction to adjudicate fair-representation claims encompasses challenges leveled not only at a union's contract administration and enforcement efforts, but at its negotiation activities as well."); *see also Parker v. Connors Steel Co*., 855 F.2d 1510, 1519-1520 (11th Cir. 1988) (mere negligence in contract negotiations does not constitute a DFR violation).

Like other DFR claims, a "violation of the [u]nion's duty of fair representation in the context of negotiations [] is established if the [u]nion's conduct in negotiations is arbitrary, irrational, or undertaken in bad faith."  *Parker v. Connors Steel Co*., 855 F.2d 1510, 1519-1520 (11th Cir. 1988).  The Eleventh Circuit quoted the Supreme Court's discussion of a union's duty during contract negotiations as follows:

> Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. . . . The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Id.* (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38 (1953)).

Accordingly, Plaintiffs' allegations—regardless of how they are labeled—allege a breach of the union's federal DFR.    Indeed, Plaintiffs' repeated references to "influencing" CBAs and the process by which those agreements were formed underscore the integral role that federal labor law plays in resolving their claims. This supports federal jurisdiction and Plaintiffs' Motion to Remand should be denied.

## CONCLUSION

The Union Defendants respectfully request that Plaintiffs' Motion to Remand be denied.


This 22nd day of October 2025.


CHARLES HERMAN LAW

/s/ Charles Herman
Charles Herman
Georgia Bar No. 142852
*Attorney for ILA Local 1475 Clerks and Checkers Union, Inc., Ricky DeLoach, Frank Ryan, Jr., Steve Sims, and Michael Parsons*

127 Abercorn Street, Suite 208
Savannah, Georgia 31401
Phone: (912) 244-3999; (912) 257-7301 Facsimile
charles@charleshermanlaw.com


MAZZOLA MARDON, P.C.
39 Broadway, 34th Floor
New York, NY 10004
(212) 425-3240

*Attorney for Defendants Harold Daggett, Dennis Daggett, and Benny Holland, Jr.*

BIGNAULT & CARTER, LLC
W. Paschal Bignault
130 Canal Street, Suite 401
Pooler, GA  31322

*Local Counsel for Defendants Harold Daggett, Dennis Daggett, and Benny Holland, Jr.*

21

1003-655
146610

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA,
SAVANNAH DIVISION

-----------------------------------------------------------------X

STEPHEN COWART, JOSEPH HURST, and          :
KENNETH RAHN, JR.,                         :
                                           :     4:25-cv-00199-RSB-CLR
                        Plaintiffs,        :
                                           :
          v.                               :
                                           :
ILA LOCAL 1475 CLERKS AND CHECKERS         :
UNION, INC., GEORGIA STEVEDORE             :
ASSOCIATION, BENNY HOLLAND, JR., RICKY     :
DELOACH, FRANK RYAN, JR., STEVE SIMS,      :
NORMAN MASSEY, TRACY O'CONNELL,            :
MICHAEL PARSONS, DENNIS DAGGETT,           :
ALAN ROBB, HAROLD DAGGETT, and JOHN        :
DOE(S) 1-10,                               :
                                           :
                        Defendants.        :
                                           :
-----------------------------------------------------------------X

### *CERTIFICATE OF SERVICE*

This is to certify that I have this day served a copy of the foregoing document to all parties registered for notice and via electronic mail to Plaintiffs' attorney as follows:

Bryan J. Henderson, Esq.
Guilmette Henderson, LLC
1355 Peachtree St. NE
Suite 1125
Atlanta, GA 30309
bryan@guilmettehenderson.com

This 22nd day of October 2025.

CHARLES HERMAN LAW

/s/ Charles Herman
Charles Herman
Georgia Bar No. 142852
*Attorney for ILA Local 1475 Clerks and Checkers Union, Inc., Ricky DeLoach, Frank Ryan, Jr., Steve Sims, and Michael Parsons*

127 Abercorn St., Ste. 208, Savannah, GA 31401
Phone: (912) 244-3999; (912) 257-7301 Facsimile
charles@charleshermanlaw.com

1003-655
146610