IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

STEPHEN COWART, JOSEPH HURST, and
KENNETH RAHN, JR.,

     Plaintiffs,

     v.

ILA LOCAL 1475 CLERKS AND
CHECKERS UNION, INC., GEORGIA
STEVEDORE ASSOCIATION, BENNY
HOLLAND, JR., RICKY DELOACH,
FRANK RYAN, JR., STEVE SIMS,
NORMAN MASSEY, TRACY O'CONNELL,
MICHAEL PARSONS, DENNIS DAGGETT,
ALAN ROBB, HAROLD DAGGETT, and
JOHN DOE(S) 1-10,

     Defendants.

CIVIL ACTION NO.: 4:25-cv-00199

**O R D E R**

Plaintiffs Stephen Cowart, Joseph Hust, and Kenneth Rahn, Jr., filed this action in the

Superior Court of Chatham County, Georgia, against the following Defendants: International

Longshoremen's Association Local 1475 Clerks and Checkers Union, Inc., ("Local 1475");

Georgia Stevedore Association, Inc., ("GSA"); Benny Holland, Jr.; Ricky Deloach; Frank Ryan,

Jr.; Steve Sims; Norman Massey; Michael Parsons; Dennis Daggett ("Dennis"); Alan Robb;

Harold Daggett ("Harold"); John Does 1–5; and John Does 6–10.[1]  Defendants removed the case

to this Court on the basis of federal question jurisdiction.  (Doc. 1.)  Currently before the Court is

Plaintiffs' Motion to Remand, (doc. 38), and several motions to dismiss by the various Defendants:

---

[1] Plaintiffs' Complaint also alleged claims against Defendant Tracy O'Connell.  (Doc. 1-1.)  However, the Court has since dismissed without prejudice Defendant O'Connell pursuant to Plaintiffs' Notice of Voluntary Dismissal.  (Docs. 51 & 52.)

Harold, Dennis, and Holland's Motion to Dismiss, (doc. 19); Local 1474, Deloach, Ryan, Sims, and Parsons's Motion to Dismiss, (doc. 25); and GSA's Motion to Dismiss, (doc. 33). For the below reasons, the Court **DENIES** Plaintiffs' Motion to Remand, (doc. 38), and **GRANTS** each of the Defendants' motions to dismiss, (docs. 19, 25 & 33). Plaintiffs' Complaint is thus **DISMISSED**. (Doc. 1-1.)

## BACKGROUND

### I.      Factual Background

Plaintiffs are "'Deck and Dock' workers" in the Port of Savannah (the "Port"), "whose job is . . . to physically load and unload cargo coming on and off ships at port, while also performing related clerical duties." (Doc. 1-1, pp. 6–7.) Defendants are various organizations and individuals affiliated with organized labor at the Port. (Id. at pp. 3–6.) Defendants Holland, Dennis, and Harold are each executives at the International Longshoremen's Association ("ILA"), a labor organization that represents longshore workers in port cities on the East and Gulf Coasts of the United States. (Id. at pp. 3, 5–6.) Holland is the ILA's Executive Vice President Emeritus, Dennis is the ILA's Executive Vice President, and Harold is the ILA's President (together, the "Executive Defendants"). (Id.) Defendant Local 1475 is a local affiliate of the ILA which represents workers in the Port. (Id. at p. 3.) Defendants Deloach, Ryan, Sims, and Parsons have each held leadership positions in Local 1475: Ryan and Sims are both former Presidents; Deloach is the current President; and Parsons is the Vice President–Deck and Dock (together, with Local 1475, the "Local Defendants"). (Id. at pp. 4–5.) Defendant GSA is a corporation that serves as the

collective-bargaining representative for stevedoring companies that employ Port workers.[2]  (Id. at p. 3.)

Prior to 2011, Local 1475 did not represent Deck and Dock workers like Plaintiffs.  (Id. at p. 7.)  Instead, Local 1475 only represented "'Clerks and Checkers,' whose sole job is to track and document cargo going on and off ships at port."  (Id. at pp. 6–7.)  This changed in 2011 when a group of non-union Deck and Dock workers directly employed by the Port's stevedoring companies filed a grievance with the National Labor Relations Board ("NLRB"), arguing that they should be represented by the ILA.  (Id. at p. 7.)  After winning their grievance, the Deck and Dock workers worked from 2011 to 2013 with ILA Vice President Holland to integrate Deck and Dock work into the operations of Local 1475.  (Id.)  On August 8, 2013, Local 1475 and the GSA[3] entered a Memorandum of Understanding that formalized Deck and Dock workers' membership in Local 1475 (the "2013 MOU").  (Id. at p. 8.)  The 2013 MOU is attached to Plaintiffs' Complaint and was signed by Deloach on behalf of Local 1475 and by GSA President Norman Massey on behalf of the GSA.  (Id. at p. 38.)  On behalf of the ILA, ILA Vice President Holland signed on a space marked "APPROVED."  (Id.)

Plaintiffs allege that the 2013 MOU "robbed [them] of many of the benefits of union membership."  (Id. at p. 9.)  In particular, they claim it "created a two-tiered caste system that put the Clerks and Checkers on the higher tier, and the Deck and Dock workers on the lower tier," by implementing the following terms: a "separate seniority classification system that denied the Deck and Dock workers the ability to advance in seniority in the Local at the same pace as their Clerks and Checkers brothers"; a "restriction on jobs offered to the Deck and Dock workers that impaired

---

[2]  (See also doc. 33, p. 11 (Defendant GSA stating in its Motion to Dismiss that "GSA represents its direct employer members."); doc. 50 (Plaintiffs' Response in Opposition to Defendant GSA's Motion to Dismiss, not contradicting GSA's description of itself).)

their ability to accumulate qualifying hours in the Local and achieve seniority"; and terms that created "[q]uality of life issues, including . . . [terms that] specifically singled out [Deck and Dock workers] as not allowed to request relief at the first meal break of a shift." (Id. at p. 8.)

Plaintiffs allege that the leadership of Local 1475 "were all longtime Clerks [and] Checkers, and [they] never actually wanted to bring Deck and Dock workers into the Local," and that the GSA "longed for the days of hiring Deck and Dock workers directly on their own payrolls without having to pay the salary and benefits associated with hiring union labor." (Id. at p. 10.) Thus, according to Plaintiffs, Local 1475 and the GSA created a "corrupt scheme" to drive the Deck and Dock workers out of Local 1475. (Id.) "After years of subjugation [of Deck and Dock workers] under the 2013 MOU," the leadership of Local 1475 and the GSA wrote and proposed the 2019 Seniority Agreement (the "2019 SA"). (Id. at p. 9.) Though the 2019 SA was branded as a good-faith attempt to resolve conflicts within Local 1475, Plaintiffs allege that its true purpose—"hidden in dense bureaucratic language and not immediately evident to the rank-and-file union members"—was "to make the second-class citizenship of the Deck and Dock workers permanent." (Id. at pp. 9, 11.) After drafting the 2019 SA, which required majority support for ratification, Local 1475 and the GSA "fraudulently influenced" Local 1475 members to vote for the agreement by "engaging in malicious whisper campaigns and electronic communications." (Id. at pp. 9–10.) The campaigns worked and the 2019 SA passed by a comfortable margin, with multiple Deck and Dock workers supporting the agreement without recognizing the dangers hidden within the document. (Id. at p. 10.)

After describing the 2013 MOU and 2019 SA, Plaintiffs further detail a scheme by Defendants to deprive Deck and Dock workers of the benefits of union membership, and they also reference various proceedings apparently related to that scheme. (Id. at pp. 11–15.) Plaintiffs

allege that, "from 2013 to the present day," Defendants have engaged in a scheme whereby "[u]nion officials . . . colluded with management to preserve a discriminatory system that benefited traditional Clerks and Checkers at the expense of Deck and Dock workers." (Id. at pp. 14–15.) According to Plaintiffs, "[t]he conspiracy between the union leadership and the GSA was particularly insidious [because] it leveraged the union's supposed duty of fair representation to actually undermine the interests of a specific group of members." (Id. at p. 14.)  Plaintiffs, in particular, state that:

> [T]he scheme perpetrated by the Defendants was designed to extract maximum value from the Deck and Dock workers while providing them minimal benefits. The Local and the GSA conspired to create a system where Deck and Dock workers would pay full union dues, contribute valuable work hours to the union's overall tally, and increase the union's bargaining power, while systematically denying them the full benefits and protections that should accompany union membership.

(Id. at p. 13.)

As evidence of such a scheme, Plaintiffs point to supposed inequities regarding finances, seniority, and job access.  (Id. at pp. 13–15.)  Plaintiffs state that "[t]he financial aspects of th[e] scheme were particularly exploitative," and that "Deck and Dock workers were required to pay the same dues and fees as Clerks and Checkers but received substantially less in return." (Id. at p. 13.) The "contribution rates to pension and welfare benefits" for Deck and Dock workers "were set at lower rates than their Clerk and Checker counterparts, and [Deck and Dock workers] were paid at base rates for jobs that previously commanded premium pay." (Id.)  Plaintiffs also allege that union leadership used the added revenue from Deck and Dock workers' dues to "enhance the position" of Clerks and Checkers.  (Id.)  Plaintiffs also state that "manipulation of the seniority system" was "[c]entral to this scheme." (Id. at p. 14.)  Plaintiffs allege that Defendants "create[d] a separate seniority classification for Deck and Dock workers [that] impos[ed] unreasonable barriers to advancement." (Id.)  According to Plaintiffs, this "dual seniority system" effectively

created a "permanent underclass" within the Local 1475 by "ensur[ing] that even experienced Deck and Dock workers would remain subordinate to more recently hired Clerks and Checkers." (Id.)  Lastly, Plaintiffs allege that Defendants "deliberately restricted Deck and Dock workers' access to better-paying and more desirable jobs" by "limiting them to only two job types despite their qualifications for a broader range of positions."  (Id.)  Plaintiffs assert that this job-access restriction "had the dual effect of limiting Deck and Dock workers' earning potential and their ability to accumulate the hours necessary for seniority advancement."  (Id. at p. 14.)

Plaintiffs reference several appeals, petitions, investigations, and proceedings that supposedly concerned the inequitable treatment of Deck and Dock workers.  Immediately after alleging that the 2019 SA "calcified the existing inequities between members," Plaintiffs refer to the 2013 MOU and state that "[t]he Deck and Dock workers . . . appealed the 2013 MOU to the ILA South Atlantic and Gulf Coast District . . . leadership and the leadership of the [ILA]."  (Id. at p. 11.)  Plaintiffs then state that, "[b]y 2021, the Deck and Dock workers had petitioned the District and the [ILA] to place the Local into an emergency trusteeship in order to reach an unbiased solution to the seniority problems facing the Deck and Dock workers."  (Id.)  Apparently in relation to this petition, Local 1475 Vice President–Deck and Dock Parsons sent letters to ILA President Harold on May 5–6, 2021, "formally requesting intervention and temporary trusteeship." (Id.)  Plaintiffs also allege that, on June 4, 2021, the ILA's "Executive Council" issued a report "finding that there was sufficient basis to impose an emergency trusteeship . . . ."  (Id.)  Even though ILA President Harold had "the power to fix the seniority system unilaterally," the ILA appointed a committee to investigate the "seniority issues" and propose a solution.  (Id.)  That committee "advocated for only partial integration."  (Id.)  Ultimately, "despite overwhelming evidence it was necessary," the ILA did not impose an emergency trusteeship.  (Id. at p. 12.)

Plaintiffs claim, without further explanation, that this decision "condemned the Deck and Dock workers to another corrupt investigation rife with deceptive use of electronic communications designed to achieve a rigged outcome." (Id.)

Plaintiffs also mention several NLRB proceedings, apparently related to Defendants' "scheme," during which various Defendants supposedly made "false statements." (Id. at p. 15.) During a 2019 NLRB proceeding "related to the seniority system," "representatives of the Local and the GSA made false statements to the NLRB regarding the fairness and non-discriminatory nature of the separate seniority system" which were "material to the NLRB's determination regarding the lawfulness of the union's practices." (Id.) Likewise, in 2022, during "NLRB Case No. 10-CB-288927," representatives of Local 1475 submitted false statements about the implementation of the MOU and the fairness of the hiring hall seniority rules which were "material to the NLRB's investigation of alleged unfair labor practices." (Id.) Finally, "[t]he Local also submitted false statements to the NLRB in Case No. 10-CB-288719, filed January 2022, misrepresenting the nature and implementation of the waiver provision signed to be placed on the emergency personnel list, and falsely characterizing the merger of the Deck/Dock list with the Clerk/Checker list as non-discriminatory and in compliance with union obligations." (Id.)

## II.    Procedural Background

Plaintiffs filed this lawsuit in the Superior Court of Chatham County, Georgia, and Defendants removed the action to this Court on the basis of federal question jurisdiction. (Doc. 1.) Plaintiffs' Complaint alleges seven causes of action against the various Defendants. (Doc. 1-1.) Three counts are for conspiracy. Count I alleges violations of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act against Defendants Local 1475 and GSA. (Id. at pp. 15–22.) Count II is for "Civil Conspiracy (Unfair Practices)," against Holland, Local 1475, Deloach,

Ryan, Sims, GSA, Massey, and John Does 1–5.  (Id. at pp. 22–24.)  And Count V is for "Civil Conspiracy (Shipping Practices)," against Holland, Local 1475, Deloach, Ryan, Sims, GSA, and John Does 6–10.  (Id. at pp. 28–30.)  Two counts are for breach of fiduciary duty.  Count III alleges "Breach of Fiduciary Duty (Creation of Unfair Practices)," against Local 1475, GSA, and "the individual union leaders named herein."  (Id. at pp. 24–26.)  Count IV alleges "Breach of Fiduciary Duty (Failure to Address Complaints)," against Local 1475, Parsons, Dennis, Harold, Robb, and John Does 1–5.  (Id. at pp. 26–28.)  The remaining two claims, Counts VI and VII, are against all Defendants and seek to recover punitive damages and attorneys' fees, respectively.  (Id. at pp. 30–31.)

Plaintiffs have not submitted proof of service for Defendants Massey, Robb, or John Does 1–10, and none of those Defendants have entered an appearance.  Each of the other Defendants has filed a Motion to Dismiss the Complaint.  The Executive Defendants jointly submitted a Motion to Dismiss to the claims against them: Counts II and V against Holland and Count IV against Dennis and Harold.  (Doc. 19.)  Plaintiffs filed a Response, (doc. 48), and the Executive Defendants filed a Reply, (doc. 59).  Likewise, the Local Defendants filed a Motion to Dismiss each of the claims against them: Counts I–VII against Local 1475; Counts I and V against Deloach, Ryan, and Sims; and Count IV against Parsons.  (Doc. 25.)  Plaintiffs filed a Response, (doc. 49), and the Local Defendants filed a Reply, (doc. 60).  Finally, the GSA filed its own Motion to Dismiss each of the claims against it: Counts I, II, III, V, VI, and VII.  (Doc. 33.)  Again, Plaintiffs filed a Response, (doc. 50), and the GSA filed a Reply, (doc. 58).

In addition to the various Motions to Dismiss filed by Defendants, Plaintiffs have filed a Motion to Remand the case to the superior court.  (Doc. 38.)  Responses in opposition to this

Motion were filed by the GSA, (doc. 38), and jointly by the Executive Defendants and the Local Defendants (together, the "Union Defendants"), (doc. 57).

## STANDARD OF REVIEW

First, relevant to Plaintiffs' Motion to Remand, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (internal citations omitted). As such, a defendant may only remove an action from state court if the federal court would possess jurisdiction over the subject matter. See 28 U.S.C. § 1441(a). A federal district court has original jurisdiction over two types of civil actions: (1) those arising under federal law ("federal question jurisdiction"); and (2) those involving diversity of citizenship ("diversity jurisdiction"). See 28 U.S.C. §§ 1331, 1332. Additionally, even if a court does not have original jurisdiction over a claim, it may still hear it by invoking "supplemental jurisdiction" if the non-qualifying claim is "so related to claims in the action [that are] within [the] original jurisdiction [of the court] that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); see also Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1563 (11th Cir. 1994).

On a motion to remand, the removing party bears the burden of establishing that the federal court has either original or supplemental jurisdiction over each of the claims in the removed complaint. Williams v. Best Buy Co., 269 F.3d 1316, 1319 (11th Cir. 2001); see also, e.g., Regenicin, Inc. v. Lonza Walkersville, Inc., 997 F. Supp. 2d 1304, 1310 (N.D. Ga. 2014) ("The removing party must prove jurisdiction by showing that each claim invokes either original or supplemental jurisdiction."). Removal jurisdiction is strictly construed with all doubts resolved in favor of remand. Mann v. Unum Life Ins. Co. of Am., 505 F. App'x 854, 856 (11th Cir. 2013).

If, when ruling on a motion to remand, a district court finds that there is federal jurisdiction over every claim in a removed complaint—whether through federal question, diversity of citizenship, supplemental jurisdiction, or on some other basis—then the court may properly hear the entire complaint and deny the remand.  28 U.S.C. § 1441.  Alternatively, if a district court finds that it has jurisdiction over some, but not all, of the claims in a complaint, then the court turns to Section 1441(c).  This provision directs that, if jurisdiction over the qualifying claims is based on the presence of a federal question, then the court retains those claims, severs the rest of the complaint, and remands the non-qualifying claims to state court.  Id. § 1441(c)(2); see also Capps v. Fla. Highway Patrol, No. 17-cv-60365, 2017 WL 1436077, at *2 (S.D. Fla. Apr. 24, 2017).

Second, as to Defendants' motions to dismiss, "[t]o survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  However, this tenet "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft, 556 U.S. at 678.  Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Ashcroft, 556 U.S. at 678 (internal quotation marks and citation omitted).  Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

## DISCUSSION

The "well-pleaded complaint rule" typically empowers plaintiffs to avoid federal jurisdiction by relying exclusively on state law on the face of their complaint.  See Dunlap v. G&L Holding Grp., Inc., 381 F.3d 1285, 1290 (11th Cir. 2004).  "There does exist, however, an 'independent corollary' to the well-pleaded complaint rule, known as the 'complete pre-emption' doctrine." Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987) (internal citation omitted) (citing Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 22 (1983)). The complete pre-emption doctrine transforms certain actions that purport to raise only state-law causes into federal claims when the action is "in reality, 'purely a creature of federal law.'" Geddes v. Am. Airlines, Inc., 321 F.3d 1349, 1353 (11th Cir. 2003) (quoting Caterpillar Inc., 482 U.S. at 393).  If a supposed state claim is completely preempted, then federal question jurisdiction exists and the claim is treated as one arising under federal law.  Id.

The Supreme Court has cautioned that federal law should completely preempt state law only when a federal statute has "extraordinary" preemptive force.  Id. (citing Caterpillar Inc., 482

11

U.S. at 393). One of the few statutes that the Court has identified as possessing such preemptive power is Section 301 of the Labor Management Relations Act. See Dunlap, 381 F.3d at 1291. That statute states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has interpreted § 301(a) as not only conferring federal jurisdiction but also mandating that federal courts "fashion a body of federal common law to be used to address disputes arising out of labor contracts." Atwater v. Nat'l Football League Players Ass'n, 626 F.3d 1170, 1176 n.6 (11th Cir. 2010) (quoting Allis–Chalmers Corp. v. Lueck, 471 U.S. 202, 209 (1985)). To ensure that uniform federal-labor principles prevail over inconsistent applications of state law, the Court has thus established that § 301 completely preempts state-law claims that arise from, or "depend[] on analysis of," a collective-bargaining agreement. Caterpillar Inc., 482 U.S. at 394; see also Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405–06 (1988). Once a court determines that complete preemption applies to a state-law claim, it may exercise federal-question jurisdiction over that claim and, furthermore, has discretion to either convert the state claim into a Section 301 claim, or dismiss it as preempted. Allis–Chalmers, 471 U.S. at 220–21; see also Dweck v. City of Mia. Springs, No. 1:18-cv-23320, 2020 WL 6081656, at *4 (S.D. Fla. Oct. 14, 2020).

Here, Defendants argue that Plaintiffs' state claims are completely preempted under Section 301 because they require interpretation of the collective bargaining agreements in the 2013 MOU and the 2019 SA. (Docs. 19, 25 & 33.) The Court agrees. For the below reasons, complete

preemption makes Plaintiffs' claims removable based on federal question jurisdiction but also, however, requires that the claims be dismissed.

### I.    Plaintiffs' Motion to Remand is Denied.

A state-law claim is preempted by Section 301 "when resolution of . . . [the] claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Allis–Chalmers, 471 U.S. at 220.  To determine whether a claim requires analysis of a collective bargaining agreement, Eleventh Circuit courts are to "look at the elements of each state law claim."  Jackson v. US Steel Corp., 763 F. App'x 805, 807 (11th Cir. 2019) (citing Lightning v. Roadway Express, Inc., 60 F.3d 1551, 1557 (11th Cir. 1995)).  A state tort claim is preempted, and thus removable to federal court, when proving any of its elements would be "'inextricably intertwined with consideration of the terms of [a] labor contract.'"  Allis–Chalmers, 471 U.S. at 213; see also Geddes, 321 F.3d at 1353 (complete preemption "transforms [a] state claim into one arising under federal law, thus creating the federal question jurisdiction requisite to removal to federal courts").

Plaintiffs argue that their state-law claims are not preempted because, rather than challenging the terms of the 2013 MOU or 2019 SA, the claims allege only that "the process by which [the] collective-bargaining agreements . . . were formed was corrupt."  (Doc. 38, p. 2.) Defendants, on the other hand, reject the contention that Plaintiffs' claims only challenge the "process" of forming the agreements.  (Doc. 56, p. 4; doc. 57, p. 6.)  Rather, according to Defendants, Plaintiffs' claims also allege that the substantive rights created by the terms of the CBAs, as well as the inequitable enforcement of those terms, disadvantaged Deck and Dock workers.  (Doc. 56, p. 4; doc. 57, p. 6.)  The Court agrees with Defendants because it would have to analyze the CBAs to resolve all of Plaintiffs' claims.

First, Plaintiffs' conspiracy claims—whether pled under Georgia's Civil RICO Act (Count I) or as a common law "civil conspiracy" claim (Counts II and V)—require analysis of the CBA. As an element of the RICO claim alleged in Count I, Plaintiffs must show that Defendants engaged in one of the "RICO predicate acts" enumerated in Georgia's statute. O.C.G.A. §§ 16-14-4(a)–(c); see also Ruiz v. Sewon Am., Inc., 766 F. Supp. 3d 1251, 1280–81 (N.D. Ga. 2025). Similarly, for the "civil conspiracy" claims in Counts II and V, Plaintiffs must show "a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." Rogers v. Dupree, 799 S.E.2d 1, 6 n.3 (Ga. Ct. App. 2017) (quoting Savannah Coll. of Art & Design v. Sch. of Visual Arts of Savannah, 464 S.E.2d 895, 896 (1995)). A review of Plaintiffs' Complaint reveals that all the predicate acts and torts alleged in support of the conspiracy claims require consideration of the CBAs.

For instance, Plaintiffs allege in Count I that Defendants committed the following RICO predicate acts: wire fraud in violation of 18 U.S.C. § 1343, (doc. 1-1, pp. 17–18); making False Statements in violation of O.C.G.A. §16-10-20, (id. at pp. 19–20); and Embezzlement of Union Assets in violation of 29 U.S.C. §501(c), (id. at pp. 18–19). To determine whether any of those predicate acts occurred, the Court must analyze the CBAs. To prove the predicate act of wire fraud, Plaintiffs must show Defendants used wire communications in furtherance of a "scheme to defraud," which, in turn, "requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." United States v. Martin, 803 F.3d 581, 588 (11th Cir. 2015); see also United States v. Chang, 722 F. Supp. 3d 1340, 1347 (N.D. Ga. 2024). According to Plaintiffs, Defendants' alleged wire fraud occurred during the "dispute[s] about Deck and Dock seniority" in 2019 and 2021. (Doc. 1-1, pp. 17–18.) As best the Court can tell, this a reference to the following incidents: when Defendants convinced

Deck and Dock workers to vote for the 2019 SA by misrepresenting the agreement's "dense bureaucratic language," which covertly "ma[d]e the second-class citizenship of the Deck and Dock workers permanent," (id. at pp. 9–11); when Defendants "made false statements to the NLRB" in 2019 "regarding the fairness and non-discriminatory nature of the separate seniority system," (id. at p. 15); and when Defendants failed to impose an emergency trusteeship to fix the seniority issue in 2021 despite "overwhelming evidence it was necessary," (id. at pp. 11–12).  To resolve whether Defendants mispresented the 2019 SA's "dense bureaucratic language," or the "nature of the separate seniority system" created by the CBAs, the Court must interpret the terms of those agreements.  The other predicate acts and torts that Plaintiffs allege in support of their conspiracy claims require similar analysis of the CBAs.

Likewise, to assess Plaintiffs' breach of fiduciary duty claims, the Court must interpret the CBAs to decide whether Plaintiffs have satisfied the first element of those claims and shown that a fiduciary duty exists.  Sewell v. Cancel, 771 S.E.2d 388, 184 (Ga. Ct. App. 2015) ("A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.")  Plaintiffs allege in Counts III and IV, respectively, that various Defendants owed them a fiduciary duty to "act in the best interests of all union members . . . [and] represent them fairly and without discrimination, and . . . ensure that union resources, benefits, and opportunities were distributed equitably among all members," and to "fairly and effectively address complaints regarding inequitable treatment." (Doc. 1-1, pp. 24, 26.)  To be sure, Plaintiffs do not explicitly allege these duties arise from the terms of the CBAs and, instead, vaguely suggest the duties exist "under the principles of union representation."  (Id. at p. 24.)  However, because the CBAs are what define the nature of any "union representation" at issue in this case, the Court would have to interpret those agreements to

15

decide whether, and to what extent, Plaintiffs' membership in Local 1475 created any fiduciary duties for Defendants. Atwater, 626 F.3d at 1184 (union members' breach-of-fiduciary-duty claim preempted by Section 301 because "resolution of the[] claims [was] substantially dependent on the interpretation of the CBA's language").

Because Plaintiffs' conspiracy claims (Counts I, II & IV) and fiduciary duty claims (Counts III & IV) require interpretation of the CBAs contained in the 2013 MOU and 2019 SA, they are completely preempted by Section 301. Accordingly, Defendants properly removed this case on the basis of federal question jurisdiction and Plaintiffs' Motion to Remand is **DENIED**. (Doc. 38.)

## II.    Defendants' Motions to Dismiss are Granted.[4]

Once a court determines that Section 301 completely preempts a plaintiff's state-law claims, the court has discretion to either dismiss the claims as preempted or convert them into Section 301 claims.[5] Allis–Chalmers, 471 U.S. at 220–21; see also Dweck, 2020 WL 6081656, at *4. Plaintiffs here have expressed neither the desire, nor the ability, to plead their claims under Section 301. To the contrary, they continue to maintain that their claims arise purely under Georgia law. (See generally doc. 38; see also docs. 48, 49 & 50.) Plaintiffs' claims are accordingly dismissed as preempted. See Prine v. Studio Mechs. Loc. No. 479, No. 1:23-CV-02187, 2025 WL

---

[4] In addition to seeking dismissal of the Complaint, Local 1475 also requested in the Local Defendants' Motion to Dismiss that the Court take judicial notice of certain documents not attached to the Complaint. (Doc. 25-1, p. 6.) The Court denies this request and issues its ruling based purely on the allegations and documents within Plaintiffs' Complaint.

[5] Once complete preemption applies, federal subject matter jurisdiction continues to exist over state-law claims that have been removed to federal court—even if a court declines to "convert" the state-law claims into Section 301 claims and opts for dismissal. See, e.g., Geddes, 321 F.3d at 1353 (complete preemption "transforms [a] state claim into one arising under federal law, thus creating the federal question jurisdiction requisite to removal to federal courts"); see also Jackson, 2018 WL 1931066, at *2–9 (denying motion to remand removed state-law claims, then refusing to convert them into Section 301 claims and exercising jurisdiction to dismiss the claims), aff'd, 763 F. App'x 805 (11th Cir. 2019).

2994126, at \*4 (N.D. Ga. July 21, 2025); Jackson v. U.S. Steel Corp., No. 2:17-cv-01967, 2018 WL 1931066, at \*8 (N.D. Ala. Apr. 24, 2018) ("[T]he court finds that [p]laintiff's [c]omplaint is due to be dismissed because [p]laintiff's artful pleading shows that he has no interest in pursuing federal § 301 claims against [d]efendants.").

Furthermore, even if the Court were to allow Plaintiffs' claims to proceed under Section 301, the claims would be time-barred by the applicable statute of limitations. Plaintiffs' claims are against not only their various union representatives, but also their employer—the GSA. (Doc. 1-1.) "Where an employee sues the employer for breach of the collective bargaining agreement and the union for breach of the union's duty of fair representation, the claims are known as hybrid § 301/fair representation claims." Shanks v. Potter, 451 F. App'x 815, 817 (11th Cir. 2011). The statute of limitations for such "hybrid" claims is six months. Id. All the conduct alleged in Plaintiffs' Complaint occurred prior to 2023, more than two years before Plaintiffs submitted their Complaint. (Doc. 1-1.) Accordingly, even if the Court converted Plaintiffs' state-law claims into Section 301 claims, they would be untimely.

Because Plaintiffs' claims are subject to dismissal as completely preempted by Section 301, the Court **GRANTS** Plaintiffs' motions to dismiss. (Docs. 19, 25 & 33.)

### III.    The Unserved Defendants named in Plaintiffs' Complaint are Dismissed.

Finally, though Plaintiffs' Complaint names Alan Robb and Norman Massey as Defendants, (doc. 1-1), there is no proof of service for any of these parties and none of them have entered an appearance in this case.[6] Further, the parties do not mention these Defendants at all in briefing these motions. The Court thus finds that, as to these Defendants, Plaintiffs have failed to

---

[6] The Complaint also names as Defendants "John Does 1-10." (Doc. 1-1.) "As a general matter, fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010). The Court accordingly does not consider "John Does 1-10" to be actual parties in this case.

meet Federal Rule of Civil Procedure 4(m)'s requirement that service be perfected within 90 days of removal of the Complaint—which occurred in this case on August 25, 2025. (Doc. 1.)  Pursuant to Rule 4(m), Defendants Robb and Massey are thus **DISMISSED without prejudice**.

**CONCLUSION**

For the above reasons, Plaintiffs' Motion to Remand is **DENIED**.  (Doc. 38.)  Additionally, because Plaintiffs' state-law claims are completely preempted by Section 301 of the Labor Management Relations Act, Defendants' motions to dismiss are **GRANTED**.  (Docs. 19, 25 & 33.)  Plaintiffs' Complaint is thus **DISMISSED**.  (Doc. 1-1.)  Further, the unserved Defendants, Robb, Massey, and John Does 1-10 are **DISMISSED without prejudice** pursuant to Rule 4(m). The Court **DIRECTS** the Clerk of Court to **ENTER** the appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED**, this 15th day of June, 2026.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA